

GOVERNMENT
EXHIBIT
1

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **HI-TECH PHARMACEUTICALS, INC.,** | : | |
| **and INTELLECTUAL WELLNESS,** | : | |
| **LLC,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | **CIVIL ACTION FILE NO:** |
| | : | 1:15-cv-3887-RWS |
| **IRONMAGLABS, LLC. A Nevada** | : | |
| **Limited Liability Company** | : | |
| **and ROBERT DIMAGGIO** | : | |
| | : | |
| **Defendants.** | : | |

### COMPLAINT

COMES NOW, the Plaintiffs Hi-Tech Pharmaceuticals, Inc., ("Hi-Tech") and

Intellectual Wellness, LLC, ("Intellectual Wellness") (collectively "Plaintiffs"), by

and through the undersigned counsel of record, and for its Complaint against the

Defendants IronMag Labs, LLC. ("IronMag") and Robert Dimaggio ("Dimaggio,")

(collectively IronMag and Mr. Dimaggio shall be referred to as "Defendants"), states

as follows:

### I.   THE PARTIES

1.      Hi-Tech is a corporation organized and existing under the laws of the State of

Georgia, with its principal place of business located at 6015-B Unity Drive,

Norcross, Georgia 30071. Hi-Tech sells, distributes, and manufactures high quality

dietary supplement products in the State of Georgia and throughout the United States.

2.     Intellectual Wellness is a Michigan Limited Liability Company with its principle place of business in Brighton, Michigan

3.     Intellectual Wellness is the owner by assignment of the following United States Patent: U.S. Patent No. 8,084,446, entitled "Use of DHEA Derivatives for Enhancing Physical Performance" ("the '446 patent") (attached thereto as Exhibit A).

4.     Intellectual Wellness is the owner by assignment of the following United States Patent: U.S. Patent No. 8,338,399 entitled "Use of DHEA Derivatives for Enhancing Physical Performance" ("the '399 patent") (attached thereto as Exhibit B).

5.     The above patents are herein referred to as the "Patents in Suit"

6.     Hi-Tech has been granted a license to the Patents in Suit by Intellectual Wellness which includes the right to institute suit with the respect to infringement of the Patents in Suit.

7.     Defendant IronMag is a Nevada Limited Liability Company with its principal place of business located in Las Vegas, Nevada. Upon information and belief, IronMag sells, distributes, and markets its products, including the Infringing

Products at issue, in the State of Georgia, in this District, and throughout the United States.

8.     Mr. Dimaggio is an individual and citizen of Michigan.

9.     Upon information and belief, Dimaggio is the Chief Executive Officer, owner, and President of IronMag.

10.    Upon information and belief, Mr. Dimaggio authorizes, participates in, directs, controls, causes, ratifies, and/or is the moving force behind the selection and sale and distribution of the Infringing Products and/or personally sells the Infringing Products.

## II.     JURISDICTION AND VENUE

11.    This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

12.    Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367.

13.    This is also an action under the Lanham Act, 15 U.S.C. § 1051, *et. seq.*, and the Georgia Deceptive and Unfair Trade Practices Act, O.C.G.A. §10-1-372 (a), for relief from IronMag's false advertising, deceptive acts, and unfair competition arising out of IronMag's use of false or misleading descriptions and/or false or misleading representations of fact. Hi-Tech brings this action to enjoin IronMag from continuing to falsely advertise its dietary supplement products, and to recover

-3-

from the competitive injury that IronMag's false advertising and unfair competition have caused to Hi-Tech's business.

14.     Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C § 1331 (federal question).

15.     This Court also has jurisdiction pursuant to 28 U.S.C § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1332 (diversity), as this action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000.00).

16.     This Court has personal jurisdiction over Defendants. For example, this Court may exercise personal jurisdiction over the Defendants pursuant to O.C.G.A. §9-10-91 because one or more of the Defendants are doing business in this judicial district and/or have committed tortious acts within this judicial district including unfair competition, patent infringement, among other wrongful and unlawful acts.

17.     This Court therefore has jurisdiction over the Defendants pursuant to the provisions of the Georgia long-arm statute.

18.     Venue is proper under 28 U.S.C. §§1391 and 1400 in that one or more of the Defendants are doing and transacting business within this judicial district, and have committed the tortious acts complained of herein in this judicial district. By way of example and without limitation, Defendants directly or through intermediaries (including distributors, retailers, and others), formulates, makes, manufactures,

ships, distributes, advertises, markets, offers for sale, and/or sells dietary supplement products that infringe on one or more claims of the Patents in Suit (hereinafter the "Infringing Products"), which include without limitation products sold under the "4 Andro Rx" and "1 Andro Rx" brand names in the Northern District of Georgia.

19.     By way of further example and without limitation, Defendants have purposefully and voluntarily placed the Infringing Products and illegal supplements into the stream of commerce with the knowledge, understanding, and expectation that such Infringing Products would and will be purchased in the Northern District of Georgia.

20.     The Infringing Products were currently available for purchase in the Northern District of Georgia.

21.     The Infringing Products are currently available for purchase in the Northern District of Georgia.

### III.   FACTUAL BACKGROUND

22.     The nutritional supplement industry is one of the fastest growing and most lucrative in the United States. A recent Forbes article estimates that nutritional supplement sales accounted for $32 billion in revenue in 2012 and predicts this number to grow to $60 billion within ten years. The growth and size of the nutritional supplement market and the relatively low barriers to entry provide perverse incentives for unfair competition prohibited by the Lanham Act.

23.   Hi-Tech is a cutting-edge sports supplement manufacturer and marketer. From its inception, Plaintiff has been a leader in the nutritional supplement market, specifically for body building products.

24.   Hi-Tech manufactures and sells products in several categories of body building products, including testosterone boosters, muscle-gainers, and pro-anabolics.

25.   Hi-Tech manufactures dozens of products in the testosterone boosters, muscle-gainers, and pro-anabolics sub-markets.

26.   Defendants operate a dietary supplement company which provides sports nutrition, muscle enhancement, weight loss, pre-and post-workout, and other various supplements.

27.   Defendants maintain a website at IronMagLabs.com to facilitate the sale and distribution of its products.

28.   Defendants advertise and sell their dietary supplements, including the Infringing Products, nationwide, including within the Northern District of Georgia.

29.   As early as May 1, of 2012 Defendants were on notice of their infringement of the Patents in Suit; were notified to cease and desist their infringement of the patent rights under the Patents in Suit; and were on notice that certain products sold by Defendants infringed one or more of the claims of one or more of the patent rights of the Patents in Suit.

30.     Defendants were sued for their infringement on September 25, 2014 in the United States District Court for the Eastern District of Michigan in an action entitled *Intellectual Wellness, LLC v. IronMag Labs, LLC* Civil Action No. 5:14-cv-13717-JEL-RSW (hereinafter "the Previous Action").

31.     On December 12, 2014, Defendants acknowledged the Patent rights under the Patents in Suit when they settled the Previous Action and agreed to pay royalties for use of the Patents in Suit.

32.     Notwithstanding their acknowledgement of the patent rights in the Patents in Suit, Defendants continued to, and still does, sell the Infringing Products and refuses and fails to pay the royalties agreed upon in settling the Previous Action.

33.     Hi-Tech's body building products have natural ingredients and compete directly with Defendants' Super DMZ 4.0™ and Osta Rx™ products.

### DEFENDANTS' MISREPRESENTATIONS

34.     Defendants have made deliberate and misleading representations regarding the IronMag Labs' Super DMZ 4.0™ and Osta Rx™ products. These products are marketed as being natural supplements, when, in fact, they contain an illegal unapproved new drug known as Ostarine, or (2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide, which is a selective androgen receptor modulator for which substantial clinical investigations have been

instituted and made public with regard to treatment of cancer cachexia, or muscle wasting.

35.   Super DMZ 4.0™ and Osta Rx™ are androgenic modulator products and unapproved new drugs sold in violation of sections 505(a) and 301(d) of the Federal Food, Drug, and Cosmetic Act (FDCA) [21 U.S.C. §§ 355(a) and 331(d)] and are misbranded drugs sold in violation of sections 502 and 301(a) [21 U.S.C. §§ 352 and 331(a)] of the FDCA.

36.   IronMag Labs states that that this product contains the following active pharmaceutical ingredients:

| Product | Active Pharmaceutical Ingredient |
|---|---|
| Super DMZ 4.0™ | (2S)-3-(4-cyanophenoxy) -N- [4-cyano-3-(trifluoromethyl)phenyl] -2-methylpropanamide) Ostarine (MK-2866) (declared on the immediate container label) |

37.   IronMag Labs states that that this product contains the following active pharmaceutical ingredients:

| Product | Active Pharmaceutical Ingredient |
|---|---|
| Osta Rx™ | (2S)-3-(4-cyanophenoxy) -N- [4-cyano-3-(trifluoromethyl)phenyl] -2-methylpropanamide) Ostarine (MK-2866) (declared on the immediate container label) |

38.   Super DMX 4.0™ and Osta Rx™ are not dietary supplements. According to section 201(ff)(3)(B)(i) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(i)], a dietary supplement may not include an article that is approved as a new drug under section 505 of the FDCA [21 U.S.C. § 355(a)] unless that article was marketed as a dietary

supplement or food prior to FDA approval of such drug. According to section 201(ff)(3)(B)(ii) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(ii)], a dietary supplement also may not include an article authorized for investigation as a new drug for which substantial clinical investigations have been instituted and made public, unless the article was marketed as a dietary supplement or food before its authorization as a new drug.

39.     Super DMZ™ 4.0 and Osta Rx™ contain (2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide which is the subject of substantial clinical investigations, which have been made public (see Exhibit C).

40.     Upon information and belief and based on the information available to Hi-Tech, ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigation. Therefore, Super DMZ 4.0™ and Osta Rx™, which contain ostarine, are also excluded from the definition of a dietary supplement under section 201(ff)(3)(B)(ii) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(ii)].

41.     Super DMZ 4.0™ and Osta Rx™ are also classified as "new drugs" as defined by section 201(p) of the FDCA [21 U.S.C. § 321(p)], because these products are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

42.     Furthermore, Super DMZ 4.0™ and Osta Rx™ are prescription drugs as defined in section 503(b)(1)(A) of the Act [21 U.S.C. § 353(b)(1)(A)], because due to their toxicity or potentiality for harmful effect, the method of their use, or the collateral measures necessary for their use, they are not safe for use except under the supervision of a practitioner licensed by law to administer them. Super DMX 4.0™ and Osta Rx™ are also prescription drugs because they contain a selective androgen receptor modulator, ostarine, and present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs.

43.     Under sections 301(d) and 505(a) of the FDCA [21 U.S.C. §§ 331(d) and 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA approved application is in effect for it.

44.     No approved applications are in effect for IronMag Labs Super DMZ 4.0™ and Osta Rx™ products.

45.     Consequently, IronMag Labs' marketing and sale of these products without such approved applications violates these provisions of the FDCA.

46.     According to section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)], a drug is misbranded if, among other things, it fails to bear adequate directions for its intended use(s).

47.    "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended [21 CFR Part 201.5].

48.    Prescription drugs can be used safely only at the direction, and under the supervision of a licensed practitioner and therefore, it is impossible to write "adequate directions for use" for prescription drugs.

49.    FDA-approved prescription drugs which bear the FDA-approved labeling are exempt from the requirements that they bear adequate directions for use by a layperson [21 CFR Part 201.100(c)(2) and 201.115].

50.    Therefore, because there are no FDA-approved applications for IronMag's Super DMZ 4.0™ and Osta Rx™ products, their labeling fail to bear adequate directions for their intended use, causing them to be misbranded under section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)].

51.    IronMag's Super DMZ 4.0™ and Osta Rx™ products are misbranded for all of the aforementioned reasons. The introduction or delivery for introduction into interstate commerce of these misbranded drug products violates section 301(a) of the FDCA [21 U.S.C. § 331(a)].

52.    Defendants' false, misleading and deceptive practices have violated the Lanham Act and have unjustly enriched Defendants at the expense of Hi-Tech, and have caused Hi-Tech extensive and irreparable harm, including, but not limited to, loss of revenue, disparagement, and loss of goodwill.

## DEFENDANTS' INFRINGEMENTS

53.    Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

54.    Defendants have committed the tort of patent infringement within the State of Georgia, and more particularly, within the Northern District of Georgia, in that Defendants have caused the Infringing Products to be formulated made, manufactured, shipped, distributed, advertised, offered for sale and/or sold in this District, and continues to do so.

55.    The Infringing Products are formulated, made, manufactured, shipped, distributed, advertised, offered for sale and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringe one or more of the claims of the Patents in Suit.

**A.    DIRECT INFRINGEMENTS**

56.    Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

57.    Defendants' employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities, have taken, used, and orally administered the Infringing Products.

58.    The Infringing Products are formulated, made, manufactured, shipped, distributed, advertised, offered for sale and sold by Defendants to include certain

-12-

ingredients that, by virtue of their inclusion in the Infringing Products, infringe one or more of the claims of the Patents in Suit.

59.   The Infringing Products are and were formulated, made, manufactured, shipped, distributed, advertised, offered for sale and sold by Defendants by virtue of the inclusion in the Infringing Products of one or more claims of the Patents in Suit, infringes and infringed one or more of the claims of one or more of the Patents in Suit, and as a result, when Defendants' employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities orally administer and administered the Infringing Products, they are and were practicing and practiced the methods disclosed in those claims.

60.   The purposes for which these ingredients are included in the Infringing Products are and were, without limitation to enhance physical performance.

