UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-80030-CR-DIMITROULEAS/MATTHEWMAN

UNITED STATES OF AMERICA,
    Plaintiff,

v.

PHILLIP BRAUN,
AARON SINGERMAN,
JAMES BOCCUZZI, and
BLACKSTONE LABS, LLC.
    Defendants.
_____/

**DEFENDANTS' MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

COME NOW, Defendants Phillip Bruan, Aaron Singerman, James Boccuzzi, and Blackstone Labs, LLC., by and through their undersigned counsel, and, pursuant to Fed. R. Crim. P. 41(h), file this Motion to Suppress Evidence obtained as the result of two unlawful seizures and searches. The Search Warrants at issue relied on both misstatements of law and fact, made intentionally by the affiant, Food and Drug Administration Office of Criminal Investigations Special Agent Kelly McCoy. In support of this motion, Defendants respectfully submit the following:

**INTRODUCTION**

On February 16, 2017, agents from the United States Food and Drug Administration ("FDA") Office of Criminal Investigation ("OCI") executed search warrants on the premises of Blackstone Labs ("Blackstone") and VenTech Laboratories ("VenTech"). These warrants were issued by Magistrate Judge William Matthewman based on signed affidavits submitted by FDA

1

OCI Special Agent Kelly McCoy (the "Affiant"). These affidavits contained numerous representations regarding the legal status of a number of dietary supplement ingredients, which were claimed to be either new drugs, misbranded, or adulterated. Additional representations were made with respect to the legal standing of FDA notices and warning letters.

The two warrants were authorized on the basis of affidavits that did not properly establish probable cause, as each falsely and with reckless disregard for the truth, made affirmative determinations as to the legal standing of ingredients that the FDA itself had not formally addressed. These misrepresentations were compounded by the statements surrounding FDA letters and public notices, giving the false impression that fair warning had been given. The FDA had not stated an affirmative position or commenced rulemaking, nor given notice of a final agency action regarding the status of these compounds.

## MATERIAL FACTS

On February 3, 2017, the Affiant, on behalf of FDA OCI, signed two (2) affidavits alleging probable cause related to the commission of Federal crimes involving unapproved new drugs, misbranded dietary supplements, and adulterated dietary supplements. The affidavits stated that evidence, contraband, and property related to the crimes would be found at two specific addresses. The only difference between the two affidavits at issue was the business name and address; herein referred together as the "Affidavits."

On February 16, 2017, federal agents executed the search warrant for Blackstone, located at 1120 Holland Drive, Boca Raton, Florida 33487. That same day, a second warrant was executed at 1140 Holland Drive, Suite 12, Boca Raton, Florida 33487. It is important to note here that the address and business searched in the second warrant execution was not the address and business

listed on the respective Affidavit. The issue presented in this Motion arises from the factual and legal information contained in the aforementioned Affidavits.

1.  **Warning Letters**

The Blackstone and VenTech Affidavits both reference FDA Warning Letters. (War. Aff. pg. 3:6). The Affiant misstates the legal status of an FDA Warning Letter. The affiant refers to them as "*formal Warning Letters*" and uses the heading "*Formal Warnings from FDA*." Under this heading, the Affiant provides Magistrate Judge Matthewman with false and misleading information, specifically that Blackstone received a *formal* warning for Dimethylbutylamine ("DMBA") contained in the products "Angel Dust" and "Cobra 6p." (War. Aff. 14:49). The FDA, in fact, had never engaged in formal rulemaking as regards to DMBA. It is axiomatic that without a formal rule, there cannot be a formal warning.

According to the FDA's Regulatory Procedures Manual, "*A Warning Letter is informal and advisory*. It communicates the agency's position on a matter, but it does not commit the FDA to taking enforcement action.[1]" (emphasis added). Not only is a Warning Letter informal, but it is legal nullity.

