**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 19-80030-CR-DIMITROULEAS/MATTHEWMAN**

**UNITED STATES OF AMERICA,**

**v.**

**PHILLIP BRAUN,**
**AARON SINGERMAN,**
**JAMES BOCCUZZI, and**
**BLACKSTONE LABS, LLC**
_____/

**DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE FOR SPEEDY**
**TRIAL ACT VIOLATIONS**

**INTRODUCTION**

In February of 2017, the United States Government seized more than $1 million in nutritional supplement products from Blackstone Labs, LLC (Blackstone). After eighteen months and no indictment, Blackstone filed a Federal Rule of Criminal Procedure 41(g) petition for the return of perishable product approaching expiration for which the Government did not claim violated federal law on October 8, 2018. Rather than release the legitimate products, the Government prematurely filed the instant indictment on March 8, 2019, to gain a tactical advantage in the Rule 41(g) proceeding. The Government had not completed its investigation, nor was the Government ready to try its case.

The premature indictment triggered a cascade of errors that cost the Defendants millions of dollars while denying them their statutory and constitutional right to a speedy trial and constitutional right to prepare an adequate defense. Defendants Philip Braun, Aaron Singerman, James Boccuzzi and Blackstone Labs, LLC seek dismissal of the indictment under the Speedy trial Act, because they were not tried within 70 days of the last co-Defendant's arraignment, even after subtracting excludable time.

1

**BACKGROUND**

## I.   Procedural Background

The Government's investigation began as early as August 2015 with several undercover purchases from Blackstone's website. The investigation climaxed with the execution of search and seizure warrants as well as the delivery of several target letters in early 2017. Incidentally, while the Defendants and their companies were raided and targeted for federal prosecution, their industry cohorts simultaneously received FDA warning letters advising them of the FDA's position on the legality of these same substances.

As explained above, after eighteen months and no indictment, Blackstone filed a Rule 41(g) petition for the return of perishable products for which the Government did not claim violated federal law. The Government opposed the petition, claiming its indictment would soon be filed. On March 8, 2019, the Government filed the instant indictment. By this point, the Government had investigated Blackstone for at least **four** years. Despite its lengthy investigation, the Government was not prepared to try its case, and much less prepared to meet its discovery obligations under *Brady*, *Giglio*, and the Southern District of Florida local rules. The Government filed the indictment to gain a tactical advantage in the Rule 41(g) proceeding.

On April 16, 2019, the Government filed a motion to designate this case as complex under the Speedy Trial Act and to continue the original May trial date (DE94). The Government cited, in part, the voluminous discovery involved and stated that more discovery was forthcoming. However, the Government's motion did not disclose the extent of its non-preparedness, nor  that it filed its indictment to defeat Blackstone's Rule 41(g) petition. The Court denied the Government's motion without prejudice to the motion being presented at the May 3, 2019 status conference (DE98).

The status of the Government's production of discovery was discussed at the May 3, 2019 status conference, in calculating an appropriate time for

2

resetting the trial. The Court directly asked the Government why discovery was not ready the day it filed its historical indictment (DE169:11-12). The Government attributed the delay to the absence of a protective order, representing that most of the discovery would be produced within two weeks of the signing of the protective order (DE169:12-13). Again, the Government did not disclose that its indictment was prematurely filed to defeat Blackstone's Rule 41(g). Nor did it let on that it had no idea when it would complete its *Brady*, *Giglio*, and discovery productions. Based on the Government's representations, the Court set the discovery production deadline for May 17, 2019, and concomitantly set the Defendants' pretrial motion deadline for September 17, 2019, and the trial date for January 6, 2020 (DE143).

The Government immediately violated the Court's discovery order with the production of additional documents starting on June 4, 2019. The Government's July 17, 2019 Production, No. 12 of 7.7 GB (136,350 pages) of data, triggered a Defense motion for continuance, which was filed on July 29, 2019 (DE180). Although the Government opposed the motion, it conceded that 80% of the late pages produced had been in its possession since the grand jury investigation (DE186:5). Yet, the Government's opposition offered no suitable justification for why it took 131 days to produce documents admittedly in its possession long before it filed its indictment. The Government took the position that the ends of justice did not warrant a continuance because the complexity of the case was addressed by the prior continuance that set the trial for January 2020 (DE186:8).

At the hearing, the Government finally admitted why it was not prepared to prosecute the case—it prematurely filed its indictment, in part, in response to Blackstone's Rule 41(g) petition for return of uncontested product (DE191:32-34):

> **THE COURT**: **Why aren't all of the documents available when you return the indictment?** I mean, there's -- you decided when to go to the grand jury. You decided when to get the indictment. Why

3

are you getting an indictment when you're not ready to go to trial, you're not ready to give all of the documents to the defense?

**MR. READER**: Without going into too much work product discussion, Your Honor, I think that there are various pressures that go into the timing of an indictment. In this case, as Your Honor knows from the pleadings, there's a parallel petition for return of property. And in the pleadings in that case the government said this motion for return of property, you know, should be dismissed for lack of jurisdiction because an indictment is coming soon. I think that was obviously some pressure on the government, as well as there is pressure that involves statute of limitations and other things.

The Government further disclosed that there were "a few more documents," including a "small group of documents involving the FDA" to be produced (DE191:36). The Government represented it should be "a very limited pool of documents." (DE191:37). The Court directed the Government to produce them, less the documents be excluded from the Government's case in chief (DE191:36).

