

# Expert Report of Miguel Villalobos

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-80030-CR-DIMITROULEAS/MATTHEWMAN

UNITED STATES OF AMERICA,
   Plaintiff,

v.

PHILLIP BRAUN,
AARON SINGERMAN,
ANTHONY VENTRELLA,
JAMES BOCCUZZI,
DAVID WINSAUER,
BLACKSTONE LABS, LLC, and
VENTECH LABS, LLC
   Defendants.
_____/

**JULY 29, 2021**



Classified as Confidential-External

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| I. | Executive Summary | 2 |
| II. | Background | 2 |
| III. | Scope | 2 |
| IV. | Analysis/Opinions | 3 |
| V. | Conclusion | 9 |
| VI. | Compensation | 9 |
| VII. | Signature | 9 |
| Exhibit A – Curriculum Vitae | | 10 |
| | | 10 |

# I. Executive Summary

In July 2021, Blackstone Labs LLC engaged UnitedLex to examine the technology assisted review approach used in the defense of Blackstone Labs, LLC et al. (Defendants); to assess the impact of the metadata supplied by the government; the impact of additional data post stabilization and estimate the cost of review to update the technology assisted review model based on the additional data. The primary goal was to determine whether the Governments concerns about the Defendants e-Discovery savvy were well founded. [1]

I have formulated the following opinions based on my analysis, research, and professional experience:

- Defendants used technology assisted review ("TAR") in this document intensive case involving in excess of a million documents. TAR uses coding determinations by humans to scientifically (using an advanced algorithm) separate relevant from non-relevant documents. I conclude that this technology was correctly used by the Defendants.

- Metadata is defined as data about data and serves as a digital footprint for ESI. Document metadata allows computer systems to organize, compare and sort documents efficiently. I have concluded incomplete metadata as explained herein provided in rolling discovery productions which had a significant negative impact on the efficiencies gained through using TAR.

- The addition of later document productions with new issues such as the Justin Smith proffer produced on May 31, 2021, after the use TAR had abated in October 2020 and human manual review had extensively progressed, requires retraining the computer algorithm to rereview the entire set of documents followed by additional manual review. The late produced documents with new issues after the project had closed will require a new TAR project and the likely manual review of hundreds of thousands of documents.

- Using a scaled-up review team, the additional review could likely be completed in approximately four (4) months at a cost of over $500,000.00.

# II. Background

I am a director of Strategic Accounts with UnitedLex.  I have over nine years of industry experience in eDiscovery project planning and budgeting; design and implementation of technology assisted review projects; leading, training, and calibrating document review teams; loading and analysing production data and eDiscovery consulting.  Attached as "Exhibit A" is my curriculum vitae ("CV") that details the relevant certifications I possess.  I hold industry certifications, such as the Relativity Certified Administrator and the Certified eDiscovery Specialist which demonstrate that I maintain the necessary training, work experiences, tested knowledge, and continuing education required be in the ever-changing industry.

# III. Scope

In formulating the opinions/analysis set forth in this report, I have reviewed and relied upon the following information:

---

A. Discussions with the review team on review approach, quality control, database issues and how the technology assisted review universe was defined.
B. Discussions with the case team on substantive impact of productions post model closure and costs associated with the review project.
C. Review team initial and ongoing training materials
D. Budgeting, overall cost and pace reporting
E. Government production letters and Concordance load files.

# IV. Analysis/Opinions

## A.    The technology assisted review (TAR) approach used was appropriate for the goals of the project.

### 1. TAR Background

The process for all technology assisted review projects is to use human coding to train a computer algorithm to make document level determinations on the text of a set of documents for a legal proceeding. The computer algorithm analyses the documents' text in conjunction with the human coding and sorts the documents into two buckets: typically, relevant, and not relevant. However, any binary choice works equally well. Shifting the decision making from people to technology informed by people allows for a dramatic reduction in costs and increase in efficiency.

With the core human technology interaction there are a wide variety of potential goals for a TAR project. As using any tool, the proper goals, setup, inputs, knowledge, and implementation are critical to the overall success. The greatest carpenter can not produce great work with a dull saw and rotted wood.

