<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-80030-CR-DIMITROULEAS**

</div>

**UNITED STATES OF AMERICA**

**vs.**

**PHILLIP BRAUN,**
**AARON SINGERMAN,**
**JAMES BOCCCUZZI, and**
**BLACKSTONE LABS, LLC,**

<div align="center">

**Defendants.**

</div>

_____/

<div align="center">

**GOVERNMENT'S OPPOSITION TO**
**BLACKSTONE LABS' UNTIMELY MOTION TO SUPPRESS**

</div>

The United States, by and through undersigned counsel, respectfully files its opposition to defendant Blackstone Labs' Motion to Suppress Search Warrant Executed on February 16, 2017 (ECF No. 479, hereafter, "Def. Mot."). The Court should deny defendant's motion because: (1) the motion is untimely, containing no new facts yet filed almost eighteen months after the Court denied defendants' similar motion to suppress; (2) the new motion utterly fails to meet the threshold for a <u>Franks</u> hearing; and (3) the supporting affidavit did not contain misleading information for the reasons set forth below.

<div align="center">

**MATERIAL FACTS**

</div>

**1.  The Agent Affidavit Sets Forth Detailed Probable Cause**

On the morning of February 16, 2017, federal agents from the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI") executed a search warrant at

1090 Holland Drive, Suites 1 and 2, Boca Raton, Florida (the "Blackstone Labs Premises"), the business address of defendant Blackstone Labs, LLC ("Blackstone Labs").[1]

A 40-page affidavit, attested to by Special Agent Kelly McCoy of FDA-OCI, was submitted to U.S. Magistrate Judge William Matthewman on February 3, 2017 for the issuance of the warrant. The affidavit outlined an ongoing course of conduct, ranging from 2012 to late 2016, that showed that Blackstone Labs and co-defendants Phillip Braun, and Aaron Singerman had been engaged in the distribution in interstate commerce of multiple products that were unlawful to distribute under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, et seq., thereby violating various provisions of the FDCA and also violating other federal statutes, specifically conspiracy to commit federal offenses (18 U.S.C. § 1349), mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). See Ex. 1, Blackstone Labs Warrant, Agent Aff. at ¶¶ 31-116 ("Affidavit"). For instance, the Affidavit set forth evidence regarding Blackstone Labs' sale of Super DMZ Rx 2.0, an unapproved new drug under the FDCA, from 2012 through September 2016. Aff. at ¶¶ 36-48. The Affidavit also discussed Blackstone Labs' distribution through 2016 of other purported dietary supplements that were in fact unlawful unapproved new drugs under the FDCA: Cobra 6P Extreme (¶¶ 54-64); Dust V2 (¶¶ 65-72); Brutal 4ce (¶¶ 73-79); Dust Extreme (¶¶ 93-99); Growth, Anesthetized, and Euphoria RX (¶¶ 100-05); and Gear Support and PCTV (¶¶ 106-11).

Law enforcement conducted undercover purchases of Blackstone Labs' products in 2016, with forensic test results detecting substances that, among other things, were not listed on the

---

[1] The Affidavit also provided probable cause for a search warrant at co-conspirator VBS Laboratories, LLC. None of the current defendants had a reasonable expectation of privacy in the Ventech/VBS Premises, and they have no standing to challenge the warrant executed there.

labels.  Aff. ¶¶ 60-62, 65, 73 (Feb. 2016 purchases from Blackstone Labs of Dust V2 [DMAA detected], Brutal 4ce [1-androsterone, androstenedione detected], and Cobra 6P Extreme [DMBA detected].  See 21 U.S.C. §§ 343(a)(1); 352(a)(1) (a food, including a dietary supplement, or a drug is misbranded if its labeling is false or misleading in any particular).  Forensic testing of a September 2016 purchase of Blackstone Labs Super DMZ Rx 2.0 from retailer Legendary Supplements also detected the steroid dimethazine, while not detecting the other active ingredient on the label, methylstenbolone.  Aff. ¶¶ 46-47.  The Affidavit also alleged that certain products were misbranded, adulterated, were unapproved new drugs, or were unsafe, all in violation of the FDCA.  Aff. at ¶¶ 50-53, 57, 59, 62, 67, 68, 69, 71, 75, 88, 95-97, 103, 109.

