**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 19-cr-80030-WPD**

**UNITED STATES OF AMERICA**

vs.

**BLACKSTONE LABS, LLC,**

**Defendant.**
_____/

## FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

The United States of America and **BLACKSTONE LABS, LLC** (the "defendant"), agree that were this case to proceed to trial, the United States would prove the following facts beyond a reasonable doubt. They further agree that these are not all of the facts that the United States would prove if the case proceeded to trial, but are sufficient to prove the charges of: conspiracy to defraud the Food and Drug Administration and to commit mail and wire fraud (Count 1), introduction of unapproved new drugs into interstate commerce (Count 3) and conspiracy to manufacture and distribute a controlled substance (Count 4).

### Summary

The defendant is a Florida corporation that distributed products labeled as dietary supplements, many of which were illegal under federal law. In 2012, CEO Aaron Singerman ("Singerman"), and president Phillip Braun ("Braun") and a co-conspirator incorporated the defendant for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold.

The defendant, through its executives and employees, knowingly conspired to defraud the FDA and to defraud consumers, in violation of Title 18, United States Code, Sections 371, 1341, and 1343. The defendant, through its executives and employees, knowingly sold and directed

others to sell unapproved new drugs, with the intent to defraud or mislead, in violation of the Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Sections 331(d), 355(a), 333(a)(2), and Title 18, United States Code, Section 2. From in or around December 2014, through in or around September 2016, in the Southern District of Florida, and elsewhere, the defendant also knowingly conspired and agreed with others to manufacture and distribute controlled substances, namely, multiple anabolic steroids, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E), and 846.

In August 2012, the defendant was founded by Singerman, Braun, and a co-conspirator to sell a product to consumers, Super DMZ RX 2.0, which contained 17b-hydroxy 2a, 17b-dimethyl 5a-androstan 3-one azine, also known as dimethazine or dymethazine and 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one, also known as methylstenbolone, each of which was a synthetic steroid. Singerman, Braun and others frequently referred to these chemicals and other similar chemicals as "designer steroids" or "prohormones." The defendant's executives and employees knew dimethazine and methylstenbolone were the two key ingredients in the product and that Super DMZ RX 2.0 was marketed as promoting muscle growth. For a product like Super DMZ RX 2.0 to be a legally labeled a "dietary supplement" under the FDCA, it had to contain legal "dietary ingredients." The defendant knew that dimethazine and methylstenbolone were synthetic substances designed to build muscle and were not dietary ingredients as defined in the FDCA. The defendant further knew that Super DMZ RX 2.0 was being illegally marketed as a dietary supplement.

In March 2014, the defendant received and executives read FDA enforcement reports stating that a manufacturer of the defendant's products had conducted a recall of the defendant's steroid products, Methadrol and Super DMZ RX 2.0. The defendant, through its executives and

2

employees, knew, as stated in the FDA enforcement reports, that the manufacturer recalled the products because they were unapproved new drugs, but the defendant continued selling the products.

On or about September 26, 2014, with intent to defraud or mislead, the defendant caused to be introduced into interstate commerce 400 bottles of Super DMZ RX 2.0, an unapproved new drug. That shipment was sent from the Southern District of Florida to Arkansas. In an email dated September 26, 2014, Braun instructed that the shipment "must go out today!"

The defendant also introduced, marketed, and distributed additional new steroid products, including Alpha-1 Max, which contained another designer steroid, methyl-1-etiocholenolol. As the defendant grew, it hired dozens of additional employees, including James Boccuzzi ("Boccuzzi"). Boccuzzi was experienced in selling products marketed as dietary supplements and worked as a manager of wholesale sales, ultimately becoming the defendant's director of sales. Boccuzzi's job was to sell the defendant's products to retail stores or distributors, including anabolic steroids and unapproved new drugs.

The defendant advertised illegal products on the internet and through email and social media, falsely telling customers that the company's products were legal and were dietary supplements. Email advertising was a major component of the defendant's sales, and the marketing emails repeatedly falsely claimed that, "All our products are manufactured in FDA approved, registered, and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines." The defendant, through its executives and employees, knew that these statements to consumers were false, and were intended to convince consumers to buy the defendant's products. The defendant's advertisements also falsely stated that, "Our pro-anabolic compounds are all third party independently lab tested before

3

encapsulation" when the defendant knew that their manufacturers, including Anthony Ventrella, were not testing the raw ingredients before encapsulation.