61.   Defendants encouraged and/or is aware of the fact that its employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities orally administered and administer the Infringing Products and practice and practiced the methods disclosed in one or more claim of the Patents in Suit, and these employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing

-13-

activities are and were acting under Defendants' direction and control when practicing these methods.

62. Therefore, Defendants are and were a direct infringer of one or more claims of the Patents in Suit pursuant to 35 U.S.C. § 271(a).

**B.    INDIRECT INFRINGEMENTS**

63. Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

64. End-users of Defendants' Infringing Products were and also still are direct infringers of one or more claims of the Patents in Suit. End-users of Defendants' Infringing Products have taken, used, and orally administered the Infringing Products.

65. The Infringing Products are and were formulated, made, manufactured, shipped, distributed, advertised, offered for sale and/or sold by Defendants by virtue of its inclusion in the Infringing Products, infringe and infringed one or more of the claims of the Patents in Suit, and as a result, when end-users of Defendants' Infringing Products orally administer and administered the Infringing Products, they are and were practicing and practiced the methods disclosed in those claims.

66. Defendants' labels and advertising for the Infringing Products explain and explained the elements and essential elements of one or more of the methods disclosed in the Patents in Suit, and those labels and advertising statements encourage, urge, and induce the Infringing Products' end-users and Defendants have

therefore specifically intended to cause these end-users to directly infringe the claimed methods of the Patents in Suit, and did so in the past, and to purchase and orally ingest the products to practice those methods, and end-users do and did practice those methods.

67.     Defendants have therefore specifically intended to cause these end-users to directly infringe the claimed methods of the Patents in Suit, and in fact urged them to do so.

68.     The Infringing Products are not and were not suitable for non-infringing uses, and none of Defendants' labels or advertisements for their Infringing Products disclose or disclosed any uses for the products, nor for the compounds disclosed in the claimed methods of the Patents in Suit, that do not infringe these claimed methods.

69.     The inclusion of the specific infringing compounds in the Infringing Products is and was material to practicing such methods.

70.     Defendants had knowledge that the Infringing Products are and were especially adapted by end-users of the products for the practicing of such methods, and indeed, Defendants encouraged, urged, and induced, and still encourages, urges and induces the Infringing Products' end-users to purchase and orally administer the Infringing Products to practice such methods.

71.     Defendants intentionally and knowingly induced encouraged, urged, and induced, and still encourages, urges and induces the Infringing Products' end-users to purchase and orally administer the Infringing Products for the purpose of practicing the claimed methods of the Patents in Suit, by having them orally ingest the compounds disclosed in such claims.

72.     Defendants have and had knowledge of the fact that the accused products, particularly as administered, infringe on one or more of the claims of the Patents in Suit.

73.     Defendants have and had direct firsthand knowledge of the Patents in Suit since at least May of 2012.

74.     Defendants willfully and knowingly decided to infringe the Patents in Suit despite knowledge of the patent's existence and its knowledge of the Infringing Products infringements of the claims of the Patents in Suit.

75.     At a minimum, and in the alternative, Plaintiff pleads that the Defendants willfully blinded itself to the infringing nature of the Infringing Products' sales.

76.     Defendants did not cease its own direct infringement, nor its contributory infringement or inducement of infringement by end-users, despite its knowledge of the Patents in Suit and the end-users' infringing activities with respect to the Patents in Suit.

77.     Therefore, Defendants are and were a indirect infringer of one or more claims of the Patents in Suit pursuant to 35 U.S.C. § 271(b) and (c).

## COUNT I
### INFRINGEMENT OF U.S. PATENT NO. 8,084,446

78.     Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

79.     Defendants have, and continue to do so, literally and directly infringed, or directly infringed under the doctrine of equivalents one or more claims of United States Patent No. 8,084,446 by making, using, offering to sell, and/or selling in the United States, and/or importing into the United States the Infringing Products, or any one of those products.

80.     In addition to the fact Defendants makes, uses, sells, and/or offers for sale the Infringing Products, and did so in the past, further examples of Defendants' direct infringements include, without limitation, the fact that Defendants encouraged and/or was aware that its employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities, orally administered the Infringing Products, and practiced and continue to practice the methods disclosed in one or more claim of the '446 Patent, and these employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities were acting under Defendants' direction and control when practicing these methods.

81.     Defendants encouraged and was aware of these persons' oral administration of the Infringing Products for these purposes, these persons were acting under Defendants direction and control, and therefore Defendants directly practiced the methods and/or claims of the '446 Patent.

82.     End-users of Defendants' Infringing Products were also direct infringers of one or more claims of the '446 Patent.

83.     End-users of Defendants' Infringing Products have taken, used, and orally administered the Infringing Products.

84.     The Infringing Products were formulated, made, manufactured, shipped, distributed, advertised, market, offered for sale, and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringed one or more of the claims of the '446 Patent.

85.     The Infringing Products were formulated, made, manufactured, shipped, distributed, advertised, marketed, offered for sale, and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringed one or more of the claims of the '446 Patent, and as a result when end-users of Defendants' Infringing Products orally administered the Infringing Products they were practicing the methods disclosed in one or more claims of that patent.

86.     Defendants' labels and advertising for the Infringing Products explain and explained the elements and essential elements of one or more of the methods

disclosed in the '446 Patent, and those labels and advertising statements encouraged, urged, and induced, and continue to do so, the Infringing Products' end-users to purchase and orally ingest the products to practice those methods, and end-users did and continue to practice those methods.

87.    Defendants therefore specifically intended to cause these end-users to directly infringe the claimed methods of the '446 Patent, and had and continue to urge them to do so.

88.    The Infringing Products are not, and were not at any time, suitable for non-infringing uses, and none of Defendants' labels or advertisements for the Infringing Products disclosed any uses for the products, nor for the compounds disclosed in the claimed methods, that did not infringe upon such methods.

89.    Defendants have and had knowledge that the Infringing Products were especially adapted by end-users of the products for the practicing of such methods, and indeed, Defendants encouraged, urged, and induced, and still encourage, urge and induce the Infringing Products' end-users to purchase and orally administer the Infringing Products and to practice the claimed methods.

90.    Defendants intentionally and knowingly induced encouraged, urged, and induced, and still encourage, urge and induce the Infringing Products' end-users to purchase and orally administer the Infringing Products for the purpose of practicing

the claimed methods of the '446 Patent, by having them orally ingest the compounds disclosed in such claims.

91.     Defendants had knowledge of the fact that the Infringing Products, particularly as administered, infringed on one or more claims of the '446 Patent.

92.     Defendants had direct, firsthand knowledge of the '446 Patent itself.

93.     Defendants' activities were without express or implied license by Plaintiff.

94.     Defendants have profited though its infringement of the '446 patent, and continues to do so.

95.     As a result of Defendants' acts of infringement, Plaintiff suffered, and will continue to suffer damages in an amount to be proved at trial.

96.     Defendants intend to continue their acts of infringement, and Plaintiff has, and will continue to, suffer irreparable harm, for which there is no adequate remedy at law unless Defendants are enjoined by this Court from continuing such acts of infringement.

97.     Defendants' past infringements and/or continuing infringements have been deliberate and willful, and this case is therefore an exceptional case, which warrants an award of treble damages and attorneys' fees in accordance with 35 U.S.C. §284 and § 285.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 8,338,399

98.     Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

99.   Defendants have, and continue to do so, literally and directly infringed, or directly infringed under the doctrine of equivalents one or more claims of United States Patent No. 8,338,399 by making, using, offering to sell, and/or selling in the United States, and/or importing into the United States the Infringing Products, or any one of those products.

100.   In addition to the fact Defendants make, use, sell, and/or offer for sale the Infringing Products, and did so in the past, further examples of Defendants' direct infringements include, without limitation, the fact that Defendants encouraged and/or was aware that its employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities, orally administered the Infringing Products, and practiced and continue to practice the methods disclosed in one or more claim of the '339 Patent, and these employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities were acting under Defendants' direction and control when practicing these methods.

101.   Defendants encouraged and were aware of these persons' oral administration of the Infringing Products for these purposes, these persons were acting under Defendants' direction and control, and therefore Defendants directly practiced the methods and/or claims of the '339 Patent.

102.   End-users of Defendants' Infringing Products were also direct infringers of one or more claims of the '339 Patent.

103.   End-users of Defendants' Infringing Products have taken, used, and orally administered the Infringing Products.

104.   The Infringing Products were formulated, made, manufactured, shipped, distributed, advertised, market, offered for sale, and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringed one or more of the claims of the '339 Patent.

105.   The Infringing Products were formulated, made, manufactured, shipped, distributed, advertised, marketed, offered for sale, and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringed one or more of the claims of the '339 Patent, and as a result when end-users of Defendants' Infringing Products orally administered the Infringing Products they were practicing the methods disclosed in one or more claims of that patent.

106.   Defendants' labels and advertising for the Infringing Products explain and explained the elements and essential elements of one or more of the methods disclosed in the '339 Patent, and those labels and advertising statements encouraged, urged, and induced, and continue to do so, the Infringing Products' end-users to purchase and orally ingest the products to practice those methods, and end-users did and continue to practice those methods.

107.   Defendants therefore specifically intended to cause these end-users to directly infringe the claimed methods of the '339 Patent, and had and continue to urge them to do so.

108.   The Infringing Products are not, and were not at any time, suitable for non-infringing uses, and none of Defendants' labels or advertisements for the Infringing Products disclosed any uses for the products, nor for the compounds disclosed in the claimed methods, that did not infringe upon such methods.

109.   Defendants have and had knowledge that the Infringing Products were especially adapted by end-users of the products for the practicing of such methods, and indeed, Defendants encouraged, urged, and induced, and still encourage, urge and induce the Infringing Products' end-users to purchase and orally administer the Infringing Products to practice such methods.

110.   Defendants intentionally and knowingly induced, encouraged, urged, and induced, and still encourage, urge and induce the Infringing Products' end users to purchase and orally administer the Infringing Products for the purpose of practicing the claimed methods of the '339 Patent, by having them orally ingest the compounds disclosed in such claims.

111.   Defendants had knowledge of the fact that the Infringing Products, particularly as administered, infringed on one or more claims of the '339 Patent.

112.   Defendants had direct, firsthand know ledge of the '339 Patent itself.

-23-

113.   Defendants' activities were without express or implied license by Plaintiff.

114.   Defendants have profited though its infringement of the '339 patent, and continue to do so.

115.   As a result of Defendants' acts of infringement, Plaintiffs suffered, and will continue to suffer damages in an amount to be proved at trial.

116.   Defendants intend to continue their acts of infringement, and Plaintiffs have, and will continue to, suffer irreparable harm, for which there is no adequate remedy at law unless Defendants are enjoined by this Court from continuing such acts of infringement.

117.   Defendants' past infringements and/or continuing infringements have been deliberate and willful, and this case is therefore an exceptional case, which warrants an award of treble damages and attorneys' fees in accordance with 35 U.S.C. § 284 and § 285.

## COUNT III
### FALSE ADVERTISING IN VIOLATION OF
### SECTION 43(A)(1)(B) OF THE LANHAM ACT

118.   Plaintiffs hereby incorporate the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

119.   Defendants have purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of its "nutritional supplements" DMZ 4.0™ and Osta Rx™, by failing to tell the consumers that these products

contain (2S)-3-(4-cyanophenoxy) -N- [4-cyano-3- (trifluoromethyl)phenyl] -2 hydroxy -2- methylpropanamide) which is an unapproved new drug and is untested on humans and potentially dangerous.

120.  Defendants' marketing of such misbranded and falsely-labeled substances has the tendency to deceive a substantial segment of the public into believing that they are purchasing a product with different characteristics. By failing to list this potentially harmful ingredient on their label, Defendants have misled consumers.

121.  The deception is material because it is likely to influence a consumer's purchasing decision, especially if the consumer has concerns about the consequences of ingesting an untested product or one considered an unapproved new drug by FDA without proper expert oversight.

122.  Defendants have introduced their false statements into interstate commerce via marketing and advertising on various websites and shipment of its product into interstate commerce containing false labeling.

123.  Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce which, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of its products in violation of Section 43(a)(1)(B) of the Lanham Act.

124.  Hi-Tech's body building products have natural ingredients and compete directly with Defendants' Super DMZ 4.0™ and Osta Rx™ products.

125.   As a result of Defendants misrepresentations, Hi-Tech has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Hi-Tech to Defendants and the loss of goodwill in Hi-Tech's products. Indeed, Defendants' conduct is a black eye on the industry as a whole, and has the tendency to disparage and diminish Hi-Tech's products and goodwill.

### COUNT IV
### VIOLATION OF THE GEORGIA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, O.C.G.A. §10-1-372 (a)

126.   Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

127.   Hi-Tech and Defendants are commercial competitors. Defendants' actions as described above constitute deceptive and unfair trade practices in violation of O.C.G.A. §10-1-372 (a).

128.   The Georgia Deceptive and Unfair Trade Practices Act was enacted to protect the public and legitimate business enterprises from those who engage in unfair methods of competition and unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

129.   Defendants' actions, as alleged herein, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, and/or misrepresentation in violation of O.C.G.A. §10-1-372 (a).

130.   Upon information and belief, consumers reasonably and justifiably relied on Defendants' deceptive, unfair, and fraudulent misrepresentations as alleged herein.

Consumers were certain to be deceived because Defendants' knowingly failed to disclose the source, affiliation, origin, characteristics, ingredients, standards and/or quality of its Infringing Products. Defendants' business practices, in the advertising, marketing, packaging, labeling, and sale of its Infringing Products as a unique and superior product, justify selection of the product over alternative dietary supplements.