> [FDA Warning letters do not] represent a decision determining rights or obligations, or one from which legal consequences flow. The FDA Manual explains that "[a] Warning Letter is the agency's principal means of achieving prompt voluntary compliance with the Federal Food, Drug and Cosmetic Act." FDA Manual, § 4-1-1. Although a warning letter "communicates the agency's position on a matter," it is only "*informal and advisory*" and "does not commit FDA to taking enforcement action." *Id*. Indeed, the Manual states that, "[d]espite the significance of the violations [for which a warning letter may be issued], there are some circumstances that may preclude the agency from taking any further enforcement action following the issuance of a Warning Letter." In short, ***an FDA warning letter compels action by neither the recipient nor the agency***."

---

[1] U.S. Food and Drug Administration Regulatory Procedures Manual, Ch. 4, pg. 4

*Holistic Candlers & Consumers Ass'n v. FDA,* 398 U.S. App. D.C. 378, 664 F.3d 940 (2012)[2]. (citation in original) (emphasis added); See Also *Cody Laboratories, Inc. v. Sebelius*, 446 Fed. Appx. 964, 969 (10th Cir. 2011) (noting that, "[i]t appears that every court to consider the question has held that an FDA warning letter does not constitute 'final agency action'.")

While formal agency action has the power and effect of law, the Affiant misled Magistrate Judge Matthewman in stating that FDA Warning Letters constituted notice of legal violations. (War. Aff. 3:6). In addition, as the FDA requested a response to each of these Warning Letters, Blackstone was not compelled to undertake any suggested action(s). Based on this wording, courts have consistently held that alternatives to undertaking the actions suggested in a Warning Letter are both implied and permissible because such a letter is informal and advisory.

> [T]he FDA requested a response from the plaintiffs "[w]ithin fifteen working days of receipt of th[e] [FDA Warning] [L]etter" and informed the plaintiffs that if they did not "believe that [their] products [were] in violation of the [Act], [to] [submit] [their] reasoning and any supporting information for [the FDA's] consideration.
>
> This indicates that [the plaintiffs] ha[d] alternatives." (concluding that language in the agency's letter—requesting that the plaintiff "advise [the FDA]" if it was "unwilling to make the changes identified in [its] letter"—"was by its very nature informal and advisory".

*Hi-Tech Pharm., Inc. v. Hahn*, Civil Action No. 19-1268 (RBW), 2020 U.S. Dist. LEXIS 113730 (D.D.C. June 29, 2020). (internal citations omitted).

Here, Magistrate Judge Matthewman was falsely led to believe that the Defendants had violated formal agency action or a formal agency position. When, in truth, the Defendants would have been within their rights to continue selling any and all of the products listed, and even to affirmatively declare as much in a reply or to not reply at all.

---

[2] Holistic Candle is the most cited authority for the proposition that a warning letter neither confers nor grants legal rights or obligations. Typical citing verbiage is: "[A]n FDA warning letter compels action by neither the recipient nor the agency." *Sproule v. United States FDA*, No. 9:17-CV-80709, 2018 U.S. Dist. LEXIS 62507 (S.D. Fla. Apr. 13, 2018)

4

2.     **New Drugs**

The Affidavit categorizes Gear Support and PCT V as both "drugs" and "new drugs." The Affiant's theory was predicated on the fact that each contained N-Acetyl-Cystine ("NAC"). (War. Aff. 28:106-107; 29:108-111). NAC is a naturally occurring constituent of asparagus, green and red peppers, parsley, and other vegetables. While the Affiant claims that FDA approved a drug form of NAC in 1985 (War. Aff. 28:107), there are no drugs containing NAC as an active ingredient listed in the 1985 edition of FDA's Orange Book.[3] In addition, FDA's Director of Food Nutrition and Food Labeling, in response to a 2016 Petition for Qualified Health Claim, concluded on behalf of the Agency that NAC is categorized as "vitamins or other nutritional substances," and the product in which it is found is a "dietary supplement".[4] With no mention of the "drug" or "new drug" theory advanced by Affiant:

> Therefore, the agency concludes that the six individual substances in the petitioner's dietary supplement are either components of food (i.e., folic acid, vitamin B-12, and vitamin E) or a dietary supplement that includes vitamins or other nutritional substances (i.e., N-acetyl cysteine, acetyl-L-carnitine, and S-adenosyl methionine), and therefore, the "nutraceutical formulation" meets the definition of a substance in the health claim regulation (21 CFR 101.14(a)(2)). *Id*.