Regarding the amount of time needed to review the documents, Defense counsel estimated that using artificial intelligence (AI), it could take approximately fifteen weeks to review 2.1 million documents (DE191:15).

At the August 12, 2019 hearing, the Court continued the trial four months until May 11, 2020 (DE190). It set the Defendants' motion deadline for January 17, 2020 (DE189; DE191:39). Thus, if the Government produced all remaining discovery within four weeks, the Defendants would have approximately seventeen weeks to conduct their review and file their pretrial pleadings, well within the fifteen weeks needed to conduct AI-assisted review.

The Government produced much more than a very limited pool of documents. It set on a drip-drop of key documents that made AI-assisted discovery review impossible. The Government's "very limited pool of documents" consisted of:

- Multiple productions of additional FDA records, including a set of 1,427 documents containing files created as early as July of 2013, supplemental chemist reports, and adverse reports;
- Multiple productions of additional DEA records, supplemental chemist reports, and chemist Memorandum of Interviews (MOIs).
- 2,893 documents from cooperating co-Defendant Robert DiMaggio which the Government withheld until obtaining a plea agreement;
- 18 documents from cooperating unindicted co-conspirator Leonard Shemtob which the Government withheld until obtaining a plea agreement in 2021;
- Emails from cooperating unindicted co-conspirator Justin Smith which the Government withheld until obtaining a plea agreement in 2021;
- A forensic image of Robert DiMaggio's computer taken in 2017;[1]
- A forensic image of Robert DiMaggio's cell phone taken in 2017;
- Phone communications between Anthony Ventrella and Ashley Ventrella;
- Phone communications produced by Paul Jasinto, a chemist with Ventech labs;
- Robert DiMaggio's plea agreement;
- File images from a search warrant of James Boccuzzi's email account executed July 17, 2018;
- 166 native files identified by the Defendants as unreadable;
- 2 DVDs of native files "omitted" from the original productions;
- 3 DVDs of native files with lower quality images;
- Videos of Phillip Braun created before the indictment was returned;
- Captures from Blackstone's website and forum regarding military training;
- Online articles dating back to March 17, 2015;
- Records related to alleged "victims";
- Two MOIs for James Boccuzzi dated February 16, 2017 and March 13, 2019;
- Bank records; and
- "Potential" *Brady/Giglio* and *Jencks* materials.

The documents were produced periodically in a drip-drop fashion. A timeline of the production dates is telling:

- September 13, 2019
- September 27, 2019

---

[1] "Mr. Reader: Again, as I said, the forensic drives, **we have made the defendants' own devices already available to them for inspection.**" D.E. 169 at 12 (emphasis added). Every Defendant except Mr. DiMaggio's, for reasons never articulated.

- November 13, 2019
- November 20, 2019
- November 26, 2019
- December 20, 2019
- January 8, 2020
- January 15, 2020
- January 24, 2020
- January 28, 2020
- January 29, 2020
- February 18, 2020
- March 27, 2020
- July 3, 2020
- December 9, 2020
- May 31, 2021

Many of the documents contained *Brady/Giglio* information that was already in the Government's possession when it filed its indictment. One egregious example was the Government's January 24, 2020 production of DEA Drug & Chemical Evaluation Section, Diversion Control Division, letters opining that the key substances at issue in this case (dimethazine and methylstenbolone) were not named as controlled substances in the CSA and did not otherwise satisfy the definition of controlled substance under the CSA. The opinions were issued between 2017 and 2018 by members of the investigatory team who assisted the lead Assistant US Attorney in preparing the case.

The production further included MOIs, proffer letters, plea agreements, and transcripts of grand jury, most of which was in existence before the Government filed its indictment. To make matters worse, key documents were produced *after* the January 17, 2020 pretrial motion deadline.

The latest productions on May 31, 2021, and September 13, 2021 is another egregious example of the Government's repeated discovery violations. They involved emails and factual proffers intentionally withheld by the Government. As will be more fully discussed, the documents' production has triggered costly and timely electronic searches.

II.     **Defendants' Discovery Review Process**

6

The Defendants implemented Technology Assisted review 2.0 (TAR 2.0)[2] using continuous machine learning in a hybrid review model, considered one of the best practices in managing large ESI projects.[3] Hybrid review is the combination of TAR and a multistage, human managed review. "In common TAR 2.0 workflows, the software is only trying to return relevant documents to the humans, and the humans review all the documents returned by the computer as predicted relevant." *See* Bolch at 42 ("Predicted Relevant Set"). The

---

[2] As explained by Judge Peck: [A]t the time of *Da Silva Moore v. Publicis Groupe* and *Rio Tinto PLC v. Vale S.A.*, it was necessary to train the TAR tool, which led to issues about how much transparency would exist to let the requesting party see all aspects of the seed set. In what eDiscovery vendors call TAR 2.0, using continuous active learning, the review of every document continues to train the system, alleviating that concern. *The biggest continuing concern is whether disputes with opposing counsel and motion practice about the use of TAR will eat up the cost savings from using TAR. Id.* (internal citations omitted)(discussing Judge Matthewman's Core Component 9, TAR).