Here the team's goal was to utilize the computer algorithm to identify the universe of likely relevant documents which is then further analyzed by a human review team for use in the litigation.

### 2. TAR Project Planning and Implementation

All well run technology assisted review workflows require the consideration of the following factors. I used these factors to assess how well the Defendants implemented TAR based on the project's goal.

a. Identify the team to finalize and engage in the workflow.
b. Select the software.
c. Identify, analyze, and prepare the TAR set.
d. Human reviewer prepares for engaging in TAR.
e. Human reviewer trains the computer to detect relevancy, and the computer classifies the TAR set documents.
f. Implement review quality control measures during training.
g. Determine when computer training is complete and validate.
h. Final identification, review, and production of the predicted relevant set.[2]

**a. Identify the team to finalize and engage in the workflow.**

---

[2] https://edrm.net/wp-content/uploads/2019/02/TAR-Guidelines-Final.pdf

The team has six roles and depending on the matter a single individual may hold multiple roles, or a single role may be overseen by a team. Here the defense team selected KLD Discovery as the eDiscovery vendor to fill the necessary roles of (1) Service Provider, (2) Workflow Expert as well as provide (3) Case Manager support. The software provider was (4) Relativity. Both KLD Discovery and Relativity are well known and frequently utilized in the industry for this type of project.

To round out the team, Defendants had their case counsel fulfil the roles of (3) Case Manager and (5) Lead Attorney. They then selected the (6) Human Reviewers.

Finally, the purpose of the TAR project was identified. Here the end goal was not a review for production but instead the use of TAR was to identify and prioritize the universe of relevant documents for the Defendants while excluding the likely high volume of irrelevant materials. The Human Reviewers would then review all the documents categorized as relevant.

**b.  Select the software.**

The Defendants selected the Continuous Active Learning approach utilizing Kroll Ontrack's proprietary system within Relativity.

**c.  Identify, analyze and prepare the TAR set.**

The TAR set step requires identifying three document sets; the outer boundary of review, the subset to be classified by the system and the initial training set to start the machine learning. The outer boundary was provided by the Government in rolling productions and includes all documents produced by the Government.

Each production was then evaluated for potential inclusion for TAR analysis set based on file type, extracted text, number of documents and timing. Defendants here followed best practices and evaluated each load independently based on the data contained therein.

The exclusions followed the usual practices of removing audio, video, images and other no text files as well as those with a low value to the algorithm such as database exports and mobile data. Any documents provided after the TAR project closed where not evaluated for inclusion. The final standard consideration is the presence multiple languages. The documents here were all in English.

The initial seed set was created by a relying on the Government's identified set of Hot Documents. The set was further broadened by relying on the Human Reviewers feedback to develop a set of search terms for analysis. Using targeted and known high value documents is the preferred approach for the initial training set. A purely random sample is recommended only when there is insufficient information or time to develop a richer initial training set.

The core advantage to using a Continuous Active Learning approach is only the initial training set needs to be identified by the Human Reviewers. Afterwards all documents coded by the Human Reviewers are used to update the rankings and further train the system creating an iterative feedback loop.

**d.  Human reviewer prepares for engaging in TAR.**

The core component in this step is the determining the rules the Human Reviewers will use to train the system. Defendants' review team was provided a standard review protocol and a 5-day training program including example documents, case background, current theories of case, current case strategy and technology use. This level of training goes well above and beyond standard training times which are typically 1-2 days in length.

### e. Human reviewer trains the computer to detect relevancy, and the computer classifies the TAR set documents.

The Defendants implemented their review protocol. Using a continuous active learning algorithm allowed for them to manually define the initial training set. Afterwards, the Human Reviewer coding is used by the model to update ranks which then form the priority ordering for the Human Reviewers.

The Defendants selected a conservative cut off point for the algorithm. Documents scored rank 50 and above as well as their family members were all manually reviewed by the Human Reviewers. This provided a broad base of training information for the algorithm to score the full set. The Active Learning approach is seen as reducing human introduced bias and potentially reducing the amount of overall training required for the system to stabilize. [3]

### f. Implement review quality control measures during training.

Humans make errors. Regardless of the amount of training, intelligence, and tool sophistication there is no known way to eliminate human error. As a result, it is very important to develop and implement a robust quality control process while reviewing documents for discovery. Using TAR raising the stakes for quality control (QC) because the algorithm will compound errors when ranking documents.