The FDA-OCI also gathered evidence that connected the ongoing illegal activity at Blackstone Labs to 1140 Holland Drive, Suite 12, Boca Raton, Florida (the "Ventech/VBS Premises"), the nearby business address of co-defendants Anthony Ventrella and Ventech Labs, LLC ("Ventech Labs") as well as two Ventrella-related companies, Fight Pharm, LLC ("Fight Pharm") and VBS Laboratories, LLC ("VBS Laboratories").  For example, in June 2016, FDA-OCI retrieved items from the dumpster at the Ventech/VBS Premises.  Aff. at ¶¶ 84-85.  The items included loose Blackstone Labs Super DMZ Rx 2.0 labels and "to do," or handwritten lists, concerning Super DMZ Rx 2.0 and other Blackstone Labs products.  Id. at ¶ 85.

Bank records showed a financial connection between defendants Blackstone Labs, Braun, and Singerman and businesses connected to defendant Ventrella.  Singerman was a signatory on a Fight Pharm bank account in April 2014.  Aff. at ¶ 91.  Braun was added to the signature card for the same account in August 2015.  Id.  Moreover, records showed that in March 2016, Singerman and Braun had signature authority over an account of VBS Laboratories.  Id. at ¶ 92.  Other records

indicated that Blackstone Labs paid VBS Laboratories approximately $60,000, in two payments, during May 2016.  Id. at ¶ 81.

**2.  The Court Denied Defendants' First Motion to Suppress and for an Evidentiary Hearing**

The Court has extended the motions deadline several times, ultimately requiring defense motions by January 31, 2020.  ECF No. 206.  The defendants filed multiple motions to dismiss and suppress, including a joint motion to suppress seeking an evidentiary hearing based on claims of misleading statements in the Affidavit.  The Court denied this motion to suppress, holding that no misrepresentations occurred, and that no Franks showing was made that warranted an evidentiary hearing.  Order, ECF No. 334.

**3.  The Defendants' Filed a Second Motion to Suppress**

The defendants filed a new motion to suppress on September 19, 2021.  ECF No. 479.  The defendants now claim that allegations of FDCA violations were based on intentionally or recklessly misleading statements in the Affidavit, that the Affidavit misleadingly described an FDA Warning Letter as "formal," and that the Affidavit misrepresented the defendants knowledge of a product recall.  The motion does not challenge the allegations that the product Super DMZ RX 2.0 was an unapproved new drug.  Aff. ¶¶ 36-48. The motion does not challenge, or even mention, the allegations of mail fraud, wire fraud, and conspiracy to commit those offenses in the Affidavit.

**LEGAL AUTHORITY**

Search warrant affidavits are presumptively valid.  Franks v. Delaware, 438 U.S. 154, 171 (1978). However, if an affidavit contains deliberate falsehoods or material omissions and the remainder of the affidavit fails to establish probable cause, any seized evidence must be

4

suppressed.   Id. at 155-56.   When challenging the validity of the government's affidavit, a defendant is required to make "a substantial preliminary showing that a false statement was included in the warrant affidavit knowingly and intentionally or with reckless disregard for the truth."   United States v. Gamory, 635 F.3d 480, 490 (11th Cir. 2001) (citing Franks, 438 U.S. at 171).   Franks also applies to alleged omissions from an affidavit.   See Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997).   However, an affiant "is not required to include every shred of known information . . . in a warrant affidavit, and the omission of a particular detail, without more, is not enough to invalidate a warrant."   United States v. Fleur, 762 F. App'x. 691, 696 (11th Cir. 2019) (internal quotations omitted).   Moreover, to impact a claim for a Franks hearing, "the omission must have been made with the purpose of misleading the judge issuing the warrant."   United States v. Whyte, 928 F.3d 1317, 1334 (11th Cir. 2019).

Defendants bear "the burden of showing that 'absent those misrepresentations or omissions, probable cause would have been lacking.'"   See Gamory, 635 F.3d at 490 (citing United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001)).   When assessing the materiality of alleged false statements and omissions, the court should redact or disregard the portions of the affidavit for which the defendant successfully made the "substantial preliminary showing" that those portions are false or misleading.   United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) (citing Franks, 438 U.S. at 171–72).   "[T]he defendant's attack 'must be more than conclusory' and the allegations of deliberate falsehood or reckless disregard for the truth 'must be accompanied by an offer of proof.'"   United States v. Flowers, 531 F. App'x. 975, 980 (11th Cir. 2013) (quoting Franks, 438 U.S. at 171).   Courts frequently examine unsuccessful Franks motions by assuming that the defendant satisfied the first prong of Franks, and then examining whether a redacted affidavit would still contain allegations sufficient to support probable cause.   E.g., United States

5

v. Cross, 928 F.2d 1030, 1041 (11th Cir. 1991).  If the redacted affidavit supports probable cause, the defendant has failed to meet their burden to hold an evidentiary hearing.  Id.; Kapordelis, 569 F.3d at 1309 (11th Cir. 2009) (rejecting the argument that claims of pervasive falsity or omission require a different analysis).