### The Defendant Conspired to Manufacture Illegal Products for Blackstone Labs, LLC and Other Corporate Entities

In or around 2014, the defendant, through its executives and employees and other co-conspirators began manufacturing Blackstone products through multiple corporate entities operating out of a warehouse close to the defendant's offices in Boca Raton. In early 2014, Singerman contacted a friend, Anthony Ventrella ("Ventrella"), about working for a new business to manufacture products for the defendant and other companies. The money to begin the new manufacturing company would come from Braun, Singerman, and a third individual owner.

Braun, Singerman, and a third individual incorporated the company Fight Pharm LLC as a Florida limited liability corporation on or about April 16, 2014. Although Braun, Singerman, and the third individual owner were the true owners of the company, Anthony Ventrella agreed to function as the nominal owner. Ventrella's name appeared on publicly available records, even though Ventrella did not truly own or control the company. In annual corporate reports filed with the State of Florida, Ventrella was listed as the chief executive officer of Fight Pharm. Concerning Fight Pharm's important business activities, Ventrella communicated regularly with and received direction from the Braun and Singerman and, to a lesser extent, the third individual owner.

Fight Pharm manufactured and distributed products labeled as dietary supplements for the defendant and also under Fight Pharm's own brand names. These included products that were illegal to distribute under federal law because they were unapproved new drugs and/or controlled substances.

In or around November 2015, Braun, Singerman, and Ventrella established another Florida limited liability corporation to manufacture dietary supplement products. VBS Laboratories, LLC

4

("VBS"), which stood for the initials of the three owners, Ventrella, Braun, and Singerman. VBS also manufactured products labeled as dietary supplements for the defendant and other companies. These also included products that were illegal to distribute under federal law because they were unapproved new drugs and/or controlled substances. Fight Pharm and VBS were established, at least in part, to conceal the defendant's, Braun's, and Singerman's involvement in the illegal manufacturing and sales of unapproved new drugs and/or controlled substances.

### The Designer Anabolic Steroid Control Act

On December 18, 2014, the Designer Anabolic Steroid Control Act of 2014 ("DASCA") was signed into law and took effect. Among other things, DASCA significantly expanded the definition of "anabolic steroid" in the Controlled Substances Act ("CSA"), of Title 21 of the United States Code. After the passage of DASCA, a "controlled" anabolic steroid included substances listed in the CSA, and also included any drug or substance derived from, or with a chemical structure substantially similar to, one or more listed anabolic steroids so long as such drug or substance: (a) was created or manufactured with the intent of producing a drug or substance that promotes muscle growth or causes a pharmacological effect similar to that of testosterone; or (b) has been, or is intended to be, marketed or promoted in any way that suggests that consuming the drug or substance will promote muscle growth or any other pharmacological effect similar to that of testosterone.

The defendant and its co-conspirators were aware of DASCA even before it became law, and knew that DASCA would negatively impact their business and their industry. Prior to the law's enactment in December 2014, the defendant received a proposal from a lobbying firm, which included a proposed plan to stop or delay the enactment of DASCA. The lobbying proposal described the bill's effect as "expand[ing] the definition of anabolic steroids in the Controlled

5

Substances Act (CSA) to include 25 specific substances and any drug or hormonal substance that is derived from or has a chemical structure substantially similar to, one or more of the listed anabolic steroids." Supplement retailer Leonard Shemtob ("Shemtob") emailed Singerman a copy of the lobbying proposal, and Braun, Singerman, Shemtob and the lobbying firm joined at least one telephone call during which they discussed the substance of DASCA. Braun and Singerman also discussed DASCA with a silent owner of the defendant, who emailed the defendant and Singerman information on or about December 22, 2014, explaining how DASCA applied to their designer steroid products, and stating that the defendant must stop selling those products and destroy remaining products in their inventory by sending them to a medical disposal company.

After DASCA took effect on December 18, 2014, the defendant, Braun, Singerman, and Boccuzzi continued to sell their designer steroid products, Super DMZ and Alpha-1 Max, but increasingly did so by selling the products through Ventrella's companies, which manufactured and distributed the product on the defendant's behalf as a Fight Pharm product, using a similar product name.