131.   As a direct and proximate result of Defendants' unlawful acts and omissions, Hi-Tech has suffered an ascertainable loss of money or property in the form of diverted or lost sales.

132.   Hi-Tech is without remedy at law and Defendants' deceptive trade practices as set forth herein continue, and will continue, unless enjoined by this Court.

133.   Plaintiffs are therefore entitled to compensatory and punitive damages, equitable and injunctive relief, costs, and reasonable attorney fees.

### COUNT V
### COMMON LAW UNFAIR COMPETITION AGAINST DEFENDANTS

134.   Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

135.   Defendants' actions, as set forth above, constitute unfair competition in violation of the common law of the State of Georgia.

136.   Defendants' actions as described herein have caused and will continue to cause irreparable injury to Hi-Tech and, unless restrained, will continue to do so.

137.   As a direct and proximate result of Defendants' conduct, Hi-Tech has suffered damages in an amount to be determined at trial.

138.   Defendants' actions entitle Hi-Tech to compensatory damages in an amount to be determined at trial and punitive damages under the common law.

139.   Defendants' actions are such as to constitute that level of wantonness and lack of care to justify punitive damages under Georgia law.

140.   Hi-Tech is without remedy at law and Defendants' deceptive trade practices as set forth herein continue, and will continue, unless enjoined by this Court.

141.   Plaintiffs are therefore entitled to compensatory damages, punitive damages, equitable and injunctive relief, costs, and reasonable attorney fees

## COUNT VI
### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)(d)

142.   Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

143.   Upon information and belief, Mr. Dimaggio operated and managed the affairs of IronMag Labs throughout all relevant times.

144.   IronMag Labs and Mr. Dimaggio knowingly engaged in a scheme to intentionally defraud Hi-Tech out of sales and profits though IronMag Labs' infringement of Hi-Tech's patents and sales on their Super DMZ 4.0™ and Osta Rx™ products.

145.   In intentional furtherance of this scheme, IronMag Labs used the Internet to disseminate IronMag Labs' Infringing Products and illegal Super DMZ 4.0™ and Osta Rx™ to consumers across the United States, and to enable consumers to purchase IronMag Labs' Infringing Products and illegal Super DMZ 4.0™ and Osta Rx™ online.

146.   In intentional furtherance of this scheme, IronMag Labs also used the U.S. Mail and/or other interstate carriers to ship its Infringing Products and illegal Super DMZ 4.0™ and Osta Rx™, to purchasing consumers throughout the United States.

147.   Defendant Dimaggio agreed with others associated with and employed by IronMag Labs to participate in and facilitate the fraudulent scheme set forth herein and had actual knowledge of IronMag Labs' fraudulent activities set forth herein.

148.   Defendants' infringement upon Hi-Tech's patents in suit and fraudulent activities described herein deceived consumers into believing IronMag Labs' products were lawful, and caused and enabled consumers to purchase IronMag Labs' products instead of Hi-Tech's products.

149.   IronMag Labs and Mr. Dimaggio also knowingly engaged in a scheme to intentionally defraud Hi-Tech out of sales and profits though IronMag Labs' false product claims regarding Super DMZ 4.0™ and Osta Rx™ content, quality, characteristics, and/or ingredients.

150.   In intentional furtherance of this scheme, IronMag Labs used the Internet to disseminate its false product claims to consumers across the United States, and to enable consumers to purchase IronMag Labs' Super DMZ 4.0™ and Osta Rx™ products online.

151.   In intentional furtherance of this scheme, IronMag Labs also used the U.S. Mail and/or other interstate carriers to ship Super DMZ 4.0™ and Osta Rx™, the subject of the false product claims, to consumers throughout the United States.

152.   Upon information and belief, IronMag Labs engaged in the fraudulent activities set forth above on a repeated and continuous basis over the course of, at least, the past three (3) years. IronMag Labs continues to engage in said fraudulent activities to date.

153.   As set forth herein, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants conspired to conduct the affairs of IronMag Labs, the enterprise, through a pattern of racketeering activity as part of their scheme to engage in false advertising regarding the IronMag Labs's Super DMZ 4.0™ and Osta Rx™ product, defrauding Hi-Tech of sales and profits.

154.   In furtherance of this scheme to engage in false advertising, Defendants agreed to, and did, use the internet to disseminate its false product claims to consumers across the United States, and used the Internet to enable consumers to

purchase IronMag Labs's Super DMZ 4.0™ and Osta Rx™ product online in violation of 18 U.S.C. § 1343.

155. Also in furtherance of this scheme to engage in false advertising, Defendants agreed to, and did, use the U.S. Mail and/or other interstate carriers to ship Super DMZ 4.0™ and Osta Rx™, the subject of the false product claims, to consumers throughout the United States in violation of 18 U.S.C. § 1341.

156. As set forth herein, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants conspired to conduct the affairs of IronMag Labs, the enterprise, through a pattern of racketeering activity as part of their scheme to unlawfully defraud consumers and Hi-Tech and to infringe upon Hi-Tech's patents in suit.

157. In furtherance of this scheme to unlawfully infringe upon Hi-Tech's NitroPro$^R$ trademark, Defendants agreed to, and did, use the internet to disseminate its IronMag Labs's infringing Super DMZ 4.0™ and Osta Rx™ mark to consumers across the United States, and used the Internet to enable consumers to purchase IronMag Labs's Super DMZ 4.0™ and Osta Rx™ product online in violation of 18 U.S.C. § 1343.

158. Defendants have intentionally conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described

above. That conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

159.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property by lost or diverted sales and by injury to its business, the reputation and goodwill of its branded products, and its ability to compete in the marketplace. As a result of the Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to actual damages, treble damages, costs, and attorney fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.   That Hi-Tech and Intellectual Wellness be awarded a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure;

2.   For a declaration that Defendants has infringed the Patents in Suit and/or induced others to infringe one or more claims of the Patent in Suit, in violation of 35 U.S.C. §§271 *et seq.*;

3.   For a declaration that Defendants' infringement and/or inducement to infringe the Patents in Suit has been willful and deliberate;

4.      That Defendants be required to provide Plaintiffs an accounting of all sales, gains, profits, and advantages derived by Defendants' infringements of the Patents in Suit.

5.      That Plaintiffs be awarded compensatory damages, together with interest and costs, adequate to compensate Plaintiff for the wrongful infringing acts by Defendants in accordance with 35 U.S.C. §284;

6.      That Plaintiffs be awarded treble damages and pre-judgment interest under 35 U.S.C. § 284 with regard to the Patent in Suit in light of Defendants' willful and deliberate infringement, in accordance with 35 U.S.C. §284;

7.      That this case be declared exceptional in favor of Plaintiffs under 35 U.S.C. § 285 and that Plaintiff be awarded its reasonable attorneys' fees and other expenses incurred in connection with this action pursuant to 35 U.S.C. §§ 284 and 285 and Rule 54(d) of the Federal Rules of Civil Procedure.

8.      That IronMag Labs be adjudged to have violated 15 U.S.C. §1125(a) by unfairly competing against Hi-Tech by using false, deceptive or misleading statements of fact that misrepresent the nature, quality, and characteristics of the IronMag Labs products.

9.      That Mr. Dimaggio be adjudged to have violated 15 U.S.C. §1125(a) by unfairly competing against Hi-Tech by using false, deceptive or misleading

statements of fact that misrepresent the nature, quality, and characteristics of the IronMag Labs products.

10.     That such damages and profits be trebled and awarded to Hi-Tech as a result of Defendants' willful, intentional and deliberate acts in violation of the Lanham Act.

11.     That Hi-Tech recover actual damages, treble damages, costs, and attorney fees for Defendants' violation of 18 U.S.C. § 1962(c)(d).

12.     That all of Defendants misleading and deceptive materials and products be destroyed as permitted under 15 U.S.C. § 1118.

13.     That Defendants be adjudged to have unlawfully and unfairly competed against Hi-Tech under the laws of the State of Georgia, §10-1-372 (a).

14.      For an order granting both preliminary and permanent injunctions pursuant to 35 U.S.C. §283, enjoining the Defendants from further acts of infringement;

15.     That Plaintiffs be awarded Punitive Damages pursuant to both Georgia and federal law; and

16.     That Plaintiffs be awarded such other relief as this Court may deem just and proper.

This 6th day of November, 2015.

S/ Edmund J. Novotny
Edmund J. Novotny, Jr.
Georgia Bar No. 547338
Charles R. Bridgers
Georgia Bar No. 080791
*Attorneys for Hi-Tech*
*Pharmaceuticals, Inc.*

101 Marietta Street
Suite 3100
Atlanta, Georgia 30303
Tel: 404-979-3150
Fax: 404-979-3170
ednovotny@novotnylawgroup.com

S/ John T. Gallagher
John T. Gallagher
*Attorney for Hi-Tech*
*Pharmaceuticals, Inc.*

Hoffmann & Baron, LLP
6900 Jericho Turnpike
Syosset, New York 11791
Telephone: (516) 822-3550
Direct Dial: (516) 608-4728
Facsimile: (516) 822-3582
jgallagher@hbiplaw.com



US008084446B2

(12) **United States Patent**
Marchewitz

(10) Patent No.: **US 8,084,446 B2**
(45) Date of Patent: **Dec. 27, 2011**

(54) **USE OF DHEA DERIVATIVES FOR ENHANCING PHYSICAL PERFORMANCE**

(76) Inventor: **Eric Marchewitz**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1202 days.

(21) Appl. No.: **11/411,530**

(22) Filed: **Apr. 26, 2006**

(65) **Prior Publication Data**

US 2006/0241093 A1    Oct. 26, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/762,328, filed on Jan. 26, 2006, provisional application No. 60/694,813, filed on Jun. 29, 2005, provisional application No. 60/674,525, filed on Apr. 26, 2005.

(51) Int. Cl.
*A61K 31/56*    (2006.01)
(52) U.S. Cl. ..................................... **514/182**
(58) Field of Classification Search .............. 514/171, 514/182
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,501,504 A | 3/1970 | Klimstra | |
| 4,587,235 A | 5/1986 | Bittler et al. | |
| 4,634,694 A | 1/1987 | Loozen et al. | |
| 5,028,631 A | 7/1991 | Schwartz et al. | |
| 5,079,377 A | 1/1992 | Yoshihama et al. | |
| 5,424,463 A | 6/1995 | Lardy et al. | |
| 5,521,167 A | 5/1996 | Gobbini et al. | |
| 5,585,371 A | 12/1996 | Lardy | |
| 5,744,462 A | 4/1998 | Schwartz et al | |
| 5,776,923 A | 7/1998 | Labrie | |
| 5,804,576 A | 9/1998 | Schwartz et al. | |
| 5,948,434 A | 9/1999 | Labrie | |
| 6,153,606 A | 11/2000 | Lardy et al. | |
| 6,368,617 B1 | 4/2002 | Hastings et al | |
| 6,489,313 B1 | 12/2002 | Lardy et al. | |
| 6,586,417 B1 | 7/2003 | Abraham | |
| 6,667,299 B1 * | 12/2003 | Ahlem et al. ................. | 514/178 |
| 6,794,374 B1 | 9/2004 | Weeks | |
| 6,924,274 B2 | 8/2005 | Lardy et al. | |
| 6,964,954 B2 | 11/2005 | Dalko et al. | |
| 7,002,028 B2 | 2/2006 | White et al. | |
| 2004/0001817 A1 | 1/2004 | Giampapa | |

OTHER PUBLICATIONS

Brose et al., Journal of Gerontology, 2003;58(1):11-19.*
Simpson et al., AIDS, 1004;18:1403-1412 *
Correspondence from J. McCormack to E. Marchewitz, sent on Jul. 7, 2011, regarding U.S. Appl. No. 11/411,530.
Klimstra et al., "The Synthesis of 3β-Hydroxyestr-4-en-17-one and 3β-Hydroxyandrost-4-en-17-one," *Steroids* 10(4):411-424 (1967).
Rosenberg, "Synthesen in der Reihe der Sexualhormone," Eidgenossischen Technical University in Zurich (1936).

* cited by examiner

*Primary Examiner* — San-Ming Hui

(57)    **ABSTRACT**

A method is disclosed for administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof for one of decreasing body weight, reducing adipose tissue, increasing endurance, as an anti-aging compound and generating production of red blood cells.

**4 Claims, No Drawings**

US 8,084,446 B2

1

## USE OF DHEA DERIVATIVES FOR ENHANCING PHYSICAL PERFORMANCE

### RELATED APPLICATIONS

This application claims priority benefit of U.S. provisional patent applications No. 60/674,525, filed on Apr. 26, 2005, No. 60/694,813 filed Jun. 29, 2005, and No. 60/762,328 filed Jan. 26, 2006.

### FIELD OF THE INVENTION

This invention relates to use of derivatives of dehydroepi-androsterone (3-beta-hydroxy-5-androst-1-en-17-one or simply "DHEA") to enhance physical performance, and more particularly to the use of DHEA derivatives for anti-aging benefits, decreasing body weight, reducing adipose tissue, and increasing endurance.

### BACKGROUND OF THE INVENTION

The adrenal gland produces many steroid hormones. These steroid hormones play a major role in many body processes including, for example, skeletal muscle growth, red blood cell production (erythropoiesis), regulation of glucose and insulin levels and cellular aging. The steroids produced by the adrenal gland can be divided into three groups: glucocorticoids, which influence carbohydrate metabolism; mineralocorticoids, which control electrolyte and water balance; and sex steroid hormones. Glucocorticoids such as cortisol regulate catabolism of skeletal muscle proteins into amino acids. These amino acids are then transported to the liver and converted into glucose during gluconeogenesis. Excessive amounts of glucocorticoids can result in higher blood glucose and insulin levels and can contribute to increased body fat and type II diabetes. Glucocorticoids are also known to play a role in the aging process by increasing cellular and mitochondrial breakdown.