The categorization of NAC as either a drug or new drug, for the purposes of establishing probable cause was unsupported by readily accessible facts and belied by the FDA's own public statements.

3.     **Unapproved New Drug**

The Affiant states that Ostapro, a product alleged to contain the Selective Androgen Receptor Modulator("SARM") known as Ostarine "cannot be a dietary supplement," and that it "is an unapproved new drug," that is "illegal." (War. Aff. 25:87-89.). Until a Public Notice[5] was

---

[3] The Orange Book is FDA's annual accounting of approved drug products. Last accessed 9-11-2021 at: https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm
[4] Docket No. FDA-2016-Q-1523, found at: https://www.fda.gov/media/119441/download
[5] A "Public Notice," found at https://www.fda.gov/news-events/fda-brief/fda-brief-fda-warns-against-using-sarms-body-building-products

issued on October 23, 2017, the FDA had remained silent on the topic of SARMs generally and Ostarine specifically[6]. However, a public notice does not comply with FDA's rulemaking authority and does not have the force or effect of law. Furthermore, the Affidavits were sworn prior to this public notice in February of 2017.

A December 2016 Order, issued by Ninth Circuit Judge Real, noted that FDA had failed to make a final determination as to whether Ostarine was a "new drug" or "illegal":

> The alleged "new drug" or "prescription drug" ingredient identified by Plaintiff is Ostarine; however, Defendants rightfully assert that the FDA has yet to make a final determination under the [Food, Drug and Cosmetic Act] about whether Ostarine is in fact a "new drug." (2:15-18.)
>
> [The Plaintiff's] allegation that Defendants acted "illegally" in advertising and selling its products because they contain an ingredient "not legal" in dietary supplements under the [Food, Drug and Cosmetic Act] likewise requires a final determination by the FDA. (3:16-18.)

The Affiant similarly claims that 1,3-dimethylamylamine ("DMAA") is an unsafe dietary ingredient, an adulterated ingredient, and/or an adulterated food. However, the FDA had failed to engage in the necessary rulemaking procedure(s) to make DMAA illegal. At the time of the Affidavits, ongoing civil litigation had been underway for several years, in an effort to determine the legal status of the ingredient. See *United States v. Quantities of Finished & In-Process Foods*, No. 1:13-CV-3675-WBH, 2015 U.S. Dist. LEXIS 178281 (N.D. Ga. Apr. 21, 2015); *United States v. Quantities of Finished & In-Process Foods*, No. 1:13-CV-3675-WBH, 2017 U.S. Dist. LEXIS 214527 (N.D. Ga. Apr. 3, 2017); *United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341 (11th Cir. 2019). The matter of DMAA's legality was unsettled at the time of the Affidavits, and the potential outcomes were not limited to those

---

[6] But note that a lone Warning Letter had been sent in 2014, and is no longer accessible on the FDA's website, but rather exists only in archive form, not visible to search engines such as Google: https://wayback.archive-it.org/7993/20170112015323/http://www.fda.gov/Food/ComplianceEnforcement/ucm081788.htm

presented as fact in the Affidavits. Therefore, the Affiant stated as settled law, that which remained unadjudicated.

### 4. Misbranded

Misbranded products are products that are represented to be one thing but are actually another, or which contain substances not disclosed on the label. See 21 U.S.C. § 343. Under the subheading "Brutal 4ce" the Affiant provides a link to support her claim that "[a]s early as 2004, FDA has publicly stated that products containing androstenedione are not lawful dietary supplements." (War. Aff. 20:74).[7] However, the Affiant misstates the FDA's position. The webpage cited by the Affiant actually refers to Warning Letters, not a blanket declaration of illegality. The FDA's position, as stated on the link cited in the Affidavit reads:

> [B]ecause the products are labeled as dietary supplements, FDA assumes that the firm has a basis to conclude that androstenedione is a dietary ingredient. However, ***FDA is still considering the legal status of androstenedione-containing products***. At this time, the Agency has not reached any final conclusion as to whether products containing steroid hormones not scheduled under the Controlled Substances Act may be lawfully marketed. (emphasis added).