[3] As Judge Matthewman explained in his seminal 2019 paper on civil eDiscovery:

> TAR is similar conceptually to a fully human-based document review; the computer just takes the place of much of the human-review work force in conducting the document review. As a practical matter … the computer is faster, more consistent, and more cost effective … than human review alone.
>
> TAR can search extensive amounts of data better, faster, more accurately, and cheaper than humans. In effect, *TAR involves skilled humans teaching a computer to rapidly, accurately, and reliably search and identify relevant documents within large sets of data.* This means that lawyers or teams of lawyers do not have to sit in a room and risk losing their eyesight reviewing countless documents to determine those that are relevant for production and those that are irrelevant. *In conjunction with TAR, the use of search terms to help identify relevant documents and the use of sampling of certain data sets are methods that must be understood and employed in the e-discovery process.*

Matthewman, *Towards a New Paradigm for E-Discovery in Civil Litigation: A Judicial Perspective,* 71 Fla. L. Rev. 1261 (2019) (emphasis added).

Defendants set up a three-stage managed review process, spending more than one million dollars to date to review the voluminous discovery provided by the Government.

The human review team was given a 5-day training session on the software used to store and analyze the data (Relativity), the indictment, the FDCA, the Dietary Supplement Health and Education Act of 1994 (DHSEA), the Designer Anabolic Steroid Control Act of 2014 (DASCA), the Government's theories, the Defense strategy (as it existed at the time) and the known background of the parties to this case. They reviewed all of the Government's "hot documents" manually. A Quality Control (QC) manager was selected from within the review team, and the team was given initial assignments using a combination of search term protocols and selected custodian review.

The Government provided a set of "hot documents" that Mr. Reader and Mr. Frank indicated formed the Government's core case against the Defendants. These documents, along with some randomly sampled and other known documents formed the core of the Defendants initial seed set. As the review team manually coded additional documents, deduplicated the data set[4], and purged clearly nonresponsive or irrelevant documents, the predictive coding updated continuously. An initial set of search terms was constructed in an attempt to cull some of the data set to a more manageable number of documents.

The review team made additional extrapolations from these early coding returns about additional potential search terms[5], and weekly QC checks for

---

[4] Lacking the necessary metadata for the bulk of the Government's productions, most of the deduplication had to be done manually for documents the predictive coding system flagged as responsive.

[5] Whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. *See* George L. Paul & Jason R. Baron, *Information Inflation: Can the Legal System Adapt?',* 13 RICH. J.L. & TECH. 10 (2007).

recall[6] and precision[7] were performed. Additionally, all internal Government documents were manually reviewed during this and later stages of the review process. Once a statistically significant set of documents was fed into the predictive coding algorithm, the review team then began TAR 2.0 review of the remaining documents.

## SUMMARY OF ARGUMENT

Under the Speedy Trial Act, the Defendants were required to be tried with 70 days of the last arraignment. The trial continuances do not meet the requirements of the Speedy Trial Act for excludable time for two reasons. First, the Court did not specify its reasons for finding that the ends of justice were served and outweighed other interests, justifying a Speedy Trial continuance. Second, the record of the proceedings does not support an ends of justice finding.

## ARGUMENT

### A. The Government Decision to Prematurely File the Indictment Caused a Cascade of Errors that Resulted in a Speedy Trial Act Violation

The Speedy Trial Act required Defendants be brought to trial within 70 days of **April 22, 2019**, the day the last co-Defendants (Phillip Braun and Blackstone) were arraigned. *See* D.E. 74; Speedy Trial Report D.E. 139. *See* 18 U.S.C. § 3161(c)(1). If not brought to trial within 70 days, the indictment **must** be dismissed on motion from the Defendants. 18 U.S.C. § 3162(a)(2). The speedy trial clock's tolling provision applies only to delays attributable to certain specific circumstances. 18 U.S.C. § 3161(h)(1)-(6). In the context of a motion to continue trial, a district court may grant the continuance **and** exclude "the resulting delay if the court, after considering certain factors, makes on-the-record findings that

---

[6] "Recall measures the percentage of documents found to be relevant." *Bolch* at 43.
[7] "Precision measures the percentage of documents that are truly relevant among all the documents the computer identified as potentially relevant." *Bolch* at 42.

the ends of justice served by granting the continuance outweigh the public's and defendant's interests in a speedy trial." *Zedner v. United States*, 547 U.S. 489, 498-99, 126 S. Ct. 1976, 1984 (2006) (citing 18 U.S.C. § 3161(h)(7)).

The Supreme Court has required that the district court "'se[t] forth, in the record of the case, either orally or in writing, its reasons' for finding that the ends of justice are served and they outweigh other interests." *Id.* at 506. 18 U.S.C. § 3161(h)(8)(A).[8] Those findings may be put on the record "by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Id.* at 507. *United States v. Myrie*, 479 F. App'x 898, 902 (11th Cir. 2012) (best practice is to state reasons when granting the continuance, but noting the reasons may be placed on the record at the time of ruling on a motion to dismiss for Speedy Trial Act violations).

Dismissal under the Speedy Trial Act is required for two reasons. First, the Court did not specify its reasons for finding that the ends of justice were served and outweighed other interests, justifying a Speedy Trial continuance. Second, the record of the proceedings does not support an ends of justice finding.