Here the Defendants followed best practices by having a dedicated QC team, standing weekly team meetings, targeted quality control searches, reviewer level analysis and consistent feedback. Documents were selected for QC primarily in three ways. At the outset and when new reviewers were added, the QC team reviewed random samples of the new reviewers' decisions. Based on the QC review, coding errors were corrected, reviewers were recalibrated, and additional samples were taken. This process was repeated until reviewers were sufficiently calibrated with the QC team which took on average 3-5 weeks. Subsequent random sampling was also used to verify reviewers maintained calibration. Additionally, repeated errors would be corrected through targeted searches on an individual or team-wide basis.

The second method was feedback during the weekly calls. Reviewers were encouraged to ask questions and work through any issues in the dataset. If there were differing approaches or incorrect assumptions, targeted searches would be created to identify and correct the errors.

Finally, feedback from the Defendant's trial team based on their preparation and review would impact the creation of additional QC searches across all Human Reviewed documents.

### g. Determine when computer training is complete and validate.

"There is no bright-line rule as to what constitutes a reasonable review, each workflow must be analyzed for reasonableness based upon the circumstances of the matter and proportional needs of the case." [4]

Here the Defendants followed an acceptable method of validating the model. The Human Reviewers observed the sparseness of the relevant documents returned b the computer during Active Learning. Once the Human Reviewers had coded all documents ranked 50 and above, the Defendants counsel determined additional review was unlikely to return meaningful additional relevant material needed for their case strategy. Additionally, this approach allowed for finality even with an indefinite series of rolling productions. The TAR project was fully closed and taken offline in October of 2020 based on Government's representations on the completeness of document production.

---

[3] https://edrm.net/wp-content/uploads/2019/02/TAR-Guidelines-Final.pdf, 18-19
[4] https://edrm.net/wp-content/uploads/2019/02/TAR-Guidelines-Final.pdf, 20-21

### h. Final identification, review, and production of the predicted relevant set

The final step in a typical TAR review is preparing for production. Here Defendants were engaged in a review of incoming productions which removes these considerations. [5] It is included in this report for completeness.

### 3. Analysis Summary of TAR Approach

The defendant's project design, setup, review steps and completion processes were all in line with the standard best practices based on the project's goals.

# B.     The incomplete metadata provided in rolling discovery productions which had a significant negative impact on the efficiencies gained through using TAR.

### 1. Metadata Use in Review

Metadata is data about data and is used in document review to dramatically increase efficiency. The most important pieces of metadata across a large universe are the hash value and the email metadata. Hash values function as fingerprints for documents. If two documents have the same hash value, they are identical (within an incredibly high degree of certainty). This is because a single character difference in a document will result in very different Hash values. As a result, having the Hash values for a full set of documents allows for removing wholly duplicate documents. Removing the documents reduces the time and costs associated with review at every level.

Additionally, the value of the deduplication increases the more individuals communicated with one another and shared documents.

Similarly, email metadata is used to reconstruct email threads (an email thread is a single message and all subsequent replies to the originating message). Within a single email thread there are potentially dozens of duplicative messages because each reply retains the previous message(s) text. Using email metadata allows for the removal of duplicative earlier threads.

Combined, hash-based deduplication and email threading reduce costs by at least 20% in a typical review. [6] The savings comes from fewer documents needing human review as well as reduced cost in hosting, TAR analysis and similar technological uses. This duplicative information is removed during step c. of the TAR planning process.

Based on discussions with the review team, the Defendants were unable to make extensive use of these ordinary eDiscovery tools using the governments supplied metadata.