## ARGUMENT

The defendants' motion should be denied for three reasons: (1) the motion is untimely and offers no new information to excuse its timing directly before trial, (2) the motion utterly fails to meet defendants' burden to request a Franks hearing, and (3) there were no misleading statements in the Affidavit, let alone knowingly or recklessly misleading statements.

### I.    The New Motion to Suppress Is Based on No New Information and Is Untimely

Federal Rule of Criminal Procedure 12(c) permits a district court, "at the time of the arraignment or as soon thereafter as practicable, [to] set a time for the making of pretrial motions or requests."  After multiple continuances, this Court set a January 31, 2020 deadline for defensive motions.[2]  Order, ECF No. 206 (granting unopposed motion to extend deadline for defensive motions).  The defendants filed multiple motions to suppress in advance of this Rule 12(c) deadline, including several joint motions to suppress.

The defendants' September 2021 Franks motion offers no new facts in challenging the search warrant affidavit, recycles arguments already rejected by this Court, and is so untimely as to merit denial.  See United States v. Milian-Rodriguez, 828 F.2d 679, 683 (11th Cir. 1987) (affirming denial of motion to suppress filed within a few days of trial and 49 days after the filing

---

[2] The Court first set a January 2020 deadline for defensive motions in August 2019.  ECF No. 189.

deadline). The Court should deny the motion because this Court has previously rejected these defendants' arguments for an evidentiary hearing on the affidavit, and the new motion was eighteen months late and three weeks before the calendar call for trial.  See Order Denying Blackstone Labs et al. Motion to Suppress, ECF No. 334, at 1 ("At the hearing, this Court found that no Franks showing was made so as to warrant an evidentiary hearing.  Defendant did not satisfy its burden to show that, absent the alleged misrepresentations, probable cause was lacking.").

The defendants' new untimely motion should also be denied because it relies on no new information.  United States v. Smith, 918 F.2d 1501, 1509 (11th Cir. 1990) (affirming denial of untimely motion to suppress where defendant did not attempt to establish cause for the untimeliness); cf. United States v. Vanholten, 542 F. App'x. 776, 779 (11th Cir. 2013) (approving denial of untimely motion to suppress, even though defendant claimed important new evidence). The defendants received this Affidavit in March 2019.  A request for a Franks hearing evaluates the contents of the affidavit, produced here to defendants more than two years ago, and months before their motions deadline. Any issues regarding the affidavit were litigated, and the defendants' motions to suppress denied.  The defendants have chosen to ignore the Court's prior ruling, offering no reasons, let alone good cause, for the late, duplicative filing.  See United States v. Fernetus, 838 F. App'x. 426, 432 (11th Cir. 2020) (affirming denial of motion to suppress as untimely where defendant "had all the information necessary to file his motion to suppress before the court's deadline, and failed to do so"); United States v. Cox, 281 F. App'x 943, 944 (11th Cir. 2008) (affirming denial of Franks motion as untimely when filed after the deadline where defendant had not attempted to establish cause of the untimeliness).

7

As the defendants have filed a second motion to suppress eighteen months after the Court's deadline, failed to include any new information suggesting intentional falsity, and the Court has already rejected a similar and overlapping motion, the Court should deny the motion.  See United States v. Cox, 281 F. App'x 943, 944 (11th Cir. 2008) (citing United States v. Ramirez, 324 F.3d 1225, 1228 (11th Cir. 2003) (noting that "Rule 12 was designed precisely to prevent a situation where defendants merely wait to gain a strategic advantage by raising a defense out of time").

## II.   The Motion Should Be Denied for Failing to Meet the Standard for a Franks Hearing

Even if the Court were to consider the defendants' untimely, duplicative motion and revisit its prior ruling, the motion fails. Were the Court to strike all of the FDCA violations in the affidavit challenged by the defendants, there remains more than adequate evidence of mail fraud, wire fraud, and conspiracy to commit mail fraud to support the magistrate's finding of probable cause.  See Cross, 928 F.2d at 1041; United States v. Sarras, 575 F.3d 1191, 1218 (11th Cir. 2009) (affirming denial of Franks claim that was based on "selective characterizations and exaggerations . . .  that did nothing to strike at the core of the probable cause finding").