After DASCA went into effect as law, the defendant, Braun, Singerman, and Boccuzzi sold off the remaining stock of products understanding that the steroids in products such as EpiSmash, Halo Extreme, and Super Trenabol, were now listed as controlled substances under the CSA. These products were labeled and intended to include the anabolic steroids epistane, halodrol, and trendione, respectively, which were listed as controlled substances after DASCA became law. Sales of these products by the defendant, Braun, Singerman, and Boccuzzi continued into 2015 even after the defendant required employees to sign a document acknowledging that such listed products were "Banned Prohormones."

The defendant, through its executives and employees knew that, even after December 18, 2014, Super DMZ contained the same ingredients, methylstenbolone and dimethazine, and continued to be marketed as a muscle growth product. Executives and employees knew that Alpha-1 Max contained methyl-1-etiocholenolol, and continued to be marketed as a muscle growth product. Executives and employees also knew that methylstenbolone and dimethazine and methyl-1-etiocholenolol were derived from or substantially similar to other listed anabolic steroids, and therefore, were anabolic steroids and illegal under federal law. In fact, the superdmz.com website, and later the defendant's website, included structural diagrams of these chemicals and marketing materials explaining how the chemicals were extremely similar to well-known anabolic steroids. The defendant's employees, including Boccuzzi, were expected to be familiar with the Blackstone website.

The defendant's executives and employees openly sold Super DMZ and Alpha-1 Max until at least March 2015. The defendant then removed the products from its website and Braun and Singerman instructed salespersons to tell consumers that the products were discontinued. However, the defendant, through its executives and employees, continued to sell the steroid products to wholesale customers directly and through Fight Pharm and VBS.

The defendant, through its executives and employees, continued selling Super DMZ and Alpha-1 Max products to trusted retailers, in particular Justin Smith ("Smith"), the owner of a Batesville, Arkansas online supplement retailer. Even while making sales of these products, the defendant's employees were instructed to tell retail customers that Super DMZ and Alpha-1 Max were illegal and unsafe. In particular, in August and September 2016, Braun arranged several bulk sales of Super DMZ to Smith. To conceal these sales, Braun instructed the defendant's then-vice president, David Winsauer, to create invoices that listed the Super DMZ products as

7

"miscellaneous" to avoid listing the product by name. Braun then emailed the invoices to Smith, and when the sales were confirmed, Ventrella would manufacture and ship the Super DMZ products to Smith on the defendant's behalf.

Between December 18, 2014, and February 2017, the defendant, Braun, Singerman, Boccuzzi and other members of the conspiracy caused to be manufactured and distributed into commerce thousands of 60-capsule bottles that they knew contained methylstenbolone, dimethazine, and/or methyl-1-etiocholenolol in violation of the Controlled Substances Act. These products included Super DMZ RX 2.0, Alpha-1 Max, Fight Pharm versions of these products, and other product names.

Among other things, the defendant's executives and employees helped conceal their roles in Fight Pharm and VBS so that Ventrella could manufacture products labeled as dietary supplements that were unlawful under the FDCA and the CSA. Moreover, the defendant's executives and employees knew that Fight Pharm, and its successor companies, fraudulently imported raw ingredients for their products from China because they could not lawfully purchase the same ingredients from within the United States without attracting the scrutiny of the FDA.

When the defendant could no longer publicly sell its steroid products, the defendant, Braun, and Singerman introduced a new category of products containing selective androgen receptor modulators, or SARMs, which also were sold in violation of the FDCA. The active ingredients in these products were not dietary ingredients, but were research chemicals under clinical investigation to build muscle. In 2015, the defendant received a Warning Letter from the FDA warning that the defendant's product, Angel Dust, which contained the stimulant Amp Citrate, aka DMBA, was being unlawfully marketed as a dietary supplement and that the defendant should

8

immediately cease distribution or risk enforcement. The defendant, Braun, and Singerman sold all of their remaining product, rather than immediately stopping the distribution.

The defendant's executives and employees disregarded consumer injury complaints. The defendant's executives and employees did not notify the FDA of such complaints, even when required by law.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

GUSTAV W. EYLER
DIRECTOR
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

Date: 11/19/2021

By: ALISTAIR F. A. READER
Trial Attorney
JOHN W. BURKE
Assistant Director
STEPHEN J. GRIPKEY
Trial Attorney
DAVID A. FRANK
Senior Litigation Counsel

Date: 11-19-2021

By: Arthur W. Leach, Esq.
Michael T. Davis, Esq.
Susan Dimitrovsky, Esq.
Attorneys for Defendant

Date: 11/18/2021

By: Authorized Representative
BLACKSTONE LABS, LLC
Defendant

9