The second group of adrenal steroids, the mineralocorticoids such as aldosterone help the body to retain sodium and water. Excesses of mineralocorticoids can result in hypertension and cardiovascular disease.

The third group of adrenal steroids include androgens and DHEA. Adrenal androgens oppose the actions of glucocorticoids and result in skeletal muscle anabolism (the opposite action of catabolism), reductions in blood glucose and insulin levels, reduction in body fat, and are believed to decrease the rate of cellular aging and increased red blood cell production. DHEA production by the adrenal glands is known to decline markedly as aging progresses.

With normal younger adults, all three groups of adrenal steroids are produced in a healthy balance. However, as people age, less DHEA is produced resulting in relatively greater amounts of glucocorticoids and mineralocorticoids and disruption of this balance.

DHEA supplementation is believed be useful in treatment of aging and obesity and to stimulate erythropoiesis and skeletal muscle anabolism. In addition, supplemental DHEA can help restore the balance of adrenal steroids.

DHEA is commonly used as a dietary supplement. Unfortunately, DHEA is rapidly metabolized by liver enzymes referred to as sulfotransferases. Sulfotransferases rapidly convert the much of the supplementary DHEA into DHEA sulfate, which is quickly excreted from the body and is not effective as an anti-aging, muscle-building or fat reduction compound. In addition, DHEA sulfate does not restore the

2

balance of the adrenal steroids discussed above. As a result, frequent and larger doses of DHEA must be taken.

DHEA is also metabolized in the body to one of several compounds including, for example, etiocholanolone (5-beta-androstan-3-alpha-ol-17-one), beta etiocholanolone (5-beta-androstan-3-beta-ol-17-one), androsterone (5-alpha-androstan-3-alpha-ol-17-one), epiandrosterone (5-alpha-androstan-3-beta-ol-17-one), 7-keto-DHEA, 7-alpha-hydroxy-DHEA, 7-beta-hydroxy-DHEA, androstenedione, estrone and estradiol.

There is great individual variability in the metabolism of oral DHEA. The DHEA metabolites estrone and estradiol can result in negative estrogenic side effects for males including growth of male breast tissue, known as gynecomastia. Some individuals have poor bioavailability of DHEA as a result of sulfation in the liver, and large doses must be taken to elicit any desired effects. These increased doses of DHEA can result in increased conversion to estrone and estradiol, with resulting negative side effects.

It would be desirable to provide compounds which can be used to help provide the beneficial effects of high DHEA levels in the body for extended periods of time, yet reduce the undesired DHEA side effects discussed above.

### SUMMARY OF THE INVENTION

In accordance with a first aspect, a method is disclosed for administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof for decreasing body weight, reducing adipose tissue, increasing endurance, as an anti-aging compound and/or increasing production of red blood cells.

From the foregoing disclosure and the following more detailed description of various preferred embodiments it will be apparent to those skilled in the art that the present invention provides a significant advance in the methods of administering anti-aging compounds, for decreasing body weight and reducing adipose tissue, and increasing endurance. Additional features and advantages of various preferred embodiments will be better understood in view of the detailed description provided below.

### DETAILED DESCRIPTION OF CERTAIN PREFERRED EMBODIMENTS

It will be apparent to those skilled in the art, that is, to those who have knowledge or experience in this area of technology that many variations are possible for the method of administering DHEA derivatives for enhancing physical performance. The following detailed description of various alternative and preferred features and embodiments will illustrate the general principles of the invention with reference to improved methods of enhancing physical performance by administering DHEA derivatives as orally available dietary supplements. Other embodiments suitable for other applications will be apparent to those skilled in the art given the benefit of this disclosure.

As used herein, a derivative of a compound refers to a species having a chemical structure that is similar to the compound, yet containing a chemical group not present in the compound and/or deficient of a chemical group that is present in the compound. The substance to which the derivative is compared is known as the "parent" substance. Here, for example, the parent compound is the androstane steroid DHEA. A derivative may be made by modification of the parent compound or by synthesis from other starting materials that are not similar to the parent.

US 8,084,446 B2

3

DHEA derivatives disclosed herein are advantageous in that they last longer in the body and are resistant to conversion to estradiol and estrogen, thereby advantageously providing the benefits of supplemental DHEA (including anti-aging benefits, decreased body weight, reduction of adipose tissue, increased endurance and/or increasing production of red blood cells) while reducing the negative side effects. Long-lasting DHEA derivatives are of the general formulas shown below, starting with the androst-1ens:



wherein R3 is one of α-OH, β-OH, R5 is one of αH and βH, and R7 is one of H and CH₃. DHEA derivatives made according to the above formula can consist of 3-alpha-hydroxy-5-alpha-androst-1-en-17-one, 3-beta-hydroxy-5-alpha-androst-1-en-17-one, 3-alpha-hydroxy-5-alpha-methyl-androst-1-en-17-one, 3-beta-hydroxy-5-alpha-7-alpha-methyl-androst-1-en-17-one, 3-alpha-hydroxy-5-beta-androst-1-en-17-one, 3-beta-hydroxy-5-beta-androst-1-en-17-one, 3-alpha-hydroxy-5-beta-7-alpha-methyl-androst-1-en-17-one, and 3-alpha-hydroxy-5-beta-7-alpha-methyl-androst-1-en-17-one, along with any salts, esters or ethers thereof.

Long lasting DHEA derivatives also include the following androst-4-ens:



wherein R3=one of is α-OH, β-OH. DHEA derivatives made according to the above formula can consist of 3-beta-hydroxy-androst-4-en-17-one and 3-alpha-hydroxy-androst-4-en-17-one along with any salts, esters or ethers thereof.

Long lasting DHEA derivatives also include the androst-5-en compound; 3-beta-hydroxy-7-alpha-methyl-androst-5-en-17-one, or any salts, esters or ethers thereof, reproduced immediately below:



4

Long lasting DHEA derivatives also include the androstan compound, 3-alpha-hydroxy-5-alpha-androstan-7,17-dione, or any salts, esters or ethers thereof, reproduced immediately below:



Long lasting DHEA derivatives also include 19-norandrost-4-en compounds according to the general formula:



wherein R3=one of is α-OH, β-OH. DHEA derivatives made according to the above formula can consist of 3-beta-hydroxy-norandrost-4-en-17-one and 3-alpha-hydroxy-norandrost-4-en-17-one or any salts, esters or ethers thereof.

Long lasting DHEA derivatives also include 19-norandrost-5-en compounds according to the general formula:



wherein R3=one of is α-OH, β-OH. DHEA derivatives made according to the above formula can consist of 3-beta-hydroxy-norandrost-5-en-17-one and 3-alpha-hydroxy-norandrost-5-en-17-one or any salts, esters or ethers thereof.

In accordance with conventional steroid carbon numbering, an atom or functional group attached to a ring depicted herein is termed α (alpha) if it lies below the plane of the paper or β (beta) if it lies above the plane of the paper. When R3 and/or R7 have one functional group listed, it is understood that the fourth bond to the carbon is hydrogen. Other related DHEA derivatives suitable for administering anti-aging compounds, for decreasing body weight and reducing adipose tissue, for increasing production of red blood cells and/or increasing endurance will be readily apparent to those skilled in the art, given the benefit of this disclosure.

All of the naturally occurring DHEA derivative compounds disclosed herein would preferably be administered orally mixed with solid or liquid carriers in appropriate unit doses.

US 8,084,446 B2

5

The preferred amount of the active ingredient that is to be administered, would depend on various factors such as the age and weight of the user. An effective oral daily dosage of the described DHEA derivatives can comprise 50-2000 mg daily, and most preferably about 100-800 mg daily. A preferred embodiment might be to administer the oral dose as a soft gelatin capsule or oral liquid suspension, either in two to three divided doses per day (i.e., 50 to 400 mg twice per day, or 25 mg to 200 mg four times per day). The DHEA derivatives as disclosed herein may also be administered transdermally using acceptable liquid vehicles, sublingually, transrectally (by suppository) intranasally, intravenously, subcutaneously, or by intramuscular injection. The DHEA derivatives as disclosed herein may also be mixed with dietary supplements such as creatine if desired.

Example 1

Capsules. 1 kg of the DHEA derivative, 3-beta-hydroxy-norandrost-4-en-17-one is mixed with microcrystalline cellulose, and placed into 10,000 hard-gelatin capsules. Each capsule contains 100 mg of 3-beta-hydroxy-norandrost-4-en-17-one.

Example 2

Capsules. 1 kg of the DHEA derivative 3-beta-hydroxy-norandrost-5-en-17-one is mixed with 5 kg of creatine and placed into 10,000 hard-gelatin capsules. Each capsule contains 100 mg of 3-beta-hydroxy-norandrost-5-en-17-one and 500 mg creatine.

From the foregoing disclosure and detailed description of certain preferred embodiments, it will be apparent that various modifications, additions and other alternative embodiments are possible without departing from the true scope and spirit of the invention. The embodiments discussed were chosen and described to provide the best illustration of the principles of the invention and its practical application to thereby enable one of ordinary skill in the art to use the invention in various embodiments and with various modifications as are suited to the particular use contemplated. All such modifications and variations are within the scope of the invention as determined by the appended claims when interpreted in accordance with the breadth to which they are fairly, legally, and equitably entitled.

6

What is claimed is:

1. A method of administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof as a compound that provides at least one or anti-aging adrenal hormonal balance, decreased body weight, reduction of adipose tissue, increased endurance, skeletal muscle growth, and increased production of red blood cells, of the general formula:



wherein R3 is one of α-OH and β-OH, wherein the DHEA derivative is administered orally.

2. The method of claim 1 wherein the DHEA derivative is administered in the form of a gel capsule.

3. The method of claim 1 further comprising administering the DHEA derivative with creatine.

4. A method of administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof as a compound that provides at least one of anti-aging adrenal hormonal balance, decreased body weight, reduction of adipose tissue, increased endurance, skeletal muscle growth, and increased production of red blood cells, of the general formula:



wherein R3 is one of α-OH and β-OH, and further comprising administering the DHEA derivative with creatine.

* * * * *

US008338399B2

(12) **United States Patent**

Marchewitz

(10) Patent No.: **US 8,338,399 B2**

(45) Date of Patent: **Dec. 25, 2012**

(54) **USE OF DHEA DERIVATIVES FOR ENHANCING PHYSICAL PERFORMANCE**

(75) Inventor: **Eric Marchewitz**, Las Vegas, NV (US)

(73) Assignee: **Proprietary Wellness, LLC**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/160,061**

(22) Filed: **Jun. 14, 2011**

(65) **Prior Publication Data**

US 2011/0245216 A1 Oct. 6, 2011

**Related U.S. Application Data**

(62) Division of application No. 11/411,530, filed on Apr. 26, 2006, now Pat. No. 8,084,446.

(60) Provisional application No. 60/674,525, filed on Apr. 26, 2005, provisional application No. 60/694,813, filed on Jun. 29, 2005, provisional application No. 60/762,328, filed on Jan. 26, 2006.

(51) **Int. Cl.**
*A61K 31/56* (2006.01)

(52) **U.S. Cl.** ................................ 514/171; 514/182

(58) **Field of Classification Search** ................. 514/171, 514/182

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,264,287 A | * | 8/1966 | Anner et al. ................ 540/31 |
| 3,501,504 A | | 3/1970 | Klimstra et al |
| 4,587,235 A | | 5/1986 | Bittler et al. |
| 4,634,694 A | | 1/1987 | Loozen et al. |
| 5,028,631 A | | 7/1991 | Schwartz et al. |
| 5,079,377 A | | 1/1992 | Yoshihama et al. |
| 5,424,463 A | | 6/1995 | Lardy et al. |
| 5,521,167 A | | 5/1996 | Gobbini et al. |
| 5,585,371 A | | 12/1996 | Lardy |
| 5,744,462 A | | 4/1998 | Schwartz et al. |
| 5,776,923 A | | 7/1998 | Labrie |
| 5,804,576 A | | 9/1998 | Schwartz et al. |
| 5,948,434 A | | 9/1999 | Labrie |
| 6,153,606 A | | 11/2000 | Lardy et al. |
| 6,368,617 B1 | | 4/2002 | Hastings et al. |
| 6,489,313 B1 | | 12/2002 | Lardy et al. |
| 6,586,417 B1 | | 7/2003 | Abraham |
| 6,667,299 B1 | | 12/2003 | Ahlem et al. |
| 6,794,374 B1 | | 9/2004 | Weeks |
| 6,924,274 B2 | | 8/2005 | Lardy et al. |
| 6,964,954 B2 | | 11/2005 | Dalko et al. |
| 7,002,028 B2 | | 2/2006 | White et al. |
| 2004/0001817 A1 | | 1/2004 | Giampapa |
| 2006/0241093 A1 | | 10/2006 | Marchewitz et al. |

OTHER PUBLICATIONS

Mottram and George, Baillicre's Clinical Endocrinology and Metabolism,2000;14(1):55-69.*

Brose et al., Creatine supplementation enhances isometric strength and body composition improvements following strength exercise training in older adults, J. Gerontol. A Biol. Sci. Med. Sci. 58:11-9 (2003).