This webpage is not a final agency action or part of the rulemaking process that must be undertaken to declare a substance illegal, but rather is an example of a Good Guidance Practice Document. These documents explain the FDA's interpretation of, or policy on, a regulatory issue, but are ***not legally binding***. According to the FDA, they merely represent one way to reach a regulatory goal, leaving stakeholders free to use other approaches that satisfy the relevant law and regulations.[8] In addition, the FDA recognizes that in order to take action "the agency ***must first establish*** that such products are adulterated (e.g., that the product is unsafe) or misbranded (e.g.,

---

[7]The link provided in the Affidavit is no longer live but can be viewed at: https://wayback.archive-it.org/7993/20170112015323/http://www.fda.gov/Food/ComplianceEnforcement/ucm081788.htm
[8]https://www.fda.gov/about-fda/transparency-initiative/fact-sheet-fda-good-guidance-practices; https://www.fda.gov/media/82791/download; https://www.fda.gov/media/82644/download

that the labeling is false or misleading)." [9] (emphasis added). The Affiant has sworn that numerous other ingredients purportedly sold by Blackstone Labs are illegal, when in fact, FDA has failed make the prerequisite official determination or go through official rulemaking.

5. **Adulterated**

Adulterated dietary supplements are defined in 21 USC §342 (f). Adulterated products are those that contain, for example, an unsafe food additive. 21 U.S.C. § 342(a)(2)(C)(i). This section of the United States Code does not allow the FDA to simply declare a dietary supplement to be misbranded, with the force and effect of law. Rather, the government must shoulder the burden of proof in such a declaration. The final paragraph of the relevant portion of the statute concludes:

> In any proceeding under this subparagraph, **the United States shall bear the burden of proof** on each element to show that a dietary supplement is adulterated. ***The court*** shall decide any issue under this paragraph on a de novo basis. (emphasis added).

It has been well-established that the government bears the burden of proving a food is adulterated in enforcement actions brought directly under the Food, Drug and Cosmetic Act ("FDCA"). (DSHEA §402). See *NVE Inc. v. HHS*, 436 F.3d 182 (3d Cir. 2006); *United States v. Two Plastic Drums,* 984 F.2d 814, 816 (7th Cir. 1993) (both noting that FDA has the burden of proof in declaring a dietary supplement adulterated, one adjudicated after enactment of the Dietary Supplement Health and Education Act ("DSHEA") in 1994, one adjudicated prior). The FDA had not exercised its formal rulemaking authority nor had the government borne its burden of proof in a proceeding prior to the Affidavits.

As neither obligation required to declare an ingredient adulterated had been discharged, the affiant misled the magistrate judge by stating that the Blackstone products containing DMBA (

---

[9] https://www.fda.gov/food/dietary-supplements/dietary-supplement-products-ingredients

found in Dust) and DMAA ( found in Dust Extreme) are adulterated. Until FDA carries this burden of proof, such a preemptive claim is simply not true, and cannot serve as probable cause.

### 6. Misstatements

The Affidavit initially properly cites 21 U.S.C. §321 (ff) in full:

> A "dietary supplement" is defined in relevant part as a product intended to supplement the diet that bears or contains one or more of the following dietary ingredients: a vitamin; mineral; herb or botanical; a dietary substance for use by man to supplement the diet by increasing total dietary intake; or a concentrate, metabolite, constituent, extract, or ***combination of the preceding ingredients***. (War. Aff. 6:19) (emphasis added).

However, when the Affiant recites the statute when discussing the ingredient Picamilon in turn, she omits key language, stating only:

> FDA has publicly stated that Picamilon is not a dietary ingredient because it is not a vitamin, mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same, nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake. (War. Aff. 28:102)

The Affiant has clearly omitted a key portion of the relevant statute – eliminating the last element sufficient for compliance, i.e., that a dietary supplement may be a "**combination of the preceding ingredients**." The correct version of the statute has also been reiterated by the FDA in a public statement.[10] Picamilon is a combination of two dietary ingredients (a vitamin and a constituent of vegetables).