As amended, the Speedy Trial Act of 1974 sets forth the factors that the Court must consider in deciding to continue a criminal trial. Those factors include:

1) Whether the failure to grant a continuance would be likely to result in a miscarriage of justice;

2) Whether the case is so unusual or so complex that it is unreasonable to expect adequate preparation within the statutory time limits; and

3) Whether failure to grant a continuance would deny the defendant reasonable time to obtain counsel, would deny the defendant or the Government continuity of counsel, or would deny counsel reasonable time to effectively prepare.

---

[8] A time exclusion that applies to one defendant in a multi-defendant case applies to all defendants. *See, e.g., United States v. Stafford*, 697 F.2d 1368, 1372 (11th Cir. 1983); *United States v. Darby*, 744 F.2d 1508, 1517 (11th Cir. 1984); 18 U.S.C. § 3161(h)(6).

*See* 18 U.S.C. §§ 3161(h)(7)(B) (2021). The Government's lack of diligent preparation is expressly precluded as an acceptable reason for continuing a trial under the Speedy Trial Act. *Id.* § 3161(h)(7)(C). Congress wisely understood that justice delayed is often justice denied. This case, involving TAR-based discovery, presents a textbook example. The Defendants have spent at least one million dollars to date, paying $30,000 per month storage fees plus staff to review and maintain the data in a case that the Government was not prepared to try. The Government's decision to file a case before it was ready to proceed to trial caused significant financial harm.

Importantly, the Speedy Trial Act does not prohibit continuances based on a prosecutor's lack of diligent preparation, "it simply prohibits the district court from relying on § 3161(h)(7)(A) to exclude any delay caused by such 'lack of diligent preparation' from the speedy trial clock." *United States v. Robertson*, 606 F.3d 943, 960 (8th Cir. 2010). Defendants could accordingly seek a continuance on grounds of Government non-diligent preparation without waiving their right to a speedy trial. *See United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009) ("When a party fails to comply with [Federal Rule of Criminal Procedure 16, which governs discovery and discovery violations], the district court is empowered to order that party to comply with the Rule, grant a continuance, exclude the evidence, or enter other just relief.").

Applied here, the Speedy Trial clock has been running since April 22, 2019, the day the last Defendants were arraigned. At the May 3, 2019 status conference, the Court continued the May trial to January 6, 2020, but did not make the required findings. Counsel for Defendant PJ Braun expressly asked if the Court would make "the appropriate finding for the speedy trial, ends of justice?," to which the Court responded it would (DE169:74). The order, however, never disclosed the Court's reasoning for finding the ends of justice would be satisfied by a continuance (DE145:1). Nor did the Court expressly state its reasons for finding the ends of justice met. As a consequence, the order does not properly exclude time after the May 6, 2019 order from the calculation and the

Speedy Trial clock reached zero on July 1, 2019. Notwithstanding, the record suggests the continuance was granted under Subsection 3161(h)(7)(b)(ii)'s complex litigation provision. The Government argued as much, in seeking a complex case designation and continuance under Subsection 3161(h)(7)(b)(ii) (DE94).

The Court's first continuance order (May 6, 2019) set an aggressive, but reasonable, time schedule for the review of the millions of documents using TAR. The Court's examination of Defense counsel uncovered that such a review could reasonably be conducted in 15 weeks. And the Court's timeline, which began with a May 17, 2019 Government discovery deadline gave the Defendants just enough time—15 weeks to upload the electronic data and run the necessary AI analytics, plus 2 weeks to draft their pretrial motions. The remaining time from September to the January trial date was just enough time to organize the documents for expert review and trial as well as to conduct second and third tier reviews of the data.

The only obstacle to the Court's carefully orchestrated time schedule for trying this complex case was the Government's lack of diligent preparation. That lack was triggered by the Government's decision to file a historical indictment before it completed its investigation and before it was ready to try its case. The Government implicitly admitted as much at the August 12, 2019, hearing, in disclosing that it filed its indictment in response to Blackstone's Rule 41(g) motion for return of property—as opposed to it being ready to proceed to trial.

Thus, even if the Court may make an after-the-fact determination that the first continuance was properly granted under the Speedy Trial Act's complex litigation provision, the record supports no such after-the-fact finding as to the second continuance. The second continuance order and record of the August 12, 2019 hearing erroneously contained no Speedy Trial Act factual findings. Furthermore, review of the record discloses but one potential justification—the Government's lack of diligent preparation—which the Speedy Trial Act expressly rejects from the list of delays excludable from the Speedy Trial Act's 70-day

mandate. Accordingly, at least sixty-seven (67) days[9] of delay triggered by this continuance is not excludable from the Defendants' speedy trial computation. Added to the fourteen (14) days that ran from the last arraignment (April 22, 2019) to the first continuance (May 6, 2019), the case is on day 81, meaning that zero days remain on the Speedy Trial Clock.

### 1.    The Government Failed to Diligently Prepare Its Case

Although the Speedy Trial Act does not define a "lack of diligent preparation," its meaning is plain and obvious. In statutory construction, "the plain meaning of the statute controls unless the language is ambiguous or leads to absurd results." *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995).