# C.     The addition of produced documents with new issues after the project had stabilized and closed

---

[5] https://edrm.net/wp-content/uploads/2019/02/TAR-Guidelines-Final.pdf, 33-34

[6] Each data set is different, and the impact of threading and hash-based deduplication varies as a result. However, a 20% reduction estimate is conservative. Certain data sets have seen reductions of up to 60% from email threading alone. https://www.ldmglobal.com/2018/08/07/email-threading-saves-time-in-document-review/

# will require a new TAR project with potentially significant additional manual review work.

### 1. Impact of expanded Relevancy on the TAR algorithm.

Adding additional data to an ongoing project is a well understood process and the more seamless incorporation of new data is an advantage of the Continuous Active Learning TAR approach over other TAR methods. New data is quickly analyzed and categorized in an ongoing project by relying on the earlier training and calibration of the system. New issues identified during the review can be addressed with targeted search terms to find previously coded documents which should now be classified as relevant. Additionally, the ongoing quality control and continuous active TAR training process will re-rank both documents coded by Human Reviewers and those not yet coded.

The Government's late production did significantly more than add new documents. It expanded which concepts should be considered relevant. As a result, the Human Reviewer coding used to train the TAR algorithm are both flawed and serve to reinforce the other's flaws. If the team were simply to feed the new documents into the existing model as Relevant without more, the model would likely return a low rank indicating the Human Review coding was in error.

The reason for the reinforcement is the model identifies certain concepts as likely relevant or not relevant based on concepts identified in the documents. Normally, this is beneficial. If 9 documents about a topic are coded not relevant by the Human Reviewers and a 10th document is added coded Relevant. The system should flag the outlier as such. This type of challenge is commonly referred to as a relevancy scope change. It requires a tailored approach for each given matter based on the relevancy change itself, the data, TAR implementation and trial strategy. [7]

In my experience the best approach for the setup in this matter is to start a new TAR project focused on the expansion in Relevance. This allows a more limited inquiry and prevents trying to fully retrain a stable model.

### 2. Impact of expanded Relevancy the original seed set.

Starting over with a new TAR project is also supported by the impact of Justin Smith proffer on the original seed set. The Defendants took a carefully considered approach to the original seed set factoring in documents identified by the Government as Hot as well as search terms crafted and refined based on the Defendant's theory of the case and documents. The issues raised in the Justin Smith proffer were outside the scope of both sets. As a result, the TAR algorithm's scope of Relevance was underinclusive at design. This under-inclusiveness was reinforced by the subsequent training and makes the original seed set actively harmful for identifying documents related to the Justin Smith proffer.

As a final note, the team would need to re-review documents Human Reviewed outside of TAR. These are documents with poor quality, limited or no extracted text. As a result, they are also poor candidates for the use of search terms and similar efficiency enhancing processes.

## D. Using a scaled-up review team, the additional review would take approximately four months at a

---

[7] https://edrm.net/wp-content/uploads/2019/02/TAR-Guidelines-Final.pdf, 34-35

## cost of over $500,000.00 plus technical and attorney costs.

The unknown impact of the newly identified issue creates a significant amount of uncertainty for how much additional review is required. Based on the full volume of documents, the original relevancy universe and the significant second level work performed in the matter, the new volume of documents which will need to re-reviewed in light of the Justin Smith proffer will likely be at least 380,000 and could in theory be significantly higher. Outside of cost considerations, a team over triple the size of the original review team could complete the review work in approximately 3 months including training, calibration, and quality control for the human reviewers as well as seed set creation, training, and calibration for the TAR algorithm. [8]

Outside of the review process itself, the documents will need to be escalated and potentially re-escalated to the Defendant's trial team for preparation for motions and the trial itself. In a condensed timeline, this process can begin concurrently with the review process and typically extends 1-2 weeks beyond.  Additionally, before review can begin the original data needs to be un-hibernated, the new data loaded a new TAR project created, the workspace prepped for review and new review guidelines need to be drafted. These steps must all be taken before review can begin and typically require approximately 2 weeks.

The timing for these steps adds approximately 1 month to the review timeline above which brings the total approximate time to completion to 4 months. Estimated costs for the non-review steps is outside the scope of this report.

---

[8] Calculations were based on a common reviewer blended price of $50/hr. and a team size of 25 reviewers.