### 1.   The Affidavit Contains Sufficient Evidence of Probable Cause of Mail/Wire Fraud Absent the Challenged Statements

The evidence supporting probable cause of mail fraud, wire fraud, and conspiracy to commit those crimes in the Affidavit is straightforward.  For example, the Affidavit alleged three different Blackstone products contained active ingredients that did not match the labels, along with evidence of intent to defraud.  The defendants' motion does not mention or challenge the probable cause of mail fraud, wire fraud, and conspiracy to commit those crimes.

In the case of Cobra 6P Extreme, Blackstone's website stated "It's so strong we weren't sure if it was a good idea to bring it to market," and forensic testing revealed that a bottle contained

the stimulant DMBA, even though it was not listed as an ingredient on the label. Aff. ¶¶ 61-62. Testing of the product Dust V2 revealed that the product contained the stimulant DMAA, even though it was not listed as an ingredient on the label. Id. ¶¶ 65, 67. Testing of a third product, Brutal 4ce, revealed two ingredients that were not listed on its label. The Affidavit alleged the ingredients in Brutal 4ce are anabolic steroid precursors, and Blackstone Labs' website included a video of president Phillip Braun stating that the Brutal 4ce product needs "post cycle therapy" which refers to a course of drugs or dietary supplements to restore the body's natural testosterone production after using anabolic steroids. Id. ¶ 76.

For each of these products, the Affidavit alleged probable cause that Blackstone Labs intended to defraud consumers by intentionally not listing the potentially unsafe ingredients on product labels, in violation of 18 U.S.C. 1341, 1343, and 1349. Aff. ¶¶ 64, 72. The evidence of intent to defraud included a handwritten note that appeared to indicate that Aaron Singerman had instructed a Blackstone Labs manufacturer[3] to misrepresent information on product labels and defraud consumers. Id. ¶ 113(D).

Taken together, these allegations provide sufficient probable cause to support a search warrant for evidence of mail and wire fraud, along with conspiracy to commit mail and wire fraud.

**2. The Redacted Affidavit Would Still Contain Ample Evidence to Support Probable Cause to Believe Defendants Committed FDCA Violations**

In addition to ignoring the substantial showing of probable cause based on mail and wire fraud, the defendants' motion does not address the other central allegation in the Affidavit: that Blackstone Labs and others were unlawfully distributing the steroid product Super DMZ RX 2.0.

---

[3] The Affidavit also noted that this individual was under indictment for manufacturing and sale of controlled substances and illegal dietary supplements. Id. ¶ 113(C).

See Sarras, 575 F.3d at 1218.   The Super DMZ RX 2.0 allegations alone provided sufficient probable cause to support issuing the warrant.   A significant portion of the Affidavit related to the defendant Blackstone Labs' product Super DMZ RX 2.0, including quoting an online interview by Blackstone Labs CEO Aaron Singerman, where he stated that Blackstone started when the Super DMZ RX 2.0 "ingredient had not become illegal yet," clearly implying that the product had become illegal at some point.   Aff. at ¶¶ 36-48.   The Affidavit explains that the label of Blackstone Labs' Super DMZ RX 2.0 states that it contains synthetic steroids.   The Affidavit alleges that dimethazine and methylstenbolone are not dietary ingredients; that Super DMZ RX 2.0 was a drug because its intended use was to affect the structure or function of the human body; and it was a new drug that lacked the requisite FDA-approval.   Id. ¶ 40.   Ample evidence cited in the Affidavit showed probable cause that this product was still for sale, was being manufactured for Blackstone Labs at a nearby facility (referred to as VBS Laboratories), and that Blackstone Labs had continued selling the product notwithstanding a recall by a manufacturer.   Id. ¶¶ 41-47, 85, 114-15.   In addition, an undercover buy from an online retailer shown to purchase products from Blackstone Labs confirmed the existence of the designer steroid dimethazine in the Super DMZ RX 2.0 product.   At the same time, testing showed that a second active ingredient listed on the label, methylstenbolone, was apparently not present in the tested bottle, showing further evidence of FDCA violations.   See 21 U.S.C. §§ 343(a)(1); 352(a)(1).

Where the Super DMZ RX 2.0 allegations standing alone provided sufficient probable cause to support issuing the warrant, as do the allegations of mail and wire fraud, the Affidavit cannot be insufficient.   Where the defendants failed to challenge or even mention four crimes supported by probable cause (FDCA violations with Super DMZ, mail fraud, wire fraud and

conspiracy to commit those offenses), the defendants have obviously failed to meet the standard for a <u>Franks</u> hearing.  <u>See</u> <u>Cross</u>, 928 F.2d at 1041.  The motion should be denied.