Correspondence from J. McCormack to E. Marchewitz, sent on Jul. 7, 2011, regarding U.S. Appl. No. 11/411,530

Klimstra et al., The synthesis of 3β-hydroxyestr-4-en-17-one and 3β-hydroxyandrost-4-en-17-one, Steroids 10(4):411-24 (1967)

Restriction Requirement from U.S. Appl. No. 11/411,530, filed May 28, 2009.

Rosenberg, Synthesen in der reihe der sexualhormone, Eidgenossischen Technical University in Zurich (1936).

Simpson et al., HIV-associated neuromuscular weakness syndrome, AIDS 18:1403-12 (2004).

Nonfinal Office Action, U.S. Appl. No. 11/411,530, mail date Sep. 14, 2011.

* cited by examiner

*Primary Examiner* – San-Ming Hui

(74) *Attorney, Agent, or Firm* – Marshall, Gerstein & Borun LLP

(57) **ABSTRACT**

A method is disclosed for administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof for one of decreasing body weight, reducing adipose tissue, increasing endurance, as an anti-aging compound and generating production of red blood cells.

**12 Claims, No Drawings**

US 8,338,399 B2

**1**

## USE OF DHEA DERIVATIVES FOR ENHANCING PHYSICAL PERFORMANCE

### RELATED APPLICATIONS

This application is a divisional of U.S. patent application Ser. No. 11/411,530, filed Apr. 26, 2006, the disclosure of which is hereby expressly incorporated by reference. U.S. patent application Ser. No. 11/411,530 claims priority benefit of U.S. provisional patent applications No. 60/674,525, filed on Apr. 26, 2005, No. 60/694,813 filed Jun. 29, 2005, and No. 60/762,328 filed Jan. 26, 2006, and the present divisional also claims the benefit of the filing dates of these provisional applications.

### FIELD OF THE INVENTION

This invention relates to use of derivatives of dehydroepi-androsterone (3-beta-hydroxy-5-androst-1-en-17-one or simply "DHEA") to enhance physical performance, and more particularly to the use of DHEA derivatives for anti-aging benefits, decreasing body weight, reducing adipose tissue, and increasing endurance.

### BACKGROUND OF THE INVENTION

The adrenal gland produces many steroid hormones. These steroid hormones play a major role in many body processes including, for example, skeletal muscle growth, red blood cell production (erythropoiesis), regulation of glucose and insulin levels and cellular aging. The steroids produced by the adrenal gland can be divided into three groups: glucocorticoids, which influence carbohydrate metabolism; mineralocorticoids, which control electrolyte and water balance; and sex steroid hormones. Glucocorticoids such as cortisol regulate catabolism of skeletal muscle proteins into amino acids. These amino acids are then transported to the liver and converted into glucose during gluconeogenesis. Excessive amounts of glucocorticoids can result in higher blood glucose and insulin levels and can contribute to increased body fat and type II diabetes. Glucocorticoids are also known to play a role in the aging process by increasing cellular and mitochondrial breakdown.

The second group of adrenal steroids, the mineralocorticoids such as aldosterone help the body to retain sodium and water. Excesses of mineralocorticoids can result in hypertension and cardiovascular disease.

The third group of adrenal steroids include androgens and DHEA. Adrenal androgens oppose the actions of glucocorticoids and result in skeletal muscle anabolism (the opposite action of catabolism), reductions in blood glucose and insulin levels, reduction in body fat, and are believed to decrease the rate of cellular aging and increased red blood cell production. DHEA production by the adrenal glands is known to decline markedly as aging progresses.

With normal younger adults, all three groups of adrenal steroids are produced in a healthy balance. However, as people age, less DHEA is produced resulting in relatively greater amounts of glucocorticoids and mineralocorticoids and disruption of this balance.

DHEA supplementation is believed useful in treatment of aging and obesity and to stimulate erythropoiesis and skeletal muscle anabolism. In addition, supplemental DHEA can help restore the balance of adrenal steroids.

DHEA is commonly used as a dietary supplement. Unfortunately, DHEA is rapidly metabolized by liver enzymes referred to as sulfotransferases. Sulfotransferases rapidly

**2**

convert the much of the supplementary DHEA into DHEA sulfate, which is quickly excreted from the body and is not effective as an anti-aging, muscle-building or fat reduction compound. In addition, DHEA sulfate does not restore the balance of the adrenal steroids discussed above. As a result, frequent and larger doses of DHEA must be taken.

DHEA is also metabolized in the body to one of several compounds including, for example, etiocholanolone (5-beta-androstan-3-alpha-ol-17-one), beta etiocholanolone (5-beta-androstan-3-beta-ol-17-one), androsterone (5-alpha-androstan-3-alpha-ol-17-one), epiandrosterone (5-alpha-androstan-3-beta-ol-17-one), 7-keto-DHEA, 7-alpha-hydroxy-DHEA, 7-beta-hydroxy-DHEA, androstenedione, estrone and estradiol.

There is great individual variability in the metabolism of oral DHEA. The DHEA metabolites estrone and estradiol can result in negative estrogenic side effects for males including growth of male breast tissue, known as gynecomastia. Some individuals have poor bioavailability of DHEA as a result of sulfation in the liver, and large doses must be taken to elicit any desired effects. These increased doses of DHEA can result in increased conversion to estrone and estradiol, with resulting negative side effects.

It would be desirable to provide compounds which can be used to help provide the beneficial effects of high DHEA levels in the body for extended periods of time, yet reduce the undesired DHEA side effects discussed above.

### SUMMARY OF THE INVENTION

In accordance with a first aspect, a method is disclosed for administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof for decreasing body weight, reducing adipose tissue, increasing endurance, as an anti-aging compound and/or increasing production of red blood cells.

From the foregoing disclosure and the following more detailed description of various preferred embodiments it will be apparent to those skilled in the art that the present invention provides a significant advance in the methods of administering anti-aging compounds, for decreasing body weight and reducing adipose tissue, and increasing endurance. Additional features and advantages of various preferred embodiments will be better understood in view of the detailed description provided below.

### DETAILED DESCRIPTION OF CERTAIN PREFERRED EMBODIMENTS

It will be apparent to those skilled in the art, that is, to those who have knowledge or experience in this area of technology that many variations are possible for the method of administering DHEA derivatives for enhancing physical performance. The following detailed discussion of various alternative and preferred features and embodiments will illustrate the general principles of the invention with reference to improved methods of enhancing physical performance by administering DHEA derivatives as orally available dietary supplements. Other embodiments suitable for other applications will be apparent to those skilled in the art given the benefit of this disclosure.

As used herein, a derivative of a compound refers to a species having a chemical structure that is similar to the compound, yet containing a chemical group not present in the compound and/or deficient of a chemical group that is present in the compound. The substance to which the derivative is compared is known as the "parent" substance. Here, for

US 8,338,399 B2

3

example, the parent compound is the androstane steroid DHEA. A derivative may be made by modification of the parent compound or by synthesis from other starting materials that are not similar to the parent.

DHEA derivatives disclosed herein are advantageous in that they last longer in the body and are resistant to conversion to estradiol and estrogen, thereby advantageously providing the benefits of supplemental DHEA (including anti-aging benefits, decreased body weight, reduction of adipose tissue, increased endurance and/or increasing production of red blood cells) while reducing the negative side effects. Long-lasting DHEA derivatives are of the general formulas shown below, starting with the androst-1 ens:



wherein R3 is one of α-OH, β-OH, R5 is one of αH and βH, and R7 is one of H and CH₃. DHEA derivatives made according to the above formula can consist of 3-alpha-hydroxy-5-alpha-androst-1-en-17-one, 3-beta-hydroxy-5-alpha-androst-1-en-17-one, 3-alpha-hydroxy-5-alpha-7-alpha-methyl-androst-1-en-17-one, 3-alpha-hydroxy-5-alpha-7-alpha-methyl-androst-1-en-17-one, 3-alpha-hydroxy-5-beta-androst-1-en-17-one, 3-beta-hydroxy-5-beta-7-alpha-methyl-androst-1-en-17-one, and 3-beta-hydroxy-5-beta-7-alpha-methyl-androst-1-en-17-one, along with any salts, esters or ethers thereof.

Long lasting DHEA derivatives also include the following androst-4-ens:



wherein R3=one of is α-OH, β-OH. DHEA derivatives made according to the above formula can consist of 3-beta-hydroxy-androst-4-en-17-one and 3-alpha-hydroxy-androst-4-en-17-one along with any salts, esters or ethers thereof.

Long lasting DHEA derivatives also include the androst-5-en compound: 3-beta-hydroxy-7-alpha-methyl-androst-5-en-17-one, or any salts, esters or ethers thereof, reproduced immediately below:

4



Long lasting DHEA derivatives also include the androstan compound, 3-alpha-hydroxy-5-alpha-androstan-7,17-dione, or any salts, esters or ethers thereof, reproduced immediately below:



Long lasting DHEA derivatives also include 19-norandrost-4-en compounds according to the general formula:



wherein R3=one of is α-OH, β-OH. DHEA derivatives made according to the above formula can consist of 3-beta-hydroxy-norandrost-4-en-17-one and 3-alpha-hydroxy-norandrost-4-en-17-one or any salts, esters or ethers thereof.

Long lasting DHEA derivatives also include 19-norandrost-5-en compounds according to the general formula:



wherein R3=one of is α-OH, β-OH. DHEA derivatives made according to the above formula can consist of 3-beta-hydroxy-norandrost-5-en-17-one and 3-alpha-hydroxy-norandrost-5-en-17-one or any salts, esters or ethers thereof.

In accordance with conventional steroid carbon numbering, an atom or functional group attached to a ring depicted herein is termed α (alpha) if it lies below the plane of the paper or β (beta) if it lies above the plane of the paper. When R3

US 8,338,399 B2

| 5 | 6 |

and/or R7 have one functional group listed, it is understood that the fourth bond to the carbon is hydrogen. Other related DHEA derivatives suitable for administering anti-aging compounds, for decreasing body weight and reducing adipose tissue, for increasing production of red blood cells and/or increasing endurance will be readily apparent to those skilled in the art, given the benefit of this disclosure.

All of the naturally occurring DHEA derivative compounds disclosed herein preferably be administered orally mixed with solid or liquid carriers in appropriate unit doses.

The preferred amount of the active ingredient that is to be administered, would depend on various factors such as the age and weight of the user. An effective oral daily dosage of the described DHEA derivatives can comprise 50-2000 mg daily, and most preferably about 100-800 mg daily. A preferred embodiment might be to administer the oral dose as a soft gelatin capsule or oral liquid suspension, either in two to three divided doses per day (i.e., 50 to 400 mg twice per day, or 25 mg to 200 mg four times per day). The DHEA derivatives as disclosed herein may also be administered transdermally using acceptable liquid vehicles, sublingually, transrectally (by suppository) intranasally, intravenously, subcutaneously, or by intramuscular injection. The DHEA derivatives as disclosed herein may also be mixed with dietary supplements such as creatine if desired.

EXAMPLE 1

Capsules. 1 kg of the DHEA derivative, 3-beta-hydroxy-norandrost-4-en-17-one is mixed with microcrystalline cellulose, and placed into 10,000 hard-gelatin capsules. Each capsule contains 100 mg of 3-beta-hydroxy-norandrost-4-en-17-one.

EXAMPLE 2

Capsules. 1 kg of the DHEA derivative 3-beta-hydroxy-norandrost-5-en-17-one is mixed with 5 kg of creatine and placed into 10,000 hard-gelatin capsules. Each capsule contains 100 mg of 3-beta-hydroxy-norandrost-5-en-17-one and 500 mg creatine.

From the foregoing disclosure and detailed description of certain preferred embodiments, it will be apparent that various modifications, additions and other alternative embodiments are possible without departing from the true scope and spirit of the invention. The embodiments discussed were chosen and described to provide the best illustration of the principles of the invention and its practical application to thereby enable one of ordinary skill in the art to use the invention in various embodiments and with various modifications as are suited to the particular use contemplated. All such modifications and variations are within the scope of this invention as determined by the appended claims when interpreted in accordance with the breadth to which they are fairly, legally, and equitably entitled.

What is claimed is:

1. A method of administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof as a compound that provides at least one of anti-aging adrenal hormonal balance, decreased body weight, reduction of adipose tissue, increased endurance, skeletal muscle growth, and increased production of red blood cells, of the general formula:



wherein R3 is one of α-OH and β-OH, R5 is one of α-H and β-H, and R7 is one of α-H and β-H.

2. The method of claim 1 wherein the DHEA derivative is administered in one of the following ways: orally, transdermally, intranasally, by injection, sublingually, and transrectally.

3. The method of claim 1 wherein the DHEA derivative is administered in the form of a gel capsule.

4. The method of claim 1 further comprising administering the DHEA derivative with creatine.

5. A method of administering a DHEA derivative or a physiologically acceptable salt, ester or ether thereof as a compound that provides at least one of anti-aging adrenal hormonal balance, decreased body weight, reduction of adipose tissue, increased endurance, skeletal muscle growth, and increased production of red blood cells, of one of the following general formulae:



wherein R3 is one of α-OH and β-OH, R5 is one of α-H and β-H, and R7 is one of α-H and β-H.

6. The method of claim 5 wherein the DHEA derivative is administered in one of the following ways: orally, transdermally, intranasally, by injection, sublingually, and transrectally.