Your Honor recently recognized that the FDA merely expressing interest in an ingredient, without a final agency action or official determination, is insufficient to declare that ingredient illegal.

---

[10] https://www.fda.gov/food/dietary-supplement-products-ingredients/picamilon-dietary-supplements While it may be FDA's position that this combination of natural ingredients is somehow not a dietary ingredient, they have never denied that the relevant word "combination" appears in the statute.

> The FDA has expressed interest in DMHA but has not taken final agency action to determine whether DMHA is a dietary ingredient, whether it is safe for human consumption and/or whether it is illegal. "[A]greeing with the FDA that the FDA Warning Letter regarding DMHA does not constitute final agency action regarding DMHA and therefore dismissing claims against the FDA upon the court's ripeness inquiry." (internal cites omitted)

*Quidera v. Blackstone Labs, LLC*, No. 20-CV-80898, 2021 U.S. Dist. LEXIS 44022, at *9 (S.D. Fla. Mar. 5, 2021) (citing *Hi-Tech Pharms., Inc. v. Hahn*, No. CV 19-1268 (RBW), 2020 U.S. Dist. LEXIS 113730, 2020 WL 3498588, at *5 (D.D.C. June 29, 2020)).[11] This Court has recognized that it is not the province of the court to determine what is a dietary supplement, whether an ingredient is safe, or whether it ought to be approved. Those determinations are reserved for the FDA, and as above, specifically reserved as a "final agency action," due to their expertise and to avoid inconsistency by the courts.

> [T]he analysis of whether DMHA constitutes a dietary supplement involves the evaluation of conflicting scientific evidence in the complex areas of product and ingredient classification and "requires the 'determination of technical and scientific questions' best left to the FDA." … Determining based on science whether DMHA is safe or properly classified as a new dietary ingredient is "a particularly complicated issue that Congress has committed to a regulatory agency," here the FDA.
>
> Moreover, the Court agrees with the *Rosas* opinion that various district courts proceeding with their own interpretation of whether DMHA constitutes a dietary supplement under DSHEA, and possibly having different interpretations and different conclusions from that of other courts, would create problems with uniformity in administration and inconsistent product regulation, which the primary jurisdiction doctrine aims to avoid.

*Quidera,* 2021 U.S. Dist. LEXIS 44022, at *9 (Citing *Rosas v. Hi-Tech Pharm.*, No. CV 20-00433-DOC-DFM, 2020 U.S. Dist. LEXIS 164565 (C.D. Cal. July 29, 2020); *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359 (S.D. Fla. 2014)).

The plaintiff's burden of proof in a civil proceeding is the "preponderance of evidence" standard. If this burden cannot be met in a civil trial resulting from lack of definitive action by the

---

[11] That case referred to DMHA, an ingredient not unlike DMAA and DMBA (addressed supra).

agency charged with interpretation and application of the statute at issue, it must logically follow that the more exacting burden of proof required in a criminal proceeding, that extending beyond reasonable doubt, cannot be met. The Search Warrants must fail to allege probable cause as a matter of law, where the burden of proof is beyond reach of the facts.

### 7. Recalls

The Affiant makes the accusation that Blackstone continued to sell a recalled product even though she was aware that both the FDA and the manufacturer of the product, Mira Health, had failed to inform the Defendants of the recall. In omitting this critical piece of information, the Affiant states "[d]espite the recall, Blackstone continued to sell [Super DMZ Rx 2.0]." (War. Aff. 12:42; 13:44). In doing so, the Affiant makes the knowingly incorrect assertion that Blackstone's actions occurred after being adequately put on notice.