The courts agree that an isolated or minor discovery violation by the government that prevents a case from going to trial may be an excludable delay. *United States v. Shulick*, 994 F.3d 123, 133 (3d Cir. 2021). *United States v. Huff*, 246 F. Supp. 2d 721, 726 (W.D. Ky. 2003) (noting, in a case involving the government's isolated failure to produce documents related to an expert, that even an inadvertent or negligent failure to comply with its discovery obligations was not tantamount to a "lack of diligent preparation" for the purposes of the Speedy Trial Act); *United States v. Huff,* 246 F. Supp. 2d 721, 726-27 (W.D. Ky. 2003) ("[I]t would be unfair to classify the United States' omission as a lack of preparedness especially where the Court found that the United States acted negligently, not in bad faith or as part of a pattern of chronic discovery abuse.").

However, delays caused by chronic discovery violations of the type seen in this case are not excludable. *Shulick*, 994 F.3d at 133; *United States v. Hastings*, 847 F.2d 920, 922 (1st Cir. 1988) (affirming district court finding that delay

---

[9] Sixty-seven days is calculated from January 6, 2020 (the initial trial deadline) to March 13, 2020 (the day the Court entered A.O. 2020-18, which tolled all cases for the duration of the COVID-19 emergency.

caused by government's chronic failure to comply with local rule's automatic discovery production rules was not excludable).*United States v. Anderson*, 902 F.2d 1105, 1109 (2d Cir. 1990) (analyzing whether discovery violations were chronic in deciding if delay caused by government discovery violations was excludable); *United States v. Cianciola*, 920 F.2d 1295, 1300 (6th Cir. 1990) (same). Though it need not be said, bad faith discovery violations that delay a trial are not excludable.

In deciding what type of delay is caused by discovery violations, the district court must "distinguish between one-off or lesser discovery violations [from] those committed chronically or in bad faith." *Shulick*, 994 F.3d at 133. Here, the timeline of the Government's discovery productions clearly demonstrates chronic discovery violations. After the August 2019 hearing, the Government violated the Court's May discovery deadline **sixteen** additional times. These violations were not one-offs or minor violations. They flowed directly from the Government's decision to prematurely file its indictment before it was ready to try its case.

   (a) Example 1: FDA did not begin reviewing its own records for related emails until after the return of the indictment. Lack of diligence caused discovery violations.

A tranche of the persistent and chronic discovery violations emanates from the Government's production of FDA documents. This case began as an FDA investigation. Yet, the Government did not undertake a review of FDA documents related to the substances listed in the indictment until after the filing of the indictment (DE261:6). This is far from the model of diligent preparation. In a Southern District of Florida criminal prosecution, the default trial discovery deadline is fourteen days after arraignment. S.D. Local R. 88.10 (o)(2). A diligently prepared prosecutor cannot file a historical indictment in this District and then begin the search for the agency-related documents he intends to produce in discovery.

The Government's production of FDA documents demonstrates why—the unwarranted delay caused the Government to miss the May discovery deadline

14

by four months. At the time of the August 12, 2019 hearing on the second motion for continuance—five months after the indictment was filed and four years after the investigation began—the FDA still had not reviewed documents authored by its own employees addressing the substances alleged in the indictment. Nor had it reviewed FDA documents addressing the Defendants and their products. The 8,000 FDA documents related to this case should have been reviewed and analyzed before making a decision to file an indictment against the Defendants.

To make matters worse, when it finally started the privilege review, it discovered "an October 2016 FDA document where a DEA chemist's email described dimethazine's legitimacy: "It is related in chemical structure to anabolic steroids controlled in Schedule III of the CSA, however, this specific substance is not listed or defined as a controlled substance."" (DE261:6). Upon receipt, the Government waited until September 13, 2019 to produce the *Brady* document, and never asked anyone at DEA to electronically search for other similar emails until January 2020 (DE261:7). In fact, it did not interview the DEA chemist who authored the opinion until January 2020. In January 2020, the Government made several more *Brady* productions of DEA documents with similar opinions by a member of the Government's own investigation team. And it did so after the Defendants' pre-trial motion deadline.

The second trial continuance was undoubtedly necessitated by the Government's lack of diligent preparation. In fact, had the Court not granted the continuance, the January production of key *Brady* material documents would have been after the commencement of the January 2020 trial date.

         (b)     Example 2: Government disregarded DOJ policies requiring it ask members of its investigative team for *Brady* Material. Consequence: Defendants did not receive *Brady* information from Terrence Boos until 10 months after return of indictment.

Another example of the chronic discovery violations that caused the delay in trying the case on January 6, 2020, is the **January 20, 2020** production of

control status letters authored by DOE Section Chief Terrence Boos stating that compounds at issue in this case were not controlled substances under the CSA. This egregious discovery violation flowed directly from the Government's lack of diligent preparation. Mr. Boos had been a member of the Government investigation team since 2017, when Government counsel first asked him to opine on the control status of substances named in the indictment (DE261:9). Yet, the Government apparently never asked Mr. Boos, or anyone on his behalf, to perform an electronic search for conflicting opinions until January 2020 (DE261:7), ten months after the Government filed its indictment.