# V. Conclusion

The opinions expressed in this report are based on my education, training, and over nine years of experience as an eDiscovery professional and are made with a reasonable degree of certainty within the field.

# VI. Compensation

UnitedLex is charging $395/hour for all analysis and testimony involving this matter.

# VII. Signature

Thank you,

*Miguel Villalobos*

Miguel A. Villalobos

Director, Strategic Accounts

M: +1 913.558.9358

E: [miguel.villalobos@unitedlex.com](miguel.villalobos@unitedlex.com)

200 E. Campus View Blvd., Columbus, Ohio, 43235

# Exhibit A – Curriculum Vitae

**MIGUEL A. VILLALOBOS**
200 E. Campus View Blvd., Columbus, Ohio, 43235
(913) 227-8465 • Miguel.Villalobos@UnitedLex.com

## EXPERIENCE

**UNITEDLEX**, Ohio, 2012 – Present

### Director, Global Litigation Services 2017 – Present

Advise on, develop, and execute eDiscovery initiatives, processes, and best practices designed to maximize quality and defensibility while mitigating risk and containing costs. Collaborate with clients spanning a wide range of industries, outside counsel, and third-party and internal resources to implement eDiscovery strategies and solutions across the EDRM lifecycle, including early case assessment, defensible data reductions, witness interviews and preparation, and advanced review workflows. Manage the discovery portfolios of multiple clients, working across offices and departments to provide budgetary oversight and ensure compliance with client-specific requirements and service-level commitments.

- Program Leader for three Fortune 500 clients with combined discovery savings of over $10M annually.
- Senior member of UnitedLex practice group charged with evaluating, designing, and standardizing advanced workflows and technological approaches including Technology Assisted Review.
- Primary contributor on multiple Request for Proposals and Scope of Work agreements, including drafting and organizing responses, structuring pricing schemes, and successfully representing UnitedLex in presentations to the client in supporting of RFPs and MSAs.

### Consultant, Litigation Discovery, 2015 – 2016

Planned, organized, and directed all phases of large and complex eDiscovery projects, ranging in substance and size from single custodian internal investigations to large-scale, multi-year matters for Fortune 500 companies. Managed multiple projects with overlapping production timelines simultaneously, overseeing domestic and international teams of over 150 reviewers, determining budget, and staffing projections, establishing workflows, and tracking important metrics to drive better informed decisions.

- Effectively managed a large pharmaceutical MDL review project with high visibility and uncompromising deadlines, requiring 4.2 million documents reviewed, 1.2 million pages redacted, and 600,000 documents produced in a two-month period.
- Successfully managed the 1.2 million document privilege portion of a yearlong, high-profile Technology Assisted Review project, calling for novel solutions and non-standard methodologies.
- Efficiently managed a dual shore project with nearly a million documents in review stemming from a patent challenge of a pharmaceutical product valued at more than $2 billion in annual revenue.

### Litigation Manager, 2012 – 2014

Assisted management team in completing review projects on time, on budget, and to the expectations of demanding clients. Led QC workflows and provided substantive and technical guidance to the team to exploit all available efficiencies. Continually evaluated and trained new team members.

## EDUCATION

**Ohio State University Moritz College of Law**, J.D., 2011
**Ohio State University**, B.A., Philosophy and English, 2007

## BAR ADMISSIONS & INDUSTRY GROUPS

**State of Ohio**, 2011

**EDRM Project Lead for Review+ Update**, 2019

## CERTIFICATIONS

**Certified E-Discovery Specialist**, 2016

**Relativity Certified Administrator**, 2014

**Reveal Certified Sales**, 2021

# About UnitedLex

**NORTH AMERICA | EUROPE  |  ASIA  |  AUSTRALIA**

UnitedLex – the world's only enterprise legal services provider – drives transformation throughout the entire legal ecosystem. UnitedLex was founded in 2006 with a singular mission to improve the performance of leading corporations, law firms, and academic institutions. Since then, more than 2,700 attorneys, engineers, and consultants across four continents have deployed innovative service models and digitally powered solutions that deliver unparalleled business impact resulting in risk mitigation, efficiency improvements, and cost optimization for clients around the world.