### III. Defendants' Claims of Intentional or Reckless Misleading Statements are Inaccurate, Misleading, and Lack a Legal Basis

Were the Court to reach the substance of the defendants' claims, the Motion still fails as it is unsupported by the facts and the law such that the defendants fail to make a preliminary showing, much less a substantial one supporting a <u>Franks</u> hearing.  <u>See</u> <u>Gamory</u>, 635 F.3d at 490.  Scrutiny of the defendants' claims makes clear that the Affidavit contained nothing misleading, and defendants' have failed for a second time to meet their burden in requesting a <u>Franks</u> hearing.

#### 1. The Affidavit Did Not Misstate the Legal Status of a Warning Letter

The defendants claim that the Affidavit misstates the legal status of an FDA Warning Letter by calling them "formal Warnings" or a "formal Warning Letter."  Def. Mot. at 3-4.  The word "formal" in plain English means "done in due or lawful form."  Merriam-Webster's Dictionary (available at www.merriam-webster.com/dictionary/formal).  The defendants conclude this was an intentional misstatement because FDA has not engaged in formal rulemaking with regards to the ingredient (DMBA) identified in the Warning Letter received by Blackstone Labs.  Def. Mot. at 3-4.  But the Affidavit does not claim that a Warning Letter is a final agency action.  The defendants' claim "that without a formal rule, there cannot be a formal warning" is simply rhetoric, not a legal conclusion.  <u>See</u> <u>id.</u> at 3.  An FDA Warning Letter constitutes official, but not final agency action.   Chapter 4: Advisory Actions, FDA Regulatory Procedures Manual (June 2021), at 18 (available at www.fda.gov/media/71878/download) (last accessed Oct. 3, 2021).  FDA typically issues Warning Letters on letterhead and they are "issued by" a program office director,

division director, or higher agency official.[4]  Id. at 20.  For a law enforcement agent to call official correspondence a "formal warning" is not a misstatement, much less an intentional attempt to mislead a judge.  The use of the word "formal" in this context was neither material nor recklessly misleading.

The defendants also argue that the Affidavit "misled Judge Matthewman in stating that FDA Warning Letters constituted notice of legal violations," while citing to the public FDA Regulatory Procedures Manual.  Def. Mot. at 3.  Their claim actually contradicts the FDA Regulatory Procedures Manual which states that "Warning Letters are issued to achieve voluntary compliance and to establish prior notice," and "are issued only for violations of regulatory significance." FDA Regulatory Procedures 4-4-1 (June 2021) at 3.  It is correct that "FDA does not consider Warning Letters to be final agency action on which it can be sued."  Id. at 4.  But defendants' argument relies on fly-specking by assuming - without basis - that a law enforcement agent meant "final action under the Administrative Procedures Act" when she used a common word to refer to official government action.

Here, the Warning Letter Blackstone Labs received from FDA is both an allegation of substantive violations by the agency tasked with enforcing the FDCA and also evidence of defendants' intent to violate the FDCA.  The Warning Letter stated that Blackstone Labs was selling a product in violation of the law.  In its written response to the agency, Blackstone Labs claimed to cease all distribution of the product.  Where the Affidavit presented evidence that the

---

[4] See Debernardis v. IQ Formulations, LLC, 942 F.3d 1076, 1082 (11th Cir. 2019) (reversing the grant of a motion to dismiss for lack standing to sue over products adulterated with DMBA where FDA sent warning letters to 14 companies); Godelia v. Doe 1, 881 F.3d 1309, 1319, n.1 (11th Cir. 2018) (noting in a product liability suit that an FDA Warning Letter identified violations of federal regulations); United States v. Endotec, Inc., 563 F.3d 1187, 1200-201 (11th Cir. 2009) (discussing relevance of Warning Letters to an FDA injunction).

company distributed products containing DMBA even after assuring FDA it would not do so, the defendants' strained interpretation of the agent's assumed intent in using the word "formal" cannot materially affect the probable cause determination.