7. The method of claim 5 wherein the DHEA derivative is administered in the form of a gel capsule.

8. The method of claim 5 further comprising administering the DHEA derivative with creatine.

9. The method of claim 5 wherein the DHEA derivative is administered as a daily dosage between about 50 mg and 2000 mg.

10. The method of claim 5 wherein the DHEA derivative is administered as a daily dosage between about 100 mg and 400 mg.

11. The method of claim 5 wherein the DHEA derivative is administered as a daily dosage between about 50 mg to 200 mg twice per day.

12. The method of claim 5 wherein the DHEA derivative is administered as a daily dosage between about 25 mg to 100 mg four times per day.

* * * * *

11/5/2015                                              GTx Press Release

 MERCK  (/index.html)          Menu
*Be well*



## Licensing

MRL BD&L Leadership (/licensing/meet-licensing-leadership.html)

Licensing Contacts (/licensing/contact-us/home.html)

Partners (/licensing/our-partnership/voice-partners.html)

News & Events (/licensing/news-and-events/home.html)

# GTx Presents Phase II Ostarine (MK-2866) Cancer Cachexia Clinical Trial Results at Endocrine Society Annual Meeting

## *Ostarine Improved Lean Body Mass and Muscle Performance in Patients with Cancer Cachexia*

WASHINGTON, June 11, 2009 - (Business Wire) - GTx, Inc. (Nasdaq: GTXI - News) today announced results of a Phase II clinical trial evaluating Ostarine™ (MK-2866), an investigational selective androgen receptor modulator (SARM), in patients with cancer induced muscle loss, also known as cancer cachexia. In the study, Ostarine treatment led to statistically significant increase in lean body mass (LBM) and improvement in muscle performance measured by stair climb in patients with cancer cachexia compared to baseline in both the Ostarine 1 mg and 3 mg treatment cohorts. These study results were the subject today of an oral podium presentation at the 2009 Annual Meeting of the Endocrine Society in Washington.

In the study, Ostarine met the primary endpoint of LBM, measured by a dual energy X-ray absorptiometry (DEXA) scan, by demonstrating statistically significant increases in LBM compared to baseline in both the Ostarine 1 mg and 3 mg treatment cohorts. Specifically, the change from baseline in LBM for the placebo, 1 mg and 3 mg treatment groups was 0.1 kg (p=0.874 compared to baseline), 1.5 kg (p=0.001) and 1.3 kg (p=0.045), respectively, at the end of the 16-week trial.

"Approximately half of all cancer patients suffer from the devastating effects of cancer induced muscle loss. Increasing lean body mass may improve patients´ quality of life and even their response to cancer treatment," said Adrian Dobs, MD, MHS, an investigator in the Phase II clinical trial of Ostarine and Professor of Medicine and Oncology, The Johns Hopkins University School of Medicine. "These Phase II results demonstrate the potential of a SARM to fill an important unmet need as there are currently no FDA-approved therapies available for cancer cachexia."

GTx and Merck & Co., Inc. are collaborating to develop Ostarine as part of a broader SARMs clinical development program. SARMs are a new class of drugs with the potential to treat musculoskeletal conditions including cancer cachexia and sarcopenia—the loss of skeletal muscle mass resulting in reduced physical strength and ability to perform activities of daily living.

11/5/2015                                                          GTx Press Release

"We are encouraged by results of this Phase II trial in patients with cancer cachexia, where Ostarine showed significant improvements in lean body mass in both treatment cohorts," said Mitchell S. Steiner, MD, CEO of GTx. "We look forward to our continued partnership with Merck on the SARM program, and to evaluating the full potential of our lead product candidate Ostarine in conditions such as cancer cachexia, sarcopenia, and other muscle wasting conditions."

Cancer cachexia is the severe and progressive loss of muscle that occurs in cancer patients and is responsible for at least 20 percent of cancer deaths. An estimated 410,000 patients in the U.S. are diagnosed with cancer cachexia each year. Currently, there are no drugs approved for the treatment of cancer induced muscle loss.

## Study Summary

159 cancer patients with non-small cell lung cancer, colorectal cancer, non-Hodgkin's lymphoma, chronic lymphocytic leukemia, or breast cancer were randomized in the placebo-controlled study at 35 sites in the U.S. and Argentina. Participants received placebo, 1 mg or 3 mg Ostarine once daily for 16 weeks. Average weight loss prior to entry among all subjects was 8.8 percent and patients were allowed to receive standard chemotherapy during the trial. The drop-out rate during the trial was 33 percent, lower than the expected 50 percent rate observed in other cancer supportive care clinical trials.

The study also met the secondary endpoint of muscle function (performance) as measured by a 12-step stair climb test measuring speed and calculating power, with each Ostarine treatment arm demonstrating a statistically significant average decrease in time to completion and average percentage increase in power exerted. The change from baseline in stair climb power in the placebo, 1 mg and 3 mg treatment groups was 0.23 watts (p=0.66 compared to baseline), 8.4 watts (p=0.002) and 10.1 watts (p=0.001), respectively. Statistically significant decreases from baseline in stair climb time were also observed. No improvement in speed or power was observed for the placebo group. There were no improvements in the endpoints of grip strength and gait speed.

The incidence of serious adverse events, deaths and tumor progression were similar among placebo and the treatment cohorts. The most common side effects reported among all subjects in the trial were fatigue, anemia, nausea, and diarrhea.

## About Cancer Cachexia

Cancer induced muscle loss occurs in about 50 percent of cancer patients and may lead to loss of protein stores, severe weakness and fatigue, immobility, loss of independence, and an inability to tolerate and respond to cancer treatments. Cancer induced muscle wasting is responsible for at least 20 percent of cancer deaths. There are no drugs currently approved for the treatment of cancer wasting.

## About GTx

GTx, Inc., headquartered in Memphis, Tenn., is a biopharmaceutical company dedicated to the discovery, development, and commercialization of small molecules that selectively target hormone pathways to prevent and treat cancer, fractures and bone loss, muscle loss and other serious medical conditions. GTx has completed a pivotal Phase III clinical trial evaluating toremifene citrate, a selective estrogen receptor modulator, or SERM, at an 80 mg dose for the prevention of bone fractures and treatment of other estrogen deficiency side effects of androgen deprivation therapy in men with prostate cancer. GTx has applied for marketing approval in the United States for toremifene 80 mg and, if approved, plans to commercialize toremifene 80 mg in the U.S. GTx is also developing toremifene citrate at a 20 mg dose in a Phase III clinical trial for the prevention of prostate cancer in high risk men with high grade prostatic intraepithelial neoplasia, or PIN. GTx and Ipsen have entered into a development and collaboration agreement for toremifene citrate in all indications except breast cancer for Europe and the Commonwealth of Independent States (CIS). In December 2007, GTx and Merck & Co., Inc. formed a collaboration to discover and develop selective androgen receptor modulators, or SARMs, a new class of drugs with the potential to treat sarcopenia, which is the loss of skeletal muscle mass resulting in reduced physical strength and ability to perform activities of daily living, as well as

11/5/2015                                                  GTx Press Release

cancer cachexia (cancer induced muscle loss) and other musculoskeletal wasting conditions. GTx and Merck are evaluating multiple SARM product candidates, including Ostarine™ (designated by Merck as MK-2866) and MK-0773 for a variety of musculoskeletal wasting indications including sarcopenia and cancer cachexia. In the second half of 2009, Merck and GTx expect to complete an ongoing Phase II clinical trial evaluating MK-0773 in sarcopenia. GTx also is conducting a Phase I clinical trial evaluating GTx-758, an oral luteinizing hormone inhibitor, for first line treatment of advanced prostate cancer.

Next Press Release >> (adimab-press-release.html)

Copyright (/policy/copyright/home.html) © 2009-2015 Merck Sharp & Dohme Corp., a subsidiary of **Merck & Co., Inc**. All rights reserved.

Privacy (/about/how-we-operate/privacy/home.html)    Terms of Use (/policy/terms-of-use/home.html)    Site Map (/map/home.html)

    

(http://privacy.truste.com/privacy-seal/Merck-and-Co-,-Inc-/validation?rid=7437b42b-c947-434e-b1f5-db06d0327616)    (http://privacy.truste.com/privacy-seal/Merck-and-Co-,-Inc-/validation?rid=7437b42b-c947-434e-b1f5-db06d0327616)



(http://www.essentialaccessibility.com)

 (https://www.facebook.com/MerckBeWell)     (https://twitter.com/merck)    

(https://www.linkedin.com/company/merck)




## GTx Presents Results from Enobosarm POWER Trials for the Prevention and Treatment of Muscle Wasting in Patients with Non-Small Cell Lung Cancer at 15th World Conference on Lung Cancer

*Enobosarm had a significant effect on Lean Body Mass (LBM) and stair climb power (SCP) through Day 84 and 147 in POWER1 trial (platinum plus taxane) using a longitudinal continuous variable analysis*

*Enobosarm had a significant effect on Lean Body Mass (LBM) through Day 84 and 147 in POWER2 trial (platinum plus non-taxane) using a longitudinal continuous variable analysis*

*Patients who had a ≥ 1kg increase in LBM demonstrated a significant advantage in Stair Climb Power (SCP)*

*Findings from both trials show that maintenance or improvement in LBM improves survival by landmark analysis*

October 24, 2013 07:30 AM Eastern Daylight Time

MEMPHIS, Tenn.--(BUSINESS WIRE)--GTx, Inc. (Nasdaq: GTXI) announced today that a poster presentation, entitled *Results from two Phase 3 randomized trials of enobosarm, a selective androgen receptor modulator (SARM), for the prevention and treatment of muscle wasting in patients with non-small cell lung cancer (NSCLC) receiving chemotherapy*, will be given by Jeffrey Crawford, M.D., Chief, Division of Medical Oncology at Duke University School of Medicine, and principal investigator for the POWER1 (platinum plus taxane) and POWER2 (platinum plus non-taxane) trials, which were chemotherapy add-on placebo controlled studies.

Top line results from the POWER trials showed that enobosarm 3 mg once daily had a significant effect on LBM through Day 84 and 147 in both trials, compared to placebo (taxane:p=0.0003 and <0.0001, respectively; non-taxane: p=0.0227 and 0.0036, respectively, using a continuous variable analyses). By the responder analysis, a larger proportion of patients receiving enobosarm maintained or increased LBM at Day 84 and 147 in both clinical trials (taxane:p=0.036 and 0.026;non-taxane:p=0.113 and 0.013), as compared to placebo. Additionally, the POWER1 clinical study met the pre-specified endpoints for the European regulatory agency, using the longitudinal continuous variable analysis. As compared with placebo, enobosarm treated patients in POWER1 achieved the primary endpoint in SCP through Day 84 (p= 0.0185) and the secondary endpoint of SCP through Day 147 (p=0.0486).

In a post-hoc analysis, regardless of treatment, patients with a ≥ 1kg increase in LBM were more likely to demonstrate at least a 10% increase in SCP compared to patients who did not have a ≥ 1kg increase in LBM (taxane: 43.7% vs 29.3%, p=0.0250; and non-taxane: 40.5% vs 26.5%, p=0.0321). Importantly, a larger

proportion of enobosarm treated patients, with 1kg or greater increases in LBM, demonstrated at least a 10% increase in SCP (taxane: p=0.0698, ≥1kg 46.4%, <1kg 29.6%; and non-taxane: p=0.0335, ≥1kg 39.6%, <1kg 20.4%), while this same trend was not observed in placebo treated patients (taxane: p=0.3149, ≥1kg 38.7%, <1kg 29.0%; and non-taxane: p=0.2852, ≥1kg 41.5%, <1kg 31.3%). This observation suggests that SCP improvements, in both trials, may be related to enobosarm increases in LBM.

Post-hoc landmark survival analyses at Day 84 suggest improved survival in patients who maintained or increased LBM in both clinical trials, regardless of treatment. As required by the study protocols, the final survival analysis will be completed after 450 deaths have been observed among patients in the studies.

Enobosarm was very well tolerated in both clinical trials. Although only minor differences in adverse events were observed between the groups treated with enobosarm 3 mg and placebo in the POWER1 and POWER2 trials, there were notable differences in the adverse event profile between studies with anemia and other hematologic toxicities more prevalent in the POWER2 (platinum plus non-taxane) clinical trial.

Abstract ID: 2266: Results from two phase 3 randomized trials of enobosarm, selective androgen receptor modulator (SARM), for the prevention and treatment of muscle wasting in NSCLC. NSCLC Novel Therapies Poster Session 3 (P3.11-026), Wednesday, October 30, 2013, from 9:30 AM -2:30 PM AEDT in the Exhibit Hall, Ground Level at the 15th World Conference on Lung Cancer being held by the International Association for the Study of Lung Cancer in Sydney, Australia.

**About The POWER Trials**

A 3 mg dose of enobosarm was studied in two Phase 3 clinical trials to prevent and treat muscle wasting in patients with NSCLC. In each of these placebo controlled, double blind, add-on clinical trials, approximately 325 patients with stage III or IV NSCLC were randomized to oral daily doses of placebo or enobosarm 3 mg at the time they began first-line standard platinum doublet chemotherapy. The POWER trials were designed to assess the effect of enobosarm versus placebo on maintenance or improvement of total LBM (muscle) assessed by Dual-energy X-ray Absorptiometry (DXA) and improvement in physical function measured by SCP. Durability of enobosarm treatment was assessed at five months. Secondary endpoints included an assessment of whether enobosarm-treated patients had an improved quality of life and reduced healthcare resource utilization compared to placebo. Overall survival is being assessed as an additional safety endpoint. GTx announced early this year that the FDA has designated enobosarm for the prevention and treatment of muscle wasting in patients with NSCLC as a *Fast Track* development program.