While it may be true that a recall was initiated, Blackstone was never given official notice of such from Mira Health or the FDA. Instead, Mira Health included the names of the Blackstone products and lot numbers in notifications sent to a company called BioGenix (GOV-1873967) and Nature Science (GOV-1873964). Although Blackstone was listed on certain Internal FDA Product Recall Reports as a consignee of Mira Health, no recall letter was ever sent to Blackstone. (GOV-02045564). Having received copies of all recall letters sent by Mira Health from the FDA's Recall Coordinator, Melinda Ruiz on December 5, 2016, the Affiant was undoubtedly aware that Blackstone never received a recall notice. (GOV-01874029).

## **ARGUMENT**

The Affiant, for each of the twelve (12) products purported to establish probable cause, makes <u>at least one</u> material misstatement germane to their respective legal status. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and

11

effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. It goes without saying that a finding of probable cause must be based upon facts that, taken as true, would amount to a violation of the law. The fact that Defendants sold various products for which the FDA had not made final determinations does not amount to a violation of the law. The fact that the Affiant misstates the law on multiple occasions is an abuse of process. "An officer of justice is bound to know what the law is, and if the facts on which he proceeds, if true, would not justify action under the law, he is a wrong-doer." *Malcomson v. Scott*, 23 N.W. 166, 168 (Mich. 1885).

The relationship between the facts alleged and the law proscribing them, must be sufficient to create a nexus between the information in the warrant and the alleged Federal crime. See *United States v. Blocker*, 2016 U.S. Dist. LEXIS 77280 at *15-16 (N.D. Ga. Feb. 29, 2016) (citing United States v. Miller, 24 F.3d 1357, 1360 (11th Cir. 1994))("The federal search warrant affidavit must set forth facts upon which the issuing judge can find probable cause that a federal crime is involved."). A warrant affidavit must show that there is a fair probability that contraband or evidence of a crime will be found at the particular place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). As the alleged facts lack nexus to a law proscribing them, there cannot be probable cause.

At the "very heart" of the Fourth Amendment's mandate is "that where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of **wrongful acts** and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation." (emphasis added). As the FDA

has merely issued non-binding, non-final, opinions on the substances at issue in the Affidavits, there cannot be sufficient evidence of a wrongful act. The Affidavits incorrectly describe the application of settled law to the substances at issue, instead replacing it with false statements on FDA's non-binding opinions.

A warrant is suspect where it contains a "false statement" that "knowingly and intentionally or with reckless disregard for the truth" was included in an affidavit that was "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). These requirements are not mere "formalities." *McDonald v. United States*, 335 U.S. 451, 455 (1948). The Magistrate Judge signing these warrants did so after being misled to believe that FDA had issued formal edicts and made final determinations as to the listed ingredients. In addition, DMAA was subject to ongoing litigation at the time of the Affidavits and warrant, yet the Affiant failed to disclose this status. The omission of a prong of a controlling statute was clearly done not only with intent but also with reckless disregard for the accuracy of the Affidavits. Because the statute was correctly stated at the beginning of the Affidavits, intent is shown by the fact that only the portion of the statute that would clearly exclude the substance at issue, Picamilon, from its regulation was missing. It cannot be a coincidence that no other portion of the statue is missing or even misstated. Further, reckless disregard is demonstrated by the fact that after the initial inclusion of the correct statute in the Affidavits, the relevant statute is misstated twice. (War. Aff. 11:39; 28:102). The Affiant did not adequately attempt to review the Affidavits for mistakes of fact or law, whether they were intentional or not. *See United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001); *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990); *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (holding that a warrant violates the Fourth Amendment when it contains omissions "made intentionally or with a reckless disregard for the accuracy of the affidavit"). Even

if Affiant believed that FDA's opinions were ultimately correct, she was obligated to disclose their true status, respectively, as advisory, non-binding or undergoing concurrent adjudication, requiring a burden of proof still unattained, and non-final.

The Supreme Court in *Bennett v. Spear* set out a two-part test for what constitutes final agency action. See 520 U.S. 154, 177-78 (1997):

> As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined,' or from which 'legal consequences will flow.