This incident illustrates the Government's lack of diligence that necessitated a trial continuance in several ways. First, the United States DOJ Manual, Policy 9-5.001(B)(2) obliges "federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team." As a "participant[] in the investigation" into Blackstone, Mr. Boos was considered a member of the prosecution team. The Government never asked him to do that which is required by the DOJ.[10]

Second, and possibly more significant, the Government was on notice, since at least August 2019, of the existence of DEA documents opining that dimethazine was neither listed nor defined as a controlled substance under the CSA (DE261:6). Why it waited until January 2020 to secure the documents from the DEA is a mystery. From the Defendants' point of view, the Government waited until after the pretrial motion deadline, as well as until after the 15-week period

---

[10] Both the timing and the substance of this January 2020 production underscores the Government's lack of diligent preparation and prejudice to the Defendants. The discovery production included emails to and from the Assistant U.S. Attorney prosecuting this very case. It is tough to fathom a decision being made to pursue a test case of this magnitude without considering contrary DEA opinions given to members of the public, especially where the lead prosecutor had memorialized conversations with the author of the DEA opinions. Yet, because the Government prematurely filed its indictment, it produced key *Brady* material **ten months** after the filing of its indictment.

of TAR discovery review.[11] Had the Government diligently pursued the known existence of DEA opinions departing from its position on the controlled status of dimethazine, the Defendants could have had the documents long before expiration of the discovery deadline.

The chronic and persistent violation of the Court's discovery deadline is magnified by the Government's failure to fully disclose at the August 2019 hearing on the second continuance request that more evidence, including *Brady* and *Giglio* material, would be produced, because the Government had not completed its preparation for trial.

> (c)  Example 3: Government failure to produce Justin Smith *Brady* material until May 2021. Government had documents since before the indictment's return.

A third and final example concerns the Government's disclosure of unindicted co-conspirator Justin Smith's proffer. Shortly after the Defendants hibernated data deemed not relevant to save money, the Government made yet another major discovery production to the Defendants. At the March 2, 2020 hearing for sanctions, the Government erroneously represented that all new information was being "expeditiously" turned over to the defense, in recognition of its *Brady* obligations:

> [I]t was that affirmative process of us adopting with great vigor our constitutional obligations under *Brady* to go look for information that might, *even might*, be helpful to the defense. When we found that information, it was turned over expeditiously. (emphasis added) (177:4-8).

Yet, a year later on May 31, 2021 (Production 19), the Government produced a November 21, 2019 factual proffer of unindicted co-conspirator

---

[11] What is shocking is that had the case remained set for trial on January 6, 2021, the Government production of this key *Brady* and *Giglio* evidence on January 24, 2020 would have been two weeks into the trial.

Justin Smith of Legendary Supplements.[12] The Government led Defendants to believe that Smith was not cooperating in this case.[13] Contained within Smith's factual proffer are clear *Brady* materials that undermine the Government's chief theory in Count I of the indictment: that the Defendants conspired to defraud the FDA from its lawful functions by hiding their conduct from the regulators. The factual proffer shows that it was Smith's idea to form one of the "conspiracies" in this case *for the purpose of not upsetting a manufacturer, and not for the purpose of hiding conduct from the Government as charged in Count I of the indictment.* But a "conspiracy" to hide conduct from a manufacturer is not the type of illegal or proscribed conduct at issue in Count 1.

Justin Smith is a significant government witness. Sales and shipments to Smith, which he resold through his business Legendary Supplements, comprise the entirety of the alleged illegal conduct for Counts 2,3,5, 6, and 7. Smith is additionally referenced (as Unindicted Coconspirator 3) in Count 4. Counts 2,3, and 5 predate any physical evidence collected by the government in this prosecution. Smith is the only fact witness for these transactions. As the only government witness for multiple charges that lack physical evidence, Smith's importance cannot be overstated. Thus, the withheld *Brady* material in the Smith Factual Proffer relates directly to refuting aspects of Count 1 (Conspiracy, 18 U.S.C. § 371) as well as Charges 2 and 3 (Introduction of Unapproved New Drugs into Interstate Commerce, 21 U.S.C. §§ 331(d), 355(a), and 333(a)(2)). Under "Purpose of the Conspiracy" the government includes "distributing these illegal products without detection and regulatory oversight by the FDA." (DE1:8, ¶ 3).

Interactions with Smith are the epicenter of the indictment. Yet, when he signed a Factual Proffer, which contained *Brady* material (both exculpatory and

---

[12] Now indicted in Case 9:20-cr-80048-WPD.
[13] *See* Letter of Mr. Frank to Defense Counsel dated [April 25]. (" "). Attached as Exhibit "2".

impeachment evidence), the government withheld the document for eighteen (18) months. As such, the latest set of *Brady* materials from Smith will require the Defense to manually re-review a *minimum* of 342,406 documents for responsiveness. The Government sat on these documents until it obtained a plea agreement from Smith, despite representing to the Defendants that he was an unindicted co-conspirator. Additionally, the Government assured this Court of the vigor with which they had adopted their constitutional Brady obligations (supra), while simultaneously withholding the Justin Smith Factual Proffer, signed four months prior.

The Court rightfully continued the case, but the Speedy Trial Act did not authorize an exclusion of time. The second continuance resulted solely from the government's lack of diligent preparation—a consequence of its decision to prematurely file the instant indictment.

**B.    The dismissal should be with prejudice.**

The decision to dismiss the case with or without prejudice requires a discussion of Defendants' efforts to prepare this document intensive case for trial using technology assisted review (TAR). Technology assisted review of data is a distinct process from the traditional form or reviewing Government discovery in federal cases. In a traditional case, the lawyer would review each piece of discovery, summarize it, and develop a running list of potential defense theories as the documents were reviewed and analyzed. In such a case, the rolling production of untimely discovery by the Government is not as harmful for the simple reason that the order in which documents are reviewed is not critical to the development of the running list.