**2. The Affidavit Was Not Misleading in Describing NAC as a Drug**

The defendants argue that the Affidavit was intentionally or recklessly misleading for categorizing NAC as either a drug or new drug. Def. Mot. at 5 (citing Affidavit at 28-29). FDA's public database of drug approvals contains information indicating that NAC was approved as a drug in 1963, well before the 1985 date stated in the affidavit. Many supplements to that application were submitted thereafter, including one listed with an "action date" of 1985. "Drugs@FDA: FDA-Approved Drugs" (acetylcysteine) (available at: www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=013601#collapseApproval) (last accessed on Oct. 3, 2021).[5] This statement in the Affidavit cannot be intentionally or recklessly misleading because the drug was originally approved even earlier than claimed in the Affidavit. In addition, the facts alleged about NAC in the Affidavit are consistent with a 2010 FDA letter that identified NAC as a drug approved in 1985, and rejected its use as a new dietary ingredient.[6]

The defendants base their claim of misconduct on a different letter from the FDA published more than a year *after* the Affidavit in 2018. The letter described NAC as a nutritional substance. Regardless of whether this letter is accurate, the Affidavit cannot be intentionally or recklessly

---

[5] Acetylcysteine (a synonym for NAC) is the generic name for the drug Mucomyst, which was approved by the FDA in 1963.

[6] FDA subsequently stated in a 2020 warning letter that "NAC products are excluded from the dietary supplement definition. . . NAC was approved as a new drug. . . on September 14, 1963. FDA is not aware of any evidence that NAC was marketed as a dietary supplement or as a food prior to that date." E.g., Warning Letter LES Labs (July 23, 2020) (available at www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/les-labs-593764-07232020).

misleading because information published after the Affidavit was sworn.  The Affidavit was not misleading, and in any event, striking the paragraphs about NAC from the Affidavit would not materially affect probable cause.

### 3.   The Affidavit Accurately Described the Ingredients Ostarine and DMAA

The defendants' erroneously claim that the Affidavit falsely described certain ingredients as "illegal" because defendants claim that they were not the subject of "settled law."  Def. Mot. at 5-7.   Whether the products in question were sold in violation of the FDCA requires a factual determination, applying facts to the law, not a legal conclusion.  The Affidavit alleged that products containing ostarine were not dietary supplements "because ostarine is the subject of substantial clinical investigation which have been made public."  Affidavit ¶ 87.  The defendants do not (and cannot) dispute this fact.  The defendants even concede that a publicly available Warning Letter regarding ostarine had been issued in 2014, Def. Mot. at 6 n.6, and that FDA issued a Public Notice warning against ingredients like ostarine in body building products in February 2017, roughly contemporaneous with the search, id. at 5, n.5.  It defies common sense to ask the Court to assume that the Affidavit was only based on publicly available information from FDA's website, rather than consultations with FDA experts.   The assertion that Blackstone ostarine products are unapproved new drugs cannot be intentionally or recklessly false when they are in agreement with scientific and legal positions communicated by FDA to the public.

The defendants next claim the Affidavit was intentionally misleading for stating that DMAA "is an unsafe dietary ingredient, an adulterated ingredient, and/or an adulterated food." Def. Mot. at 6.  However, the Affidavit did not rely on a conclusion that DMAA is not a dietary ingredient.  The Affidavit clearly states "Even if DMAA were a dietary ingredient, it would be a new dietary ingredient subject to premarket notification.  As of January 26, 2017, Blackstone Labs

had not submitted premarket notification for DMAA. Therefore, even if DMAA were a dietary ingredient, Dust Extreme would be adulterated under 21 U.S.C. §§ 342(f)(l)(B) and 350b(a)." Affidavit at ¶ 96.

The defendants claim that court challenges to FDA's regulation of ostarine and DMAA in other jurisdictions meant that these ingredients were not subject to "settled law," and therefore the Affidavit's factual allegations were reckless or intentionally false. Def. Mot. 6-7.  The defendants also claim that a December 2016 order by "Ninth Circuit Judge Real[] noted that FDA had failed to make a final determination as to whether Ostarine was a 'new drug' or 'illegal.'" Id.  Although their motion fails to cite to the case, the defendants' quotation is in fact from a district court opinion on primary jurisdiction. Nutrition Distribution v. Ironmag Labs, No. CV 15-8233-R, 2016 WL 10591320 (C.D. Cal. April 6, 2016) rev'd and remanded, 723 F. App'x 397 (9th Cir. 2018). Notably, the Ninth Circuit reversed that decision in an unpublished decision, and remanded it to consider whether FDA had provided expert advice that would be helpful to a decision on ostarine, and noted that "under the primary jurisdiction doctrine, the agency's guidance need not be given in connection with formal proceedings or as part of a final determination." Nutrition Distribution, LLC v. IronMag Labs, LLC, 723 F. App'x 397, 398–99 (9th Cir. 2018).