**About Cancer-Induced Muscle Wasting**

Cancer-induced muscle wasting begins early in the disease process, resulting in decreased physical function and other detrimental consequences, such as fatigue and weight loss, which can contribute to disability, reduced quality of life and shorter overall survival, compared with patients without muscle loss. There are currently no drugs approved for the prevention and treatment of muscle wasting in patients with cancer.

**About Non-Small Cell Lung Cancer**

The American Cancer Society estimates about 228,190 new cases of lung cancer will be diagnosed in the United States in 2013, and approximately 85 to 90 percent of these are non-small cell lung cancer. Approximately 159,480 Americans are expected to die from lung cancer this year.

**About GTx**

GTx, Inc., headquartered in Memphis, Tenn., is a biopharmaceutical company dedicated to the discovery, development, and commercialization of small molecules for the treatment of cancer, cancer supportive care, and other serious medical conditions.

*Forward-Looking Information is Subject to Risk and Uncertainty*

*This press release contains forward-looking statements based upon GTx's current expectations. Forward-looking statements involve risks and uncertainties, and include, but are not limited to, statements relating to GTx's clinical trials for enobosarm (also known as Ostarine® or GTx-024). GTx's actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of these risks and uncertainties, which include, without limitation, the risks (i) that GTx will not be able to commercialize its product candidates if clinical trials do not demonstrate safety and efficacy in humans; (ii) that GTx may not be able to obtain required regulatory approvals to commercialize its product candidates in a timely manner or at all; (iii) that clinical trials being conducted by GTx may not be completed on schedule, or at all, or may otherwise be suspended or terminated; or (iv) that GTx could utilize its available cash resources sooner than it currently expects and may be unable to raise capital when needed, which would force GTx to delay, reduce or eliminate its product candidate development programs or commercialization efforts. You should not place undue reliance on these forward-looking statements, which apply only as of the date of this press release. GTx's quarterly report on Form 10-Q filed with the Securities and Exchange Commission on July 22, 2013 contains under the heading, "Risk Factors," a more comprehensive description of these and other risks to which GTx is subject. GTx expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in its expectations with regard thereto or any change in events, conditions or circumstances on which any such statements are based.*

Contacts
GTx, Inc.
Marc Hanover, 901-507-6915
President and Chief Operating Officer
mhanover@gtxinc.com

11/5/2015    GTx, Inc. enobosarm (Ostarine® or GTx-024) : Preventing and Treatment Muscle Wasting in Lung Cancer Patients



New Science. Established Pathways. Better Medicines.™

Register for Updates    Contact Us

About GTx | Science | Pipeline | Investors | Careers | webcast



PIPELINE

Overview

Enobosarm – Breast
Cancer (GTx-024)

SARD – Prostate
Cancer

GTx-758 – Prostate
Cancer

Clinical Trials

## enobosarm (Ostarine®; GTx-024)



Enobosarm (Ostarine®, GTx-024) is the Company's lead product candidate and is being developed for two breast cancer indications: as a targeted treatment for (i) estrogen receptor positive (ER+) and androgen receptor positive (AR+) breast cancer, and (ii) AR+ triple negative breast cancer (TNBC). For both clinical trials, the primary efficacy objective will be clinical benefit, which is defined as a complete response, partial response or stable disease. Enobosarm is a selective androgen receptor modulator, or SARM.

In June 2015, the Company plans to commence enrollment in an open-label, Phase 2 clinical trial in patients with advanced AR+ Triple Negative Breast Cancer. The study will enroll up to 55 patients with the primary efficacy objective defined as clinical benefit at 16 weeks

In the third quarter of 2015, the Company plans to commence enrollment in an open-label Phase 2 clinical trial in patients with ER+/AR+ advanced breast cancer. The study will enroll up to 118 patients with the primary efficacy objective defined as clinical benefit at 24 weeks.

### Historical Overview

- Steroidal androgens have been used to treat breast cancer (BC) prior to the development of SERMs (tamoxifen, raloxifene, and toremifene) and AIs (exemestane, letrozole, and anastrazole).
- Testosterone and other steroidal androgens can be converted (aromatized) to estrogens, which can contribute to the proliferation of BC. Further, the side effects of non-aromatizable androgens (e.g., fluoxymesterone), including masculinizing (facial and body hair growth, deepening of voice) and other side effects (edema, aggression, acne), limited widespread use.
- Steroidal androgens, with response rates (regression) of 20-25%, fell out of favor in the 1970s, due to a combination of increased efficacy (25-35% regression) and more favorable side effect profile of tamoxifen. [1]
- The last 30-plus years of hormonal research has focused on anti-estrogen therapy with SERMs, steroidal and non-steroidal AIs, and estrogen receptor down regulators for ER+ BC.
- Triple negative breast cancer (TNBC) is a very aggressive disease and, as there are currently no treatment options beyond chemotherapy, there is a significant unmet need for additional less toxic therapies.

### Current Clinical Landscape of AR Targeting

- The emergence and optimization of non-steroidal drugs acting as agonists (i.e., SARMs) or antagonists (i.e., antiandrogens) have reinvigorated the search for hormonal therapies targeting the androgen receptor (AR).
- Physicians, experienced with the use of androgens for treatment of BC, continue to use a course of androgens, following failure of newer hormonal approaches, in order to delay chemotherapy.
- Multiple approaches to targeting the AR are currently being evaluated, including traditional androgen agonists and, more recently, androgen blockade.
- Based on historical clinical data and preclinical evidence with SARMs, GTx believes that a safe, non-steroidal SARM is a rational therapeutic approach targeting the AR in ER+ BC patients, who have demonstrated previous hormonal responsiveness, and in TNBC patients. [1-2]

### Enobosarm for ER+/AR+ BC and AR+ TNBC

- Enobosarm is a non-steroidal AR agonist that binds with high affinity and selectivity to the AR, does not bind the estrogen receptor, and cannot be converted to estrogenic metabolites.
- In postmenopausal women, studies with enobosarm (3mg) have demonstrated a lack of masculinizing and other side effects generally associated with steroidal and non-steroidal androgens. [3]
- In addition, enobosarm may offer added benefits, including increasing lean body mass, improved performance, enhanced libido, decrease in bone turnover (potentially resistant to metastasis), and increased quality of life.
- A 22 patient, proof of concept, Phase II trial (NCT01616758) in ER+ BC is completed and preliminary data indicates feasibility of continued development. [4]
- Preclinical data in multiple models of AR+ TNBC cells suggests that enobosarm exhibits strong anti-proliferative effects both in vitro and in vivo. [2]

1. Garay, JP and Park, BH, Am J Cancer Res, 2012. 2(4): 434-45.
2. Narayanan, R et al., PLoS ONE 9(7): e103202.
3. Jones, A et al., Drugs of the Future. 2013. 38(5): 309-316.6
4. "Enobosarm for the Treatment of Metastatic, Estrogen and Androgen Receptor Positive, Breast Cancer"
Final Results of the Primary Endpoint and Current Progression Free Survival
Overmoyer, B et al., San Antonio Breast Cancer Symposium, 2014. (Abstract)

©2014 GTx, Inc.

Home    Terms & Conditions    Careers    Site Map



| | |
|---|---|
| **From:** | PJ Braun <pj@blackstonelabs.com> |
| **Sent:** | Tuesday, May 3, 2016 6:05 AM |
| **To:** | htpharmac@aol.com |
| **Cc:** | pjbraunfitness@yahoo.com |
| **Subject:** | Re: Hi-Tech |

Hey Jared I appreciate your direct candidness with me. I have said since day one that you seem like a really strait forward type of guy which is why I knew you COULD NOT BE INVOLVED with any of AARONS SIDE BUSINESS. I Told you things in confidence today... But also at a time of great shock and really without being overly dramatic, I told you this in the middle of pure heartbreak. I would hope that you could see that anything I said had heavy emotion behind it and also that I was simply telling you the 100% truth on everything. I had a really fucked yo day bro.

For the above reason I would really like a pass on whatever offensive words I may have made. I think we have a really awesome thing going with hi-tech and I want to continue to grow it so much bigger. I would never want to offend you in anyway because forget the business, I think of you as my friend ... And as you can see my friend situation isn't in a strong place. I am deeply sorry for anything I said today that changed  your position with us, I wasn't speaking in a "matter of fact way" I was simply throwing emotional ideas out and I thought you would understand me.

PLEASE GIVE US THE CHANCE TO GROW WITH YOU! Your support has meant so much to me and I'm really hurting right now man. I hope you can understand. I truly think my words were taken the wrong way and I'm deeply sorry!

Thank you. Pj

PJ Braun
President At Blackstone Labs
www.blackstonelabs.com

On May 2, 2016, at 9:40 PM, htpharmac@aol.com wrote:

> Pj,
> If you and Aaron should work things out and move back into a GMP type "mindset" let me know and I will be glad to make your products. I think in the long run it is the only way to avoid the FDA as the days of making stuff in your basement are not only over but, in fact, against the law.



> -----Original Message-----
> From: htpharmac <htpharmac@aol.com>
> To: pj <pj@blackstonelabs.com>; pjbraunfitness <pjbraunfitness@yahoo.com>
> Sent: Mon, May 2, 2016 9:00 pm
> Subject: Hi-Tech
>
> PJ,
> After talking to you this afternoon I got off the phone and was at a loss for words. I have never been accused of any possible scheme to defraud or giving anyone a kickback, and the fact that you thought I was capable of such shows you do not know much about my character or you are seeing "ghosts" where there are none. I have enjoyed working with Blackstone over the past 6 months and wish Blackstone all the best in business in the future. However, I can not do business with someone who believes I could be capable of such a "kickback" scam that would have robbed you of money when I knew you and Aaron were partners.
>
> The other thing you said today that was troubling was that you had set up a lab and did not know why Aaron had sent several jobs to Hi-Tech. When I came to Blackstone's office the point was to bring you guys into the world of GMP to keep Blackstone moving forward instead of backwards. It was Blackstone's goal to produce in a GMP environment versus the non GMP situation you have with DuraCap. By the sound of whatever new lab you are setting up it seems you are taking a step backwards as producing in a GMP environment is expensive and takes a long time to establish. Aaron (and I thought you) gave Hi-Tech business because we brought significant savings to Blackstone and provided a GMP environment. (see below certifications)

BSL-482288
GOV_01632009

https://cdn.shopify.com/s/files/1/1119/7502/files/Hi-Tech_Pharmaceuticals__Inc.Certificate_of_Excellence_2.18.15.pdf?15128809456939277486
https://cdn.shopify.com/s/files/1/1119/7502/files/Hi_Tech_Nutraceuticals_LLC_Certificate_of_Superior_2.23.15.pdf?8142434374010501008
https://cdn.shopify.com/s/files/1/1119/7502/files/Catanzariti_Hi_Tech_Nutraceuticals_Food_Processing_Reedsville_02-23-15_FINAL_E_JC_02-24-15.pdf?8142434374010501008

It appears that the new direction of Blackstone does not fit Hi-Tech. We have several PO's in house we will work with you guys to complete and then would ask that you transition the business back to Duracap or "your lab". We will not be making any of the liposomal products as I made those with the understanding Aaron would give me more of his other business which he did. The new direction you seem to be going is not conducive of me allowing Blackstone my patented copmounds and delivery system if I am getting nothing in return.

I also helped settle the case brought by Kevin Smith and have otherwise been a good friend and business partner, and am disappointed you thought I could be part of any "kickback" scheme when every quote was sent to both you and Aaron simultaneously. I have worked 20 years to build an "unimpeachable reputation" by always doing what I say I am going to do even when it is costly and standing and fighting for the industries rights when nobody else stands beside me.....all for what??? to be considered a fraud--I am at a loss for words.



BSL-482289
GOV_01632010

GOVERNMENT
EXHIBIT
3

| From: | David Winsauer <david@blackstonelabs.com> |
|---|---|
| Sent: | Wednesday, August 17, 2016 1:06 PM |
| To: | Joseph Safina <safjs@aol.com> |
| Subject: | Fwd: Good Luck |

another try in case last one didn't work.

---------- Forwarded message ----------
From: **David Winsauer** <david@blackstonelabs.com>
Date: Wed, Aug 17, 2016 at 9:00 AM
Subject: Fwd: Good Luck
To: Joseph Safina <safjs@aol.com>


Try this one

Sent from my iPhone

Begin forwarded message:

> **From:** PJ Braun <pj@blackstonelabs.com>
> **Date:** August 17, 2016 at 1:50:00 AM EDT
> **To:** Christopher Niemczyk <chrisn@blackstonelabs.com>
> **Cc:** david@primenutrition.com, Richard Newton <jr@blackstonelabs.com>
> **Subject: Re: Good Luck**
>
> Singerman was with Jared
>
> PJ Braun
> President At Blackstone Labs
> www.blackstonelabs.com
>
> On Aug 17, 2016, at 1:45 AM, Christopher Niemczyk <chrisn@blackstonelabs.com> wrote:
>
>> With who jared or bactolac
>>
>> Chris Niemczyk
>> VP
>> 610.905.9669
>> www.blackstonelabs.com
>>
>>
>> On Aug 17, 2016 1:32 AM, PJ Braun <pj@blackstonelabs.com> wrote:
>>> Singerman was with him today... He flew up there.
>>>
>>> PJ Braun
>>> President At Blackstone Labs
>>> www.blackstonelabs.com
>>>
>>> On Aug 17, 2016, at 1:14 AM, Christopher Niemczyk
>>> <chrisn@blackstonelabs.com> wrote:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-370734
GOV_01520900

Just emailed bactolac

Chris Niemczyk
VP
610.905.9669
www.blackstonelabs.com


On Aug 17, 2016 12:29 AM, PJ Braun <pj@blackstonelabs.com>
wrote:
    Here we go

    PJ Braun
    President At Blackstone Labs
    www.blackstonelabs.com

    Begin forwarded message:

        **From:** htpharmac@aol.com
        **Date:** August 16, 2016 at 9:39:07 PM EDT
        **To:** pj@blackstonelabs.com
        **Subject: Good Luck**

        https://blackdiamondsupplements.com/exo-13

        PJ,
        I am writing this as one of my sales guys pointed out to me after we
        talked of a new product that you guys launched. We spoke in depth
        about the danger about combining DMAA with a MAO Inhibitor
        (namely DMHA). You yanked it out of the Dust Xtreme wisely,
        however, you and your partner Ben have launched a product with
        precisely that in it with the EXO-13. Ben is clearly the most reckless
        guy in our industry and has no clue about chemistry as I see he did
        the same with Chaos and Pains new product. I have spent over $2
        million in fighting for DMAA and will not sit idly by while you guys
        bring adverse attention to DMAA with this reckless behavior and
        probably hurt someone badly. Ben is already indicted for such but
        apparently his greed has him "doubling down" and you are his
        partner. I think it best if we part ways as you seem to be more like
        Ben and Wes than myself. The few items we have left with PO's we
        will fullfill.