The Eleventh Circuit does not allow mistakes of law, no matter how reasonable, to form the basis for probable cause. *United States v. Chanthasouxat*, 342 F.3d 1271 (11th Cir. 2003). *Heien v. North Carolina*, 574 U.S. 54, 135 S. Ct. 530 (2014) holds that a reasonable mistake of law may still be sufficient to provide probable cause. But the touchstone is reasonableness. It is objectively unreasonable for a Special Agent of the FDA[12] to misinterpret the primary statute which the agency is charged to enforce.

This Court, in *Quidera* recognized the legal status of an ingredient being indeterminate and inconclusive was a bar to civil prosecution. If the legal status of an ingredient is insufficiently clear to allow civil litigation to proceed, it must be the case that it is insufficiently clear to allow for criminal prosecution. To hold otherwise would violate the most basic tenets of fair warning and due process. The Defendants respectfully ask that the products and ingredients on which FDA has purposely remained silent, or failed to engage in rulemaking, not be subject to prosecution. As this Court has previously held that civil litigation may not progress on FDA silence, Defendants submit that the more severe sanctions imposed by criminal prosecution must likewise be prohibited.

---

[12] The affiant has received, per the affidavit, "extensive training" in this area. Pg. 1.

As the Affiant has been "extensively trained" in the relevant laws, policies, and procedures, the conflation of FDA Good Guidance Practice Documents with authoritative rulemaking, omission of crucial words from controlling statutes, and entirely misstating the import of Warning Letters, should not be relied upon to establish good faith.

## REQUEST FOR A HEARING

Egregious behavior on the part of the Government without consequence erodes the public trust in the judicial system:

> When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition. United States v. Olsen, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., dissenting from denial of rehearing en banc)

Pursuant to *Franks v. Delaware*, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment, as incorporated in the Fourteenth Amendment, requires that a hearing be held at the defendant's request. Pp. 438 U. S. 155-156; 438 U. S. 164-172.  A hearing is necessary to establish the facts required for a *Franks v. Delaware,* 438 U.S. 154 (1978) violation.

## GOVERNMENT'S POSITION AS TO THE MOTION

A copy of this Motion was provided to the Government by undersigned counsel, Richard G. Lubin. The Government has advised that it opposes the motion.

## **CONCLUSION**

WHEREFORE, Defendants respectfully request that this Court: (1) conduct an evidentiary hearing pursuant to *Franks v. Delaware* into the accuracy of the affidavit upon which the warrants were issued; (2) upon good cause shown at that hearing, enter an Order suppressing all evidence seized in or as a result of the seizures pursuant to the warrants issued upon misleading and incorrect affidavits; (3) disallow those ingredients of indeterminate legal status to be prosecuted; and, (4) for such other and further relief as this Court may deem just and proper.

**DATED** this 19th day of September, 2021.

Respectfully submitted,

**RICHARD G. LUBIN, P.A**.
707 North Flagler Drive
West Palm Beach, FL  33401
Telephone:  561-655-2040
Facsimile:   561-655-2182
Email: rich@lubinlaw.com
Counsel for Aaron Singerman

By:   */s/ Richard G. Lubin*
**RICHARD G. LUBIN**
Fla. Bar No. 182249


*/s/ Amy Morse*
**AMY MORSE, ESQ**.
Morse & Morse, LLC
Of Counsel to Richard G. Lubin, P.A.
707 North Flagler Drive
West Palm Beach, FL 33401
T: (561) 651-4145;
F: (561) 655-2182
Email: amy@morselegal.com
FL Bar No.: 0388475
Co-Counsel for Aaron Singerman

/*s/Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Defendant Braun

*s/Michael T. Davis*
**MICHAEL T. DAVIS**
Florida Bar No.: 63374

*s/Susan Dmitrovsky*
**SUSAN DMITROVSKY**
Florida Bar No. 73296

**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
mdavis@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Defendant Blackstone Labs, Inc.


/*s/ J. Stephen Salter*
**J. STEPHEN SALTER**
8975 Pompano Way
Gulf Shores, Alabama 36542
Phone: 205-585-1776
Email: umstakwit@aol.com
Admitted Pro Hac Vice for Defendant Boccuzzi

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 19, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     */s/ Richard G. Lubin*
         **RICHARD G. LUBIN**