In contrast, not every document can be reviewed in a document intensive case such as this. Technology assisted review vitally assists the legal team in identifying documents most likely to be relevant. As the legal team assigns relevancy scores to documents presented by the program, the program reassesses the relevance of the remaining millions of documents, pushing similar documents to the top of the list or to the bottom of the list, depending on how

the document is scored. An essential prerequisite to a technology assisted review of discovery is the production by the Government of a complete data set on which to run the data analytics. Where the indictment is historical, the Government must turn over all discovery, including *Brady* and *Giglio* material within its possession, the day it files its indictment. A Government failure to turn over a complete set of data prejudices a defendants' discovery review, making the process substantially more expensive and extremely less accurate.

Where there has been a Speedy Trial Act violation, the Court may dismiss the indictment with prejudice or without prejudice. *United States v. Brown*, 183 F.3d 1306, 1309-10 (11th Cir. 1999). There is no preference for one type of dismissal over the other. *Shiver v. United States*, 619 F. App'x 864, 866 (11th Cir. 2015). "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." *United States v. Taylor*, 487 U.S. 326, 333, 108 S. Ct. 2413, 2417 (1988) (quoting 18 U.S.C. § 3162(a)(2)).

As to the first factor. In one sense, all federal crimes are serious. But the Speedy Trial Act requires the Court to distinguish among severity. Here, the FDA's treatment of other industry participants who received warning letters demonstrates the level of seriousness with which the FDA regards this case. The DOJ has selectively prosecuted the Defendants. At the same time other industry participants received warning letters, the Defendants were targeted with search warrants that raided their corporate headquarters and corporate bank accounts.

The second factor considers "the facts and circumstances of the case which led to the dismissal." Here, the Government decided to file its indictment for the express purpose of mooting Blackstone's Rule 41(g) motion for return of property. Accordingly, Government was not complete with its investigation, much less prepared to make the required disclosures necessary for a trial that complied with the rules of criminal procedure, *Brady*, *Giglio*, and due process.

20

The timing of its filing decision was not in good faith. That lack of good faith caused the chronic discovery violations that delayed the trial. Even worse, had the Government met the Court's May 2019 discovery deadline, the continuance for failure to provide discovery would not have been filed, the case would have been tried on January 6, 2020, and the trial would have been completed before the COVID-19 pandemic shut down the Federal Courts. The delay triggered by the Government's lack of diligent preparation undoubtedly cost the Defendants time and an enormous amount of money.

The third and final factor—the impact of a reprosecution on the administration of this chapter and on the administration of justice—weighs in favor of dismissal with prejudice. "[D]ismissal without prejudice can be viewed as frustrating the Act's mandate of swift prosecution since it would open the way to retrial after an even longer delay." *United States v. Russo*, 741 F.2d 1264, 1267 (11th Cir. 1984). This case has been delayed for two years because of circumstances set in motion by the Government's attempt to secure a tactical advantage against Blackstone's Rule 41(g) motion for return of property. Still, even if the Court found the lack of diligence unintentional, the Eleventh Circuit has explained that "the mere lack of improper motive is not a sufficient excuse for the delay." *Id.* "Some affirmative justification must be demonstrated to warrant a dismissal without prejudice." *Id.* The Government can provide no affirmative grounds justifying dismal without prejudice.

Furthermore, reprosecution would reset the case in a manner that prejudices the Defendants. Consider the Justin Smith production of documents in May 2021 that were in the Government's possession for a year and a half.

The Defendants have employed an outside ESI expert to help them ascertain the damage done to the Defense preparations to date (Expert's Report attached as Exhibit 1). The current estimates are, with existing funds, it will take a minimum of 42 weeks solely to re-review the 342,406 documents the Defense has identified as being relevant for trial for responsiveness in light of the most recent *Brady* production. This does not include the time needed to identify and

segregate these documents for trial, nor to update the Defendants' predicative coding model and conduct a re-review.

Not to be forgotten is the costs of rerunning the data through Relatively. Relativity's vendor (Kroll Discoveries) has informed the Defendants that it will cost $3,240.46 simply to un-hibernate the data set from nearline hosting. Un-hibernation will double the Defendants' monthly storage costs going forward (from $4.50 / GB to $9.00 / GB). The Defendants cannot update and revise their predictive coding model without un-hibernating and re-activating the data set, causing cascading problems in the Defendants ability to prepare for trial.

In short, a reprosecution would effectively require the Defendants expend at least another one million dollars rerunning the data analytics on late discovery as well as what undoubtedly will be future discovery productions from the government. Given the chronic discovery violations, which undoubtedly flow from the Government's bad faith attempt to defeat the Rule 41(g) motion by filing the indictment, the case should be dismissed with prejudice.