The defendants next misleadingly cite another case about DMAA.  At the time of the Affidavit, FDA's position was clearly that products containing DMAA were sold in violation of the FDCA, and a federal judge in 2013 had approved a warrant for in rem forfeiture in another district based on FDA's assertions.  Warrant, United States v. Quantities of Finished & In-Process Foods, No. 1:13-CV-3675-WBH, ECF No. 2 (N.D. Ga. Nov. 8, 2013).  While the owner of that seized DMAA filed suit to challenge FDA's allegations and was still fighting the seizure, there was no reason to believe at the time of the Affidavit that the court's probable cause determination

was wrong.[7]  See United States v. Quantities of Finished & In-Process Foods, No. 1:13-CV-3675-WBH, 2017 WL 4456903, at *4-5 (N.D. Ga. Apr. 3, 2017) (dismissing challenge to FDA's determination).  Ironically, the litigation that the defendants seek to rely on resulted in a grant of summary judgment for the FDA because "products for human consumption containing DMAA are adulterated foods under the FDCA and subject to seizure," which was followed by an Eleventh Circuit decision holding that DMAA was not generally recognized as safe.  Id.; United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods, 936 F.3d 1341, 1350 (11th Cir. 2019), cert. denied, 141 S. Ct. 626 (Oct. 19, 2020).

Where the Affidavit was based on "information obtained from other government agents" (e.g., scientific experts whose opinions supported the judicially-approved seizure warrant), the Affidavit's factual statements about ostarine and DMAA cannot have been intentionally misleading, and were in fact accurate.  See Affidavit, ¶ 5.

### 4.   The Defendants Misstate the Affidavit's Allegations on Misbranding

The defendants also claim that the Affidavit falsely describes the product Brutal 4ce as misbranded.  The defendants' theory is that there was no final agency action deeming the active ingredients in those products as illegal.  Def. Mot. at 8-9.  This argument misrepresents or misunderstands the Affidavit.  This product was misbranded *because it contained active ingredients not listed on the label.*  Affidavit ¶ 67, 75.  Failure to include an active ingredient on a label causes the product to be misbranded because its labeling is false or misleading, in violation of the FDCA, and the Affidavit stated so accurately. 21 U.S.C. §§ 343(a)(1); 352(a)(1) (a food,

---

[7] Put another way, the defendants are arguing that the Affidavit is intentionally misleading simply because a supplement manufacturer filed a lawsuit disputing FDA experts' scientific conclusions.

including a dietary supplement, is misbranded if its labeling is false or misleading in any particular).

### 5. The Affidavit Does Not Misstate that Picamilon is Not a Dietary Ingredient

The defendants claim that the affidavit is intentionally misleading because of a purported discrepancy between the statute and one paragraph in the Affidavit.  Def. Mot. at 9.  Contrary to defendants' argument, the Affidavit did not misleadingly omit a key portion of the relevant statute. The Affidavit cited the relevant statute in full, Aff. ¶ 19, and noted that FDA had issued Warning Letters to five companies marketing picamilon as a dietary ingredient, because picamilon does not meet the statutory definition of a dietary ingredient, id. at ¶ 101.  The defendants make much of the Affidavit's description in paragraph 102 of what FDA has "publicly stated" about picamilon, which did not include the word "combination."   Def. Mot. at 9.  There is no omission because the same affidavit cites the statute in full.  See Order, ECF No. 334 at ¶ 10 ("Fly-specking the affidavit for instances where the affidavit could have been phrased differently does not warrant any relief."). In any event, a Franks hearing is unnecessary when the reviewing court can simply consider whether the additions suggested by the defendant to the affidavit would preclude a finding of probable cause.  See Kapordelis, 569 F.3d at 1309 (citing Novaton, 271 F.3d at 987).  Indeed, "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Madiwale, 117 F.3d at 1327 (citation omitted).  If the Court adds the word "combination" as requested by the defendants, the Affidavit still contains more than enough evidence to support probable cause.

### 6. This Court Already Ruled the Affidavit Did Not Misrepresent the Recalls

The defendants claim, for the second time, that the Affidavit made a "knowingly incorrect assertion" that Blackstone was adequately put on notice of a recall of their product Super DMZ

RX 2.0.  Def. Mot. at 11.  The Court rejected this exact argument in the 2020 motion to suppress. Order, ECF No. 334 at 3 ("Judge Matthewman . . . would have been sophisticated enough to understand that it was alleged that Blackstone was selling after the recall, and not in spite of learning of the recall.").

The defendants' renewed claim is based on the following inaccurate statement: "the Affiant was undoubtedly aware that Blackstone Labs never received a recall notice."  Def. Mot. at 11. This unsupported allegation is doubly false, first because it would have been impossible to have been certain Blackstone Labs did not receive a recall notice from their manufacturer, and second because evidence produced by Blackstone  Labs now confirms that Blackstone Labs, Singerman and Braun *were* aware of the specific recalls on March 13, 2014, one day after the initial recall. As the Court ruled eighteen months ago, this "language was not false."  ECF No. 334 at 9, ¶ 9.

### 7.   Defendants' Arguments about Formal Rulemaking Lack A Legal Basis

The defendants erroneously claim that the affidavit recklessly described certain products as adulterated because they had not yet been subject to a final agency action or regulation.  Def Mot.  8-9.  This argument shares a theme with defendants' other claims – the incorrect legal theory that FDA cannot enforce the FDCA without "final determination" or "final agency action" regarding a specific ingredient.  The Eleventh Circuit firmly rejected this argument that formal rulemaking was a prerequisite to enforcement action under the FDCA in a case cited by the defendants, in which the court upheld the government's *in rem* forfeiture of FDA-regulated products.  United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods, 936 F.3d 1341 (11th Cir. 2019).  "[I]t is 'well established' that 'agencies have discretion to choose whether to proceed by rulemaking or adjudication.'"  Id. at 1351 (quoting RTC Transp.

Inc. v. I.C.C., 731 F.2d 1502, 1505 (11th Cir. 1984)).[8]  There is no legal requirement that FDA undertake rulemaking to establish probable cause that a product violates the FDCA.  Nor is there any such requirement to do so prior to the institution of criminal proceedings regarding violative products.  Congress left the choice of enforcement methods to FDA's discretion.  Heckler v. Chaney, 470 U.S. 821, 835 (1985) (noting that FDCA enforcement provisions "commit complete discretion to [FDA] to decide how and when they should be exercised").  This is simply a decision that the agency makes between case-by-case enforcement and taking rulemaking action.  Both tools are available to FDA.  See Heckler, 470 U.S. at 835.

Lastly, the defendants point to this Court's recent decision in Quidera v. Blackstone Labs, where the Court dismissed a class action suit based on an application of the primary jurisdiction doctrine.  No. 20-CV-80898, 2021 U.S. Dist. LEXIS 44022, at *6-7 (S.D. Fla. Mar. 5, 2021).  In Quidera, the Court concluded that the issue of deciding whether a chemical is a dietary ingredient is "best left to the FDA."  Id. at *9 (citations omitted).  In this case, the FDA determined that certain products violated the law, were a risk to consumers, and merited enforcement - a matter this Court stated is within the agency's expertise.  The defendants seek to extend the Quidera decision to suggest that determining the "legal status" of an ingredient is so difficult as to bar criminal prosecution on due process grounds.  This argument both contradicts binding authority, e.g., Heckler, 470 U.S. at 835, and implies, again with no basis, that every prior FDCA criminal prosecution without a prior final agency rule was unconstitutional.  The ample case law affirming FDCA criminal convictions confirms that defendants' interpretation cannot be correct.

---

[8] Accord Warning Letters, FDA Regulatory Procedures Manual  ("Also available to the agency are enforcement strategies which are based on the particular set of circumstances at hand and may include sequential or concurrent FDA enforcement actions such as recall, seizure, injunction, administrative detention, civil money penalties and/or prosecution to achieve correction.").

## **CONCLUSION**

Even if all of the language challenged by the defendants were struck, the supporting Affidavit sets forth abundant evidence of probable cause.   In any event, there were no intentionally or recklessly false statements in the Affidavit.   Further, the motion should be dismissed as untimely because it was filed almost eighteen months after the Court's motions deadline with no good cause and it merely retreads the same ground as a prior motion.   For the foregoing reasons, the government respectfully asks that this Court deny Blackstone Labs' motion to suppress.

Dated: October 4, 2021

<div style="margin-left:40%">

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

GUSTAV W. EYLER
DIRECTOR
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

     */s/ Alistair Reader*
ALISTAIR F. A. READER
Court ID A5502377
Trial Attorney
STEPHEN J. GRIPKEY
Court ID A5502620
Trial Attorney
JOHN W. BURKE
Court ID A5501294
Assistant Director
U.S. Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, D.C. 20044-0386

</div>

Alistair.F.Reader@usdoj.gov
(202) 353-9930
Stephen.Gripkey@usdoj.gov
(202) 307-0048
Josh.Burke@usdoj.gov
(202) 353-2001

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I electronically filed the foregoing document with

the Clerk of the Court, suing the CM/ECF system, which will send a notice of electronic filing to

all counsel of record.

_/s/ Alistair Reader_____
Alistair Reader
U.S. Department of Justice

21