        ☒


--
**David Winsauer | Vice President**

BSL-370735
GOV_01520901

Blackstone Labs
**1090 Holland Drive 1**
**Boca Raton, FL 33487**

BSL-370736
GOV_01520902

**GOVERNMENT EXHIBIT**

4

**From:** htpharmac@aol.com
**To:** aaronsingerman@me.com
**Cc:**
**Bcc:**
**Date:** 09/06/2016 02:47:11 pm
**Subject:** Fwd: Your Fortress Supplements Order Confirmation (#6544)
**Attachments:**

——Original Message——
From: Olen Harris <redcbr_900@yahoo.com>
To: Jared <htpharmac@aol.com>
Sent: Tue, Sep 6, 2016 2:43 pm
Subject: Fw: Your Fortress Supplements Order Confirmation (#6544)

On Tuesday, September 6, 2016 2:39 PM, Fortress Supplements <Info@FortressSupplements.com> wrote:

## Thanks for Your Order

Your order ID is **#6544**.

### Shipping Address

olen harris

United States
404-259-6949

### Billing Address

olen harris

United States
404-259-6949

### Your Order Contains...

| Cart Items | Qty | Item Price | Item Total |
|---|---|---|---|
| Blackstone Labs Metha-Drol Extreme (Final Supply) | 1 | $199.95 USD | $199.95 USD |
| Blackstone Labs Super DMZ 2.0 (Final Supply) | 1 | $69.95 USD | $69.95 USD |
| | | Subtotal: | $269.90 USD |
| | | Shipping: | $0.00 USD |
| | | Grand Total: | $269.90 USD |
| | | Payment Method: | Credit Card |

### Fortress Supplements

http://www.fortresssupplements.com/

Fortress Supplements is powered by Bigcommerce. Launch your own store for free with Bigcommerce.

GOVERNMENT
EXHIBIT

5

| PARTICIPANTS | FROM | BODY | STATUS | TIMESTAMP: TIME | READ: TIME |
|---|---|---|---|---|---|
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | Someone please reach out to Joey | Read | 9/23/2016 5:27:55 PM(UTC-4) | 9/23/2016 5:28:26 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | I will cut that motjerfucker off he will Never make a product for us again | Read | 9/23/2016 5:28:10 PM(UTC-4) | 9/23/2016 5:28:26 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +15616768390 | Ok | Sent | 9/23/2016 5:32:02 PM(UTC-4) | |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | Aaron is such a scumbag | Read | 9/23/2016 5:32:24 PM(UTC-4) | 9/23/2016 5:32:24 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +17548028072 JR Newton | I am talking to Joey now . No way Joey is saying anything. | Read | 9/23/2016 5:35:16 PM(UTC-4) | 9/23/2016 5:35:30 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +17548028072 JR Newton | I will stake my life on it no way Joey says anything . | Read | 9/23/2016 5:37:13 PM(UTC-4) | 9/23/2016 5:37:14 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | That's a good idea | Read | 9/23/2016 5:37:34 PM(UTC-4) | 9/23/2016 5:37:46 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | How does Aaron know ? | Read | 9/23/2016 5:37:43 PM(UTC-4) | 9/23/2016 5:37:46 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +17548028072 JR Newton | We don't need to play games We are why Joey survives | Read | 9/23/2016 5:37:51 PM(UTC-4) | 9/23/2016 5:37:52 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | He's had to see the invoice somehow | Read | 9/23/2016 5:37:52 PM(UTC-4) | 9/23/2016 5:37:52 PM(UTC-4) |

| | | | | | |
|---|---|---|---|---|---|
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +15616768390 | He knew it happened before so he just casually looked on the site and searched for dmz? | Sent | 9/23/2016 5:38:06 PM(UTC-4) | |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | But how else could Aaron know | Read | 9/23/2016 5:38:07 PM(UTC-4) | 9/23/2016 5:38:07 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | I'm On a plane dad on wifi | Read | 9/23/2016 5:38:23 PM(UTC-4) | 9/23/2016 5:38:23 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | We all need to be on same page | Read | 9/23/2016 5:38:35 PM(UTC-4) | 9/23/2016 5:38:44 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | When I land I swill call and say what Justin said to Jared | Read | 9/23/2016 5:38:48 PM(UTC-4) | 9/23/2016 5:38:49 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | Justin was very smooth and said Jared believed him | Read | 9/23/2016 5:39:02 PM(UTC-4) | 9/23/2016 5:40:28 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +17548028072 JR Newton | You know that this is happened before with Aaron so anything that says miscellaneous is going to make him think that plus is all over the Internet | Read | 9/23/2016 5:39:16 PM(UTC-4) | 9/23/2016 5:40:28 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | How did he see it though? | Read | 9/23/2016 5:39:51 PM(UTC-4) | 9/23/2016 5:40:28 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | | Read | 9/23/2016 5:40:10 PM(UTC-4) | 9/23/2016 5:40:28 PM(UTC-4) |

| | | | | | |
|---|---|---|---|---|---|
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +17548028072 JR Newton | I talked to Joey and basically the cobra 6P that got screwed up is now the reason why we put miscellaneous on the invoice to help cover some of his negative dept . It was our way to help him . Remember Aaron have Joey the product ingredients. so we paid Joey the money so he didn't have to eat the whole cost. We have nothing to worry about it except for an internal rat . | Read | 9/23/2016 5:42:28 PM(UTC-4) | 9/23/2016 5:44:07 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +17548028072 JR Newton | We have to make sure that Amber doesn't send Aaron any Info without me going thru it . We don't need anything stupid to happen . PJ Please call me when you can . | Read | 9/23/2016 5:58:28 PM(UTC-4) | 9/23/2016 5:58:35 PM(UTC-4) |
| davidwinsauer@gmail.com David Winsauer (owner) +12033134515 PJ Braun +17548028072 JR Newton +15616768390 | +12033134515 PJ Braun | I will call when I land | Read | 9/23/2016 6:23:52 PM(UTC-4) | 9/23/2016 6:24:08 PM(UTC-4) |



| | |
|---|---|
| **From:** | PJ Braun < pj@blackstonelabs.com > |
| **Sent:** | Saturday, September 24, 2016 3:01 PM |
| **To:** | Christopher Niemczyk < chrisn@blackstonelabs.com> |
| **Subject:** | Re: specials |

It's fine you can give him a deal on regular dust then. Joe is telling me that if we can't get insured by Jared that he wants to sell the extreme off and cut it... that's not something I really want to do. Jared has not responded but there was some drama because Aaron told him that I sell Dmz to legendary supps off the books ( not true) so Jared called legendary pissed. Fortunately Justin was smart enough to think on his feet and said the Dmz he got was from last year an he still hasn't sold it all out yet.

PJ Braun
President At Blackstone Labs
www.blackstonelabs.com

On Sep 23, 2016, at 9:27 PM, Christopher Niemczyk < chrisn@blackstonelabs.com> wrote:

> Your call, I know you said yes , but I'm torn ... also any word on jared and the insurance
>
> Chris Niemczyk
> VP
> ▮▮▮▮▮▮
> www.blackstonelabs.com
>
> ---------- Forwarded message ----------
> From: Doug McConnaha < doug@pafdistribution.com>
> Date: Sep 23, 2016 10:21 PM
> Subject: RE: specials
> To: Christopher Niemczyk < chrisn@blackstonelabs.com>
> Cc:
>
> No but thanks like I said not enough profit for us we have too many from the hitech family already and there is getting g to be so much dmaa ones out there now it's really cheapen them up.
>
> Get Outlook for Android
>
> **From:** Christopher Niemczyk <chrisn@blackstonelabs.com>
> **Sent:** Friday, September 23, 2016 6:07:43 PM
> **To:** Doug McConnaha
> **Subject:** RE: specials
>
> I can probably get the 2000 done at 22 or 3000 at 21
>
> **From:** Doug McConnaha [mailto:doug@pafdistribution.com]
> **Sent:** Wednesday, September 21, 2016 11:41 PM
> **To:** Christopher Niemczyk
> **Subject:** RE: specials
>
> No i can't make money on it sorry .I have about 6 different ones from the aps hitech Gaspari family so the margins like I said are so much better. And I'm insured by them also they put a rider policy for paf .
>
> Get Outlook for Android
>
> **From:** Christopher Niemczyk <chrisn@blackstonelabs.com>
> **Sent:** Wednesday, September 21, 2016 8:16:52 PM
> **To:** Doug McConnaha
> **Subject:** RE: specials
>
> So no extreme ?
>
> Chris Niemczyk

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-459676
GOV_01609442

VP

███████████

www.blackstonelabs.com

On Sep 21, 2016 8:44 PM, Doug McConnaha <doug@pafdistribution.com> wrote:

Order please send my credit for prime in the one attached also and the rest in the new fat burner EXO-13 please for the credit 6 k plus owed .I also included a Blackstone order .

Thanks

Doug McConnaha

PAF Distribution

o: 800-███████

c: 563-███████

http://pafdistribution.com/

☒ PAF BSN Logo

**From:** Christopher Niemczyk [mailto:chrisn@blackstonelabs.com]
**Sent:** Wednesday, September 21, 2016 5:08 PM
**To:** Doug McConnaha
**Subject:** RE: specials

Can't do that..... I will do the dust v2 at 15 for 1000 this time for you to close that deal and blow out your inventory, the cog it 7 bucks different between the two

**From:** Doug McConnaha [mailto:doug@pafdistribution.com]
**Sent:** Wednesday, September 21, 2016 5:00 PM
**To:** Christopher Niemczyk
**Subject:** RE: specials

How about this ill do 2000 extreme at $20 and 1000 v2 at $15 plus some other items added ? that way we both get rid of some old dust

Doug McConnaha

PAF Distribution

o: 800-███████

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

c: 563 ███████

http://pafdistribution.com/

☒ PAF BSN Logo

**From:** Christopher Niemczyk [mailto:chrisn@blackstonelabs.com]
**Sent:** Tuesday, September 20, 2016 10:58 AM
**To:** Doug McConnaha
**Subject:** RE: specials

I'll match the dust v2 so you can get that out the door

As for dust extreme I can probably get 1500 and 1500 at 22

Chris Niemczyk
VP
610 ███████
www.blackstonelabs.com

On Sep 20, 2016 11:32 AM, Doug McConnaha - doug@pafdistribution.com - wrote:

I cant use that many what about like 2000 . Also I have 1000 v2 I need to move but guy will only buy in 2000 lots so need price on 1000 more I'm giving him these at 15 to get rid of. My V@ sales were nothing last month now we have Xtreme .

Doug McConnaha

PAF Distribution

o: 800 ███████

c: 563 ███████

http://pafdistribution.com/

☒ PAF BSN Logo

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-459678
GOV_01609444

**From:** Christopher Niemczyk [mailto:chrisn@blackstonelabs.com]
**Sent:** Tuesday, September 20, 2016 12:17 AM
**To:** Doug McConnaha
**Subject:** RE: specials

He said 20 if you prepay for 2500 each. Must take 5000

Chris Niemczyk
VP
███████████
www.blackstonelabs.com

On Sep 19, 2016 9:40 PM, Doug McConnaha < doug@pafdistribution.com > wrote:

What price can you do on the new dust xtreme ? Said you were going to talk to PJ and yes you have my word no lower than 26.99 I have to make my amrgins also !!

Doug McConnaha

PAF Distribution

o: 800-███████

c: 563-███████

http://pafdistribution.com/

×  PAF BSN Logo

**From:** Christopher Niemczyk [mailto:chrisn@blackstonelabs.com]
**Sent:** Tuesday, September 13, 2016 12:58 PM
**To:** Doug McConnaha
**Subject:** specials

The specials are on a three and one for 15 days for the products shown, so I would buy enough that you can honor the three and one into next month, we will be stopping it on the 30th no matter what.... If someone comes asking for it , ill redirect them to you... the entire deal would be at 50% off ( proteins and dust extreme would be at 40%). No further discount will be given to clear product, but I'm not requiring a minimum either.  I'm going to talk to  PJ about doing 5000 unit order for you and see what the price would be , but I know he is going to require it to be sold at 26.99 . same for the 3 whey

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-459679
GOV_01609445

X  christopherNiemczyk

WWW.BLACKSTONELABS.COM/MARKETING

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-459680
GOV_01609446