The discovery issues in this case mirror those of *United States v. Graham*, 2008 WL 2098044, at *2-3 (S.D. Ohio May 16, 2008). In *Graham*, the Court found the sheer volume of data turned over by the government, combined with the government's erratic and unmanageable method of turning over material prejudiced the defendants, requiring dismissal of the indictment under the Speedy Trial Act, 18 U.S.C. § 3161. *Id* at *8. The Court noted:

> One, the volume of discovery in this case quite simply has been unmanageable for defense counsel.[14] Two, like a restless volcano, the government periodically spews forth new discovery, which adds to defense counsels already monumental due diligence responsibilities. Three, the discovery itself has often been tainted or incomplete. For example, during oral argument, counsel for Defendants stated that computer hard drives produced by the government were riddled with bugs and viruses and that tape

---

[14] Early in the case, the Government informed the Court of the large volume and their plans to make additional productions in their first motion to designate the case complex and continue trial. *See* D.E. 94.

> recordings and transcriptions were missing or incomplete. Indeed,
> it appears that these issues may require yet another continuance of
> the trial if the indictment is not dismissed.

*Id.* (internal citations omitted). In dismissing the case, the court noted that although the government did not act in bad faith, "discovery could have and should have been handled differently." *Id.* at 8; *but see United States v. Qadri*, No. 06-00469, 2010 WL 933752 (D. Haw. Mar. 9, 2010) (denying motion to dismiss on speedy trial grounds, despite finding that the delays were due at least in part to the nature of e-discovery, the complex nature of the alleged crimes, and the necessity of several coordinating branches of government in the investigation).

Here, whether the Government has acted in bad faith or not is irrelevant. It informed the Court and the Defendants, on multiple occasions in 2019, that most of the discovery had been, or was nearly completed, when it was not. The Speedy Trial Act violation is clear. The Court has employed a number of increasingly severe remedies to this problem. Dismissal is the only remedy in the face of such a presumptively prejudicial delay.

### C.    Defendants' Prior Waivers Do Not Cure the Violation

To the extent the Government erroneously relies on the Defendants' previous waiver of the Speedy Trial Act, the argument is a nonstarter. If the Act were designed solely to protect a Defendant's right to a speedy trial, it would follow that if the Defendants were to waive the application of the Act, the inquiry would end. *See Zedner v. United States*, 547 U.S. 489, 500-01 (2006). But the Act was designed with the public interest firmly in mind. *Id.* (quoting 18 U.S.C. 3161(h)(8)(A) ("[t]o exclude delay resulting from a continuance-even one 'granted ... at the request of the defendant' the district court must find "that the ends of

justice served … outweigh the best interest of the public and the defendant in a speedy trial").[15]

Moreover, any waiver of Speedy Trial rights was in reliance on the Governments' repeated representations to the Court, and to Defendants, that discovery was complete or nearly completed. Defendants spent one million dollars and thousands of labor hours reviewing documents to prepare this case for trial. Thus, irrespective of any prior waivers, the requests for Defense charged continuances were based on the Government being forthcoming with its open file practice.

## CONCLUSION

For these reasons, the Court should dismiss the indictment with prejudice.

Respectfully submitted,

/s/ Benedict P. Kuehne
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989

---

[15] Whether a district court presumes waiver or exacts a waiver from the defendant is a distinction without difference. *United States v. Young*, 674 F. App'x 855, 858–59 (11th Cir. 2016). Both practices circumvent the strict procedural requirements to be undertaken under the Act. *Id.* (citing 18 U.S.C. § 3161(h)). And, in so doing, both practices disserve the interest of the public in efficient justice. *Id.* (citing *Barker*, 407 U.S. at 526–28, 92 S.Ct. 2182 ("reject[ing] … the rule that a defendant who fails to demand a speedy trial forever waives his right" because it, in part, disserves "society['s] … particular interest in bringing swift prosecutions."). If a defendant were empowered to waive the trial deadline it would vitiate the protections afforded society by speedy justice, which includes lessening the opportunity for recidivism during pretrial release and preserving "the deterrent effect of punishment." *United States v. Young*, 674 F. App'x 855, 858 (11th Cir. 2016)(quoting *Zedner*, 547 U.S. at 501, 502, 126 S.Ct. 1976).

24

Fax: 305-789-5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Defendant Braun

*s/ Michael T. Davis*
**MICHAEL T. DAVIS**
Florida Bar No.: 63374

*s/ Susan Dmitrovsky*
**SUSAN DMITROVSKY**
Florida Bar No. 73296

**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
mdavis@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Defendant Blackstone Labs, Inc.

*/s/ Richard G. Lubin*
**RICHARD G. LUBIN**
Fla. Bar No. 182249
**RICHARD G. LUBIN, P.A**.
707 North Flagler Drive
West Palm Beach, FL  33401
Telephone:  561-655-2040
Facsimile:   561-655-2182
Email: rich@lubinlaw.com
Counsel for Aaron Singerman

*/s/ Amy Morse*
**AMY MORSE, ESQ**.
Morse & Morse, LLC
Of Counsel to Richard G. Lubin, P.A.
707 North Flagler Drive
West Palm Beach, FL 33401
T: (561) 651-4145;
F: (561) 655-2182
Email: amy@morselegal.com

25

FL Bar No.: 0388475
Co-Counsel for Aaron Singerman


*/s/ J. Stephen Salter*
**J. STEPHEN SALTER**
8975 Pompano Way
Gulf Shores, Alabama 36542
Phone: 205-585-1776
Email: umstakwit@aol.com
Admitted Pro Hac Vice for Defendant Boccuzzi

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 1, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By:      */